# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KELLY BOLDING, and MICHAEL
MANFREDI, individually and on behalf of a class
of all others similarly situated,

        Plaintiffs,

    v.

BANNER BANK, a Washington Corporation,

        Defendant.

No. 2:17-cv-0601 RSL

PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS
FOR PRODUCTION TO DEFENDANT
BANNER BANK

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

bank branch(es) where each works or worked, job title, **and** most recent contact information, including telephone, mailing address **and** email address for each.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. A:** Produce all **documents**, which **relate to**, support, refute, **or** memorialize **Defendant's** answer to the previous interrogatory, including but not limited to, the complete **compensation, time and performance records** for each identified employee (including all documents reflecting wages, commissions, and/or salaries paid by **Defendant** during each **MLO's** employment).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. B:** Produce the complete Outlook **or other** work-related calendars **and** schedules for all **persons** identified in the previous interrogatory.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. C:** Produce all **documents** reflecting **or** constituting time records for all **Mortgage Loan Officers** identified in the previous interrogatory, including all time records, timesheets, time cards, **or** other records submitted by each MLO, **and** entries of overtime worked (including any **documents** other than timesheets that reflect the number of hours worked by each **MLO** during his/her employment with **Defendant**).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. D:** Produce all **documents** which show the days, start **and** stop times **and/or** daily **and** weekly number of hours worked by each **Mortgage Loan Officer** identified in answer to the previous interrogatory.

PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page 9

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

support, refute, **or** memorialize **Defendant's** answer to the previous interrogatory, including all **documents** reflecting the hours worked in the branch for each **Mortgage Loan Officer**.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. I:** Produce all employee handbooks from April 17, 2014 to present.

**RESPONSE:**

**INTERROGATORY NO. 3:** **Identify Defendant's** methods for tracking, recording **and** calculating the total hours worked by **Mortgage Loan Officers**, including but not limited to, all policies **and** procedures **relating to** tracking **and** recording overtime.

**ANSWER:**

**REQUEST FOR PRODUCTION NO. J:** Produce all **documents**, which **relate to,** support, refute, **or** memorialize **Defendant's** answer to the previous interrogatory, including but not limited to, policies, procedures, emails to **Plaintiffs**, managers, **or** any other **person** regarding **your** time keeping procedures.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. K:** Produce all **documents** reflecting **Defendant's** policies **and** procedures regarding job training **relating to hours**, compensation **and** overtime for non-exempt employees, rate of overtime pay, the FLSA, attendance, work place rules, time correction, scheduling, pay practices, clocking in and out, time used for meal **or** rest breaks, discipline, **and** code of conduct.

**RESPONSE:**

PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page 11

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

**REQUEST FOR PRODUCTION NO. KK:** Produce all **documents**, which **relate to**, support, refute, **or** memorialize **Defendant's** answer to the previous interrogatory, including but not limited to, all **documents** reflecting time submissions by **Mortgage Loan Officers**, including through the system identified above, all **documents** reflecting submissions rejected by managers, resubmissions by employees, **or** late **or** delayed payment, policies, procedures, emails to **Plaintiffs**, **and** any **communications** (including emails) reflecting these procedures, **and Mortgage Loan Officer** time submissions.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. LL:** Produce all personnel policies **or** Human Resources **documents** provided to managers regarding employee time keeping, **and** adjusting employees' time from what was reported on the system from April 17, 2014 to present.

**RESPONSE:**

**INTERROGATORY NO. 8: Identify** all trainings relating to recording **and** payment of overtime for **Mortgage Loan Officers**, including but not limited to, the date **and** location of each such training, the employees in attendance, who conducted the training, the overall purpose of the training, topics covered, **and** any materials distributed. **Your** answer should include all online trainings of employees (such as that referenced in the Declaration of Kathryn Hawley, ¶9, *Dkt.* 21-5).

**ANSWER:**

**REQUEST FOR PRODUCTION NO. MM:** Produce all **documents**, which **relate to**, support, refute, **or** memorialize **Defendant's** answer to the previous interrogatory,

PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page 19

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

including but not limited to, all **documents**, materials, policies, procedures **and communications** (including email **communications**) relating to each training.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. NN:** Produce all presentation materials which mention overtime compensation for **Mortgage Loan Officers** in relation to any presentations made by any of **Defendant's** representatives (including but not limited to, managers, legal counsel, human resources personnel, administrative assistants, **or** any other person) from April 17, 2014 to present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. OO:** Produce all **documents or** memoranda reflecting unwritten payroll practice guidelines, record-keeping guidelines, directives, memoranda **or** other **documents** to supervisors **or** other managerial personnel employed by **Defendant** regarding the approval of the number of overtime hours worked by **MLOs** since April 17, 2014.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. PP:** Produce all other **documents** that contain instructions to **Mortgage Loan Officers** as to what constitutes work that must be recorded as "on-the-clock."

**RESPONSE:**

**INTERROGATORY NO. 9:** **Identify** each and every **communication** between Defendant and **Plaintiffs** since the filing of this suit on April 17, 2017 that **related to** or

PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page 20

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

DATED this 13th day of October, 2017.

THE BLANKENSHIP LAW FIRM, P.S.

By: _____
Scott C. G. Blankenship, WSBA No. 21431
Robin J. Shishido, WSBA No. 45926
Jordan A. Taren, WSBA No. 50066
The Blankenship Law Firm, P.S.
1000 Second Avenue, Suite 3250
Seattle, WA 98104
Telephone: (206) 343-2700
Facsimile: (206) 343-2704
Email:   sblankenship@blankenshiplawfirm.com
         rshishido@blankenshiplawfirm.com
         jtaren@blankenshiplawfirm.com

*Attorneys for Plaintiffs*

PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page 28

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

# EXHIBIT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KELLY BOLDING, and MICHAEL
MANFREDI, individually and on behalf of a
class of all others similarly situated,

Plaintiff,

v.

BANNER BANK, a Washington Corporation,

Defendant.

No. 2:17-cv-0601-RSL

BANNER BANK'S OBJECTIONS
AND RESPONSES TO
PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND
REQUESTS FOR PRODUCTION

Banner Bank objects and responds to Plaintiffs' First Set of Interrogatories and

Requests for Production of Documents as follows:

**RESPONSES TO ALL INTERROGATORIES AND DOCUMENT REQUESTS**

1.     **Privilege.**  Banner Bank objects to the discovery requests to the extent they seek

documents or information protected from disclosure by privileges and other protections from

production including, without limitation, the attorney-client privilege, the work-product

doctrine, joint-defense or common interest privilege, or any other constitutional, statutory,

common law or regulatory protection, immunity or proscription from disclosure.  Where

Banner Bank withholds documents or information under a claim of privilege or other protection

from production, Banner Bank will so indicate on a privilege log, except with respect to

privileged or work-product information generated after commencement of this action  Banner

Bank does not intend the inadvertent production of any privileged or protected documents or

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 1
4821-0650-5811v.11 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

individuals' rights to privacy under state and federal law. Banner Bank further objects to this Request as overbroad, unduly burdensome, and disproportionate to the needs of the case because it seeks every document that may "**relate to**, support, refute, **or** memorialize" the names, addresses, work location, compensation information, and other employment details of every putative class and collective member. That request is nearly boundless and the burden of producing every responsive document would far outweigh any benefit. Banner Bank further objects to this Request because Banner Bank and AWB's compensation, time, and performance records are stored across various different systems (some of which are archived) and retrieving the requested information from those systems for every putative class and collective member would be highly burdensome. Banner Bank further objects to this Interrogatory because it seeks documents protected by the attorney-client privilege and work-product doctrines.

Without waiving the foregoing objections, Banner Bank responds that it will produce Named Plaintiffs' MLO wage statements, time records, performance evaluations, written discipline, Incentive Compensation Plans, and spreadsheets showing Banner Bank's and AWB's calculations for their overtime owed on incentive pay from April 17, 2014, forward, to the extent that it locates those documents following a reasonably diligent search and inquiry.

**REQUEST FOR PRODUCTION NO. B:** Produce the complete Outlook **or** other work-related calendars **and** schedules for all **persons** identified in the previous interrogatory.

**RESPONSE:** Banner Bank objects to this Request as vague and ambiguous as to "schedules." Banner Bank further objects to this Request seeking documents regarding individual putative class and collective members as overbroad, unduly burdensome and disproportionate to the needs of the case, particularly at this early stage of the litigation when the Court has not decided whether to certify a class or collective, or if a class or collective is certified, the composition of that class or collective. *See generally* Resp. to All Interrogatories and Requests for Production ¶¶ 2–3. Banner Bank further objects to this Request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not likely to lead to the

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 6
4821-0650-5811v.11 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

discovery of admissible evidence on the grounds that it seeks information beyond MLOs

employed by Banner Bank and AWB. No Named Plaintiff worked at any other bank, and

therefore, Named Plaintiffs cannot represent MLOs who worked for other banks or seek

discovery about them. Banner Bank further objects to this Request as overbroad, unduly

burdensome, disproportionate to the needs of the case, and not reasonably calculated to lead to

the discovery of admissible evidence to the extent it seeks information beyond Banner and

AWB employees with the titles of Loan Officers, Mortgage Loan Officers, Residential

Lenders, and Residential Loan Officers. Those are the only job titles that performed the MLO

duties. Banner Bank further objects to this Request, which seeks confidential, personal

information, because the Interrogatory seeks to invade individuals' rights to privacy under state

and federal law. Banner Bank further objects to this Request, on the grounds that it seeks

confidential information regarding Banner Bank's business and its customers that Outlook

calendars may contain without regard to the information's relevance to the issues in this case.

Banner Bank further objects to this Request as overbroad, unduly burdensome, and

disproportionate to the needs of the case because it seeks voluminous data without regard to the

information's relevance to the issues in this case that would be highly time consuming to

retrieve from Banner Bank's active and archived databases and AWB's archived databases.

Without waiving the foregoing objections, Banner Bank responds that after a reasonable

search and inquiry, it was not able to locate Named Plaintiffs' Outlook calendars for the period

of April 17, 2014, forward. Banner Bank is willing to meet and confer regarding producing

Outlook calendar invitations since April 17, 2014, to the extent they are located in Named

Plaintiffs' email files that Banner Bank is able to obtain after a reasonably diligent search and

inquiry.


**REQUEST FOR PRODUCTION NO. C:** Produce all **documents** reflecting **or**

constituting time records for all **Mortgage Loan Officers** identified in the previous

interrogatory, including all time records, timesheets, time cards, or other records submitted by

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

Plaintiffs cannot represent MLOs who worked for other banks or seek discovery about them. Banner Bank further objects to this Interrogatory as overbroad, unduly burdensome, disproportionate to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond Banner Bank and AWB employees with the titles of Loan Officers, Mortgage Loan Officers, Residential Lenders, and Residential Loan Officers. Those are the only job titles that performed the MLO duties. Banner Bank further objects to this Interrogatory as overbroad, unduly burdensome, disproportionate to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence based on plaintiffs' definition of "identify." That definition purports to require Banner Bank to (among other things) identify every person who helped prepare a document, who received the document, and its location. Banner Bank further objects to this Interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks information beyond AWB and Banner Bank's timekeeping and overtime policies and procedures because the request seeks broad-ranging and duplicative information. Banner Bank further objects to this Request because it seeks AWB and Banner Bank's confidential business information.

Without waiving the foregoing objections, Banner Bank responds that AWB and Banner Bank required MLOs to record all hours worked accurately, including all overtime hours whether or not they had been preapproved. From April 17, 2014, forward, AWB required MLOs to record the start and end times of work periods. From April 17, 2014, to mid-2017, Banner Bank required MLOs to record their total hours worked each day. From mid-2017, forward, Banner Bank required MLOs to record the start and end time of their work periods. AWB and Banner Bank's timekeeping software then calculated the total hours worked based on the entries.

**<mark>REQUEST FOR PRODUCTION NO. J:</mark>** Produce all **documents**, which **relate to**, support, refute, **or** memorialize **Defendant's** answer to the previous interrogatory, including

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 16
4821-0650-5811v.11 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

but not limited to, policies, procedures, emails to **Plaintiffs**, managers, **or** any other **person** regarding **your** time keeping procedures.

**RESPONSE:** Banner Bank objects to this Request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence on the grounds that it seeks information beyond MLOs employed by Banner Bank and AWB. No Named Plaintiff worked at any other bank, and therefore, Named Plaintiffs cannot represent MLOs who worked for other banks or seek discovery about them. Banner Bank further objects to this Request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond Banner Bank and AWB employees with the titles of Loan Officers, Mortgage Loan Officers, Residential Lenders, and Residential Loan Officers. Those are the only job titles that performed the MLO duties. Banner Bank further objects to this Request as overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it seeks documents beyond AWB and Banner Bank's timekeeping and overtime policies, training materials, and procedures because no class or collective has been certified. Banner Bank further objects to this Request as overbroad, unduly burdensome, and disproportionate to the needs of the case because it seeks every document, including emails of all putative class and collective members and their managers, that may "relate to, support, refute, or memorialize" AWB and Banner Bank's timekeeping procedures. The burden of retrieving every document and email related to AWB and Banner Bank's timekeeping procedures far outweighs any benefit—particularly at this early stage in the case. Banner Bank further objects to this Request as overbroad, unduly burdensome, and disproportionate to the needs of the case because it seeks voluminous data that would be highly time consuming to retrieve from Banner Bank's active and archived databases and AWB's archived databases. Banner Bank further objects to this Request because it seeks AWB and Banner Bank's confidential business information.

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 17
4821-0650-5811v.11 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

Without waiving the foregoing objections, Banner Bank responds that it will produce Banner Bank and AWB's policies, procedures, and training materials regarding timekeeping procedures for MLOs from April 17, 2014, forward, to the extent it locates those documents after a reasonably diligent search and inquiry. Because these documents contain AWB and Banner Bank's confidential business information, Banner Bank will produce these documents within ten (10) days after the Court enters an appropriate protective order.

**REQUEST FOR PRODUCTION NO. K:** Produce all **documents** reflecting **Defendant's** policies **and** procedures regarding job training **relating to hours**, compensation **and** overtime for non-exempt employees, rate of overtime pay, the FLSA, attendance, work place rules, time correction, scheduling, pay practices, clocking in and out, time used for meal **or** rest breaks, discipline, **and** code of conduct.

**RESPONSE:** Banner Bank objects to this Request as vague and ambiguous as to "work place rules," "scheduling," and "pay practices." Banner Bank further objects to this Request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence on the grounds that it seeks information beyond MLOs employed by Banner Bank and AWB. No Named Plaintiff worked at any other bank, and therefore, Named Plaintiffs cannot represent MLOs who worked for other banks or seek discovery about them. Banner Bank further objects to this Request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond Banner and AWB employees with the titles of Loan Officers, Mortgage Loan Officers, Residential Lenders, and Residential Loan Officers. Those are the only job titles that performed the MLO duties. Banner Bank further objects to this Request as overbroad, unduly burdensome, and disproportionate to the needs of the case on the grounds that the Request call for the production of any documents reflecting policies and procedures regarding any job training "relating" to "hours, compensation and overtime for non-exempt employees, rate of overtime pay, the

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

because, among other things, the definition seeks every individual involved with the training, every email or other communication related to it, and every date or place on which it occurred. Banner Bank further objects to this Interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because reviewing Banner Bank and AWB's records to determine the date and location of each responsive training, the employees in attendance, and who conducted the training because that information is not stored in an easily accessible form for the entire period since April 17, 2014. Banner Bank further objects to this Interrogatory because it seeks AWB and Banner Bank's confidential business information.

Without waiving the foregoing objections and pursuant to Federal Rule of Civil Procedure 33(d), Banner Bank responds that it will produce Banner Bank and AWB training materials provided to MLOs regarding time recording and overtime from April 17, 2014, forward, to the extent that it locates such documents after a reasonably diligent search and inquiry. Because the requested documents contain AWB and Banner Bank's confidential business information, Banner Bank will produce these documents within ten (10) days after the Court enters an appropriate protective order.


**REQUEST FOR PRODUCTION NO. MM:** Produce all **documents**, which **relate to**, support, refute, **or** memorialize **Defendant's** answer to the previous interrogatory, including but not limited to, all **documents**, materials, policies, procedures **and communications** (including email **communications**) relating to each training.

**RESPONSE:** Banner Bank objects to this Request as vague and ambiguous as to "materials." Banner Bank further objects to this Request seeking documents regarding individual putative class and collective members as overbroad, unduly burdensome and disproportionate to the needs of the case, particularly at this early stage of the litigation when the Court has not decided whether to certify a class or collective, or if a class or collective is certified, the composition of that class or collective. *See generally* Resp. to All Interrogatories and Requests for Production ¶¶ 2–3. Banner Bank further objects to this Request as overbroad,

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

unduly burdensome, disproportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence on the grounds that it seeks information beyond MLOs employed by Banner Bank and AWB. No Named Plaintiff worked at any other bank, and therefore, Named Plaintiffs cannot represent MLOs who worked for other banks or seek discovery about them. Banner Bank further objects to this Request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it seeks information beyond Banner and AWB employees with the titles of Loan Officers, Mortgage Loan Officers, Residential Lenders, and Residential Loan Officers. Those are the only job titles that performed the MLO duties. Banner Bank further objects to this Request as overbroad, unduly burdensome, and disproportionate to the needs of the case because it seeks (among other things) (a) every document that may "relate to, support, refute, or memorialize" trainings attended by every putative class and collective member regarding timekeeping and overtime; and (b) every communication related to MLO training regrading timekeeping and overtime. The significant burden of locating and producing every such document—including responsive archived and unarchived emails—far outweighs any benefit. Banner Bank further objects to this Request as overbroad, unduly burdensome, and disproportionate to the needs of the case because Banner Bank and AWB's training records are stored across various different systems (some of which are archived) and retrieving the requested documents from those systems for every putative class and collective member would be highly burdensome. Banner Bank further objects to this Request because it seeks confidential business information.

Without waiving the foregoing objections, Banner Bank responds that it will produce Banner Bank and AWB's training materials provided to MLOs regarding time recording and overtime from April 17, 2014, forward, to the extent that it locates those training materials after a reasonably diligent search and inquiry. Because the requested documents contain AWB and Banner Bank's confidential business information, Banner Bank will produce these documents within ten (10) days after the Court enters an appropriate protective order.

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 58
4821-0650-5811v.11 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

commensurate benefit to the case.  Banner Bank further objects to this Request as overbroad and unduly burdensome based on Plaintiffs' definition of "identify," which purports to require Banner Bank to list, among other things, every individual involved with the withheld document, every email or other communication related to it, and every date or place on which it occurred.

DATED this 13th day of November, 2017.

Davis Wright Tremaine LLP
Attorneys for Defendant Banner Bank

By /s/ Ryan Hess
Kenneth E. Payson, WSBA #26369
Sheehan Sullivan Weiss, WSBA #33189
Ryan Hess, WSBA #50738
Laura-Lee Williams, WSBA #51358
1201 Third Ave, Suite 2200
Seattle, WA 98101-3045
Telephone: 206.622.3150
Fax: 206.757.7700
E-mail: kennethpayson@dwt.com
          sheehansullivanweiss@dwt.com
          ryanhess@dwt.com
          lauraleewilliams@dwt.com

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 90
4821-0650-5811v.11 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

# EXHIBIT  C

May 22, 2018

Ken Payson
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

      RE:    *Kelly Bolding and Michael Manfredi v. Banner Bank*
             U.S. District Court for the Western District of Washington
             2:17-cv-0601 RSL

Dear Mr. Payson,

      We write to you regarding both deposition scheduling and Defendant's deficient document production. With respect to deposition scheduling, we would like to continue discussions with you about scheduling the depositions of Rick Clark, Sarah Ward, Michael Manfredi, and Armando Ortiz, at a mutually agreeable time. We would also like to continue discussions about scheduling the second and third (respectively) depositions of Miranda Taylor and Kelly Bolding.

      With respect to document production, Plaintiffs served Defendant with their First Interrogatories and Requests for Production on October 13, 2017. Defendant responded on or about November 13, 2017. Defendant produced very few documents in response to Plaintiff's discovery requests. You advised via e-mail that Defendant was withholding additional documents pending agreement on a protective order. We had no further communications from Defendant regarding discovery until April 23, 2017, when Defendant served us with "placeholder" deposition notices for 35 opt-in FLSA Plaintiffs.

      On May 17, 2018, after discussions and e-mails between our offices about a protective order, depositions, and document production, Defendant disclosed additional documents that it had withheld from its original production. On May 18, Defendant disclosed two additional timekeeping documents.

      We have reviewed the documents Defendant disclosed to us on May 17 and 18. While we appreciate Defendant's disclosure of additional documents, Defendant's Answers and Responses to Plaintiff's Interrogatories and Requests for Production are still deficient in a number of ways. Deficiencies are described below.

## I. DEFICIENCIES

### A. Outlook Calendars For Named Plaintiffs and All Opt-In FLSA Plaintiffs

ROG 1 asks Defendant to "[i]dentify…each employee who worked as a Mortgage Loan Officer…from April 17, 2014 through the present." Defendant responded by identifying Named Plaintiffs Michael Manfredi and Kelly Bolding, together with Miranda Taylor. Defendant did not identify any other employees. RFP B then asked Defendant to "produce the complete Outlook or other work-related calendars and schedules for all persons identified in [ROG 1]." Defendant responded: "…after a reasonable search and inquiry, *it was not able to locate Named Plaintiffs' Outlook calendars* for the period of April 17, 2014 forward. Banner Bank is willing to meet and confer regarding production of Outlook calendar invitations since April 17, 2014, to the extent they are located in Named Plaintiff's e-mail files…." (emphasis added).

Defendant's response is deficient, first, because it only responds with respect to the Named Plaintiffs. RFP B requests the Outlook calendars for all employees from April 17, 2014 to present, not just for the Named Plaintiffs. The Court has now conditionally certified a FLSA class. Plaintiffs may seek class-wide discovery. Please respond to RFP B with the Outlook calendars for all employees, April 17, 2014 to present.

We are also troubled by Defendant's statement that it "cannot locate" the Named Plaintiff's Outlook calendars. On January 23, 2015, the case of *Erickson et. al v. AWB*, No. 15-2-01976-7 SEA, was filed in King County Superior Court. On December 19, 2014, before suit was filed, the *Erickson* Plaintiffs sent AWB a number of preservation letters. The letters advised AWB of its duty to preserve "any and all evidence" that could be discoverable in any lawsuit brought by Plaintiffs, or lead to discovery of other evidence that might be relevant.

In the midst of the *Erickson* litigation, AWB announced it was transitioning to a new e-mail system as part of its merger with Banner Bank. The transition would have destroyed archived Outlook accounts. AWB moved for a "protective order" that would allow it to complete the transition and destroy archived Outlook email accounts that were not "specifically preserved." On November 19, 2015, Judge North issued an order denying AWB's motion for a protective order. Judge North ordered AWB to preserve email accounts, including archived emails, while litigation was ongoing. On February 3, 2016, Judge North denied AWB's renewed motion for a protective order. He stated that discovery was still ongoing, and that additional witnesses and relevant discovery may still be identified. On April 17, 2017, Plaintiffs filed the instant suit against Defendant. The *Erickson* Court never granted AWB's motion for protective order. From December 2014 onward, AWB was subject to a litigation hold and to subsequent Court orders that required it to preserve both current and archived email accounts.

Kelly Bolding began working for AWB in June 2011. She was still working at AWB in December 2014, when the *Erickson* Plaintiffs sent AWB preservation letters. Kelly Bolding was also a witness in the *Erickson* case, and AWB was unquestionably aware she might have future claims against AWB. A March 18, 2016 court order noted that "it is unknown if Ms. Bolding will retain Plaintiffs' counsel in the future *to file legal claims against Defendant*." *Erickson et al. v. AWB*, No. 15-2-01976-7 SEA, Order Granting Defendant's Motion to Re-Note the Deposition of Kelly Bolding (North, J. March 16, 2016). Because AWB without question knew Ms. Bolding's Outlook email account (including her calendar) was relevant to both ongoing and future litigation, it had a duty to preserve the account. Yet, based on Defendant's response to RFP B, it appears that Defendant has lost and/or destroyed Ms. Bolding's Outlook calendar.

With respect to Mr. Manfredi's Outlook calendar, AWB was subject to two court orders to preserve employees' email accounts. Yet, based on Defendant's response to RFP B, it appears that Defendant has lost and/or destroyed Mr. Manfredi's Outlook calendar.

We would like to meet and confer with you about your response to RFP B, and about what steps have been taken to find responsive Outlook calendars.

B. Outlook Calendars For Managers

ROG 6 asks Defendant to identify all managers who supervised MLOs, from April 17, 2014 to present. RFP V then asks Defendant to produce the complete Outlook or other work-related calendars for those managers. Defendant has responded to RFP V with a number of objections, including an objection to the request as overbroad, unduly burdensome, and disproportionate to the needs of the case.

Outlook calendars contain managers' schedules, including scheduled activities outside of business hours. Information contained in the calendars is relevant to Plaintiffs' claim, and is reasonably likely to lead to discovery of admissible evidence. The calendars are specifically relevant to Plaintiffs' claims that Defendant knew MLOs were working more hours than they were paid for. Defendant cannot claim that it (and by extension its managers) had "no knowledge" of work outside business hours, and simultaneously refuse to disclose the calendars of those managers. Defendant must disclose response calendars. We look forward to meeting and conferring on this issue.

C. Timekeeping Information For All MLOs, April 17, 2014 To Present

RFP C asks Defendant to "[p]roduce all documents reflecting or constituting time records for all Mortgage Loan Officers identified in the previous interrogatory, including all time records, timesheets, time cards, or other records submitted by each MLO, and entries of overtime worked[.]." RFP KK also asks for "all documents reflecting time

submissions by MLOs....all documents reflecting submissions rejected by managers, resubmissions by employees, or late or delayed payment...."

Defendant has responded to both these Requests with the statement that it will "produce Named Plaintiffs' time records from April 1, 2014 forward." On May 18, 2018, Defendant produced Excel spreadsheets showing "clock in" and "clock out" times for opt-in FLSA Plaintiffs. We appreciate Defendant's disclosure thus far. Please let us know when we can expect similar spreadsheets for the other MLOs who were employed by Defendant between April 17, 2014 to present.

Defendant's response is also deficient because it does not include data in its native format. While Defendant has produced Excel spreadsheets that show the times some of the opt-in Plaintiffs "clocked in" and "clocked out" each day, Defendant has not produced the actual electronic timekeeping records from its various timekeeping systems (e.g. Ceridian for AWB, Empower and UltiPro for Banner). Specifically, it has not produced records showing the original timecards employees entered into the timekeeping systems, and showing timecards that were and were not approved by supervisors. Defendant must produce timekeeping information in its native format. We would like to meet and confer with you about disclosure of timekeeping information for MLOs in its native format.

D. Underline: All E-mails and Other Internal Documents Related To Defendant's Timekeeping Procedures

RFP J asks for "...all policies, procedures, emails to Plaintiffs, managers, or any other person regarding your timekeeping procedures." Defendant responded by stating that it will produce "Banner Bank and AWB's policies, procedures, and training materials regarding timekeeping procedures for MLOS...." However, RFP J asks for *all documents* related to timekeeping, not just policies and procedures. To date, Defendant has not produced a single e-mail or memorandum related to timekeeping procedures. We presume that, in a company of Banner's size, there were e-mails and/or memos related to timekeeping procedures. Please produce all responsive e-mails and other documents. Alternately, please respond to RFP J in writing with a statement that all responsive documents have been produced.

E. Electronic Files For All MLOs, April 17, 2014 To Present

RFP No. E asks for "all electronic files, with metadata intact, which evidence when each Mortgage Loan Officer identified in your answer to [Interrogatory No. 1] (i) sent any email from a work e-mail address; (ii) received any e-mail to a work email address; or (iii) logged on to Defendant's network or computer system." Defendant responded with respect to Named Plaintiffs only. It stated: "[A]fter a reasonably diligent search and inquiry, it has not located any records of when Named Plaintiffs logged on and off of AWB's systems or when Plaintiffs Bolding and Manfredi logged on and off of

Banner Bank's systems. Banner Bank will produce the log on and off data regarding Banner Bank's systems...."

RFP E requests the electronic files of all MLOs April 17, 2014 to present, not just the files of Named Plaintiffs. A FLSA class has been conditionally certified, and Plaintiff is unquestionably entitled to class-wide discovery. *See, e.g., Khadera v. ABM Indust., Inc.*, 2011 WL 3651031, at * (April 18, 2011) (noting that class-wide discovery is proper following conditional certification of a FLSA class). Please respond to RFP E with the requested electronic files for all MLOs, including Miranda Taylor, from April 17, 2014 to present. We would also like to meet and confer with you about what steps Defendant has taken to find responsive files.

F. Training Materials

RFP J requests training materials related to timekeeping procedures for MLOs. RFP MM requests all documents related to training in recording and payment of overtime for MLOs. Defendant responded to RFP MM, after objection, with the statement that it "will produce Banner Bank and AWB's training materials provided to MLOs regarding time recording and overtime from April 17, 2014, forward...."

Thus far, Defendant has disclosed several power point presentations related to timekeeping systems. We have reason to believe other training materials exist. For example, we know from personnel files that new Banner MLOs attended an overnight training. Some part of this training was presumably related to timekeeping. Defendant has not disclosed any materials from this training. Declarant Jeffrey Case also states that he holds an "offsite training for my RLOs 1-2 times a year." Declaration of Jeffrey Case at ¶ 12. Defendant has not disclosed any documents from this training, or from any other trainings given by individual managers. These are just two examples of known deficiencies. Defendant must disclose all training documents in its possession or control. If Defendant contends it has disclosed all responsive documents, please state that in writing.

G. Policies and/or Procedures Related to Overtime, Overtime Pre-Approval, Attendance, Compensable Time, and Clocking In and Out

RFP K requests "all documents reflecting Defendant's policies and procedures" regarding employee training in a number of topics, including overtime, overtime pre-approval, and clocking in and out. RFP M requests documents related to overtime policies and procedures. RFP N also requests documents related to overtime policies. RFP DD requests documents related to Defendant's policies determining which time is compensable. RFP EE requests all documents which reflect the manner and/or process used by Defendant to determine overtime preapproval. RFP LL requests all personnel policies and Human Resources documents provided to managers regarding employee timekeeping and adjusting employees' time, from April 17, 2014 to present.

In response to all of these Requests, Defendant has produced employee handbooks, two documents on travel polices, and two additional timekeeping documents (an Ultipro user manual and a document on adjusting timesheets for closed pay periods). Defendant has not produced any e-mails. Defendant has not produced any internal memos. Aside from employee handbooks, Defendant has not produced a single document related to its policies for overtime, overtime pre-approval, or clocking in and out.

Banner (and AWB before it) employed hundreds of MLOs. We presume Defendant has additional responsive documents. If Defendant has in fact disclosed all responsive documents, please state in writing that all responsive policies have been disclosed.

### H. Communications Related to MLOs' Requests For Approval Of Overtime

RFP O asks for "all documents and communications reflecting or related to Mortgage Loan Officers' requests for approval of overtime and approval and rejection of such requests." RFP P asks for "all documents that documents that constitute or reflect requests by Mortgage Loan Officers for approval of overtime including but not limited to, e-mails." Defendants have not disclosed a single responsive communication in response to these Requests. In response to RFP O, Defendants state after objections that they are "willing to meet and confer with Plaintiffs regarding searching Named Plaintiffs' e-mail files and their direct managers' email files (to the extent that such files are still accessible) for emails regarding overtime approval related to the Named Plaintiffs...."

RFP O and P are not limited to communications involving the Named Plaintiffs and their managers. RFO O and P ask for all documents and communications related to overtime approval, whether or not Named Plaintiffs were involved. Searching just the "Named Plaintiffs' e-mail files and their direct managers' email files," as Defendants propose, is insufficient. We look forward to meeting and conferring on this issue.

### I. Documents Related To Warnings

RFP Q asks for "any and all documents which reflect any manager or other employee warning any MLO that he or she was working unapproved overtime hours or admonishing any MLO for working overtime hours from April 17, 2014 to present." In response, Defendant states it will produce "any formal warnings issued to Named Plaintiffs regarding working approved or unapproved overtime...." Defendant also states it is willing to meet and confer regarding searching Named Plaintiffs' and direct managers' e-mail files.

Producing only "formal warnings" to "Named Plaintiff," as Defendant proposes, is insufficient. RFP Q asks for all documents in which *any* manager or employee warns *any* MLO, formally or informally, that he or she was working unapproved overtime. The requested documents are unquestionably relevant to Plaintiffs' claims that Defendant discouraged MLOs from reporting all the hours they worked. While Plaintiffs are

certainly willing to meet and confer about search terms, Defendant cannot simply refuse to look for responsive documents.

### J. Documents Reflecting Negative Employment Action Related to Unapproved Overtime

RFP R asks for any and all documents "which reflect that a manager took negative employment action (including but not limited to, write-ups, discipline or termination) against any MLO because he/she worked unapproved overtime...." In response, Defendant objects and then states it will produce "formal warnings issued to the named Plaintiffs...." However, RFP R does not ask only for formal warnings; it asks for documents reflecting negative employment actions related to unapproved overtime. Please disclose all documents responsive to RFP R. If it is Defendant's contention that no responsive documents exist, please state that in writing.

### K. Identity of All Managers

Interrogatory No. 6 asks Defendant to "identify all managers employed by Defendant who supervised Mortgage Loan Officers directly or indirectly from April 17, 2014 to present." Defendant has responded by identifying only the Named Plaintiffs' managers. A FLSA class has been conditionally certified, and the identities of all MLO managers-not just the managers for Named Plaintiffs-are unquestionably relevant to this suit. Please identify all mangers employed by Defendant from April 17, 2014 to present.

### L. Communications To or From Managers Related to Overtime

Interrogatory No. 6 asks Defendant to "identify all managers employed by Defendant who supervised Mortgage Loan Officers directly or indirectly from April 17, 2014 to present." RFP W then asks for all communications to or from managers, related to MLO compensation, recording of hours, overtime hours worked, overtime compensation, or edits to time records. The definition of "communications" includes emails. Defendant has responded with a list of objections. Among other things, Defendant states that a response would require a "significant outlay of resources..." Defendant has not produced a single responsive document.

The requested communications to or from managers related to compensation, overtime, and edits to time records are unquestionably relevant to this suit. The communications are relevant to Plaintiffs' claim Defendant discouraged and/or barred MLOs from reporting all the hours they worked. Plaintiffs would like to meet and confer about how best to identify and produce responsive communications.

### M. Organizational Charts

RFP Y asks for "organizational charts and other documents reflecting the chain of command and supervisory relationships for all Bank branches...." After a list of

objections, Defendant responds by referring Plaintiffs to its response to Interrogatory No. 6. Defendants have not produced a single organizational chart in response to RFP Y. Please produce all documents responsive to RFP Y.

### N. Documents Reflecting Unapproved Overtime Hours

RFP FF requests "any and all documents which reflect overtime hours of any MLO which were worked but later disapproved after they were worked." Defendant has responded to this Request with a list of objections. Defendant objects, among other reasons, because "locating every document that 'reflect' overtime hours that were worked but later disapproved would require the collection of (among other things) all MLO and supervisor emails (some of which are archived), and then reviewing and culling those emails for responsive documents."

In cases involving emails, it is well recognized that a corporate Defendant can and must "review and cull" emails for responsive documents. A party that claims reviewing emails would be unduly time-consuming and/or costly bears the burden of showing that email search and retrieval actually would result in undue burden and cost. *See, e.g., Elkharwily v. Franciscan Health Syst.*, 2016 WL 6061575, at *1 (W.D. Wash. July 16, 2016). Defendant has not met that burden here. While Defendant claims it would be unduly burdensome to search supervisors' emails, it does not provide any evidence in support of this claim. Defendant also does not explain why it cannot search its timekeeping systems for MLO timecards that were disapproved, and then identify the subset of timecards (if any) that were rejected because of overtime. The various timekeeping databases Defendant used presumably tracked approved and disapproved timecards. We would like to meet and confer about this Request.

### O. Documents Instructing MLOs As To "On-the-Clock" Work

RFP PP requests "all other documents that contain instructions to Mortgage Loan Officers as to what constitutes work that must be recorded as 'on-the-clock.'" In response, Defendant states only they will "produce Banner Bank and AWB polices regarding recording compensable time...." RFP PP requests all documents, not just policies, that instruct MLOs as to what constitutes on-the-clock work. Please produce all responsive documents.

### P. Description Of and Documents Related To Meeting with HR and AWB Western Washington Team

ROG 10 asks Defendant to describe the "meeting with Human Resources and the AB Western Washington team and managers" referenced in the Declaration of Jeffrey Keeney. RFP RR asks for all documents related to that meeting. Defendant responds only that "after a reasonably diligent search and inquiry Banner Bank lacks information sufficient to answer Interrogatory 10." This is a deficient Answer that must be supplemented. Defendant's declarant Jeffrey Keeney states under oath that this meeting

occurred, and Defendant thus clearly does have information about the meeting. Please respond substantively to Interrogatory No. 10, and please disclose related documents.

### Q. Description Of Efforts To Preserve ESI

ROG 12 asks Defendant to "describe in detail any and all policies and procedures and the particular steps Defendant...has taken to preserve electronically stored information and documents relating to this lawsuit....Your answer should include a description of all steps Defendant...ha[s] taken to preserve Plaintiffs' email accounts, as well as the email accounts of persons identified in either party's initial disclosures." RFP UU asks Defendant to disclose related documents. Defendant responded only that it "has undertaken reasonable efforts to preserve relevant documents, including ESI." This is a deficient answer that must be supplemented, especially in light of Defendant's contention that key responsive materials, including e-mail accounts, have been lost.

### R. Identity of Disciplined MLOs

ROG 13 asks Defendant to identify all MLOs from April 17, 2014 to present who have been "disciplined, counselled, warned, written-up, demoted, removed from their compensation plan, or terminated" for failure to meet performance standards. RFP YY then asks for documents related to those MLOs. Defendant responded to ROG 13 with a list of objections, including that the request was overbroad, unduly burdensome, and disproportionate to the needs of the case.

The identity of MLOs who were disciplined for performance is relevant to Plaintiffs' claims. Specifically, the information sought is relevant to Plaintiffs' contention that MLOs needed to work over 40 hours a week to perform their essential job duties. Defendant presumably tracked MLO performance. Defendant does not explain why it would be unduly burdensome to search for and identify MLOs who were disciplined for performance. Defendant must respond and either identify responsive MLOs, or explain why the requested information would be unduly burdensome to produce. Depending upon how Defendant tracked performance, we can work cooperatively to identify the least burdensome means of finding responsive information.

### S. Identity Of All MLOs Who Made Complaints Related to Overtime

ROG 16 asks Defendant to identify all persons who made complaints or raised concerns related to compensation, including overtime compensation. RFP DDD asks for related documents. Defendant objected on a number of grounds. Defendant objected that the request for all complaints related to "compensation" was overbroad. Defendant also contended that a response would require "a significant outlay of Bank's resources-including extensive ESI review-without a corresponding benefit to the case."

To the extent Defendant contends this Request is unduly burdensome, Plaintiffs would like to meet and confer with Defendant as to a solution. However, the information

sought is relevant to this case, and is discoverable. One solution may be to simply disclose the email accounts of MLOs and supervisors to Plaintiffs, in their entirety. Defendant would thus be relieved of the burden of searching individual email accounts.

T.  Identity Of All FLSA Lawsuits Against Defendant In the Past Ten Years

ROG 17 asks Defendant to identify all lawsuits regarding charges of FLSA violations, filed against Defendant in the past 10 years. Defendant responds to this Request with a list of objections. The identify of lawsuits involving similar claims is generally discoverable. *See, e.g., Johnson v. City of Philadelphia*, 1994 WL 612785 (E.D. Pa. 1994) (Information concerning prior lawsuits involving the defendant alleging claims similar to those in the present case were discoverable.). Please answer ROG 17.

## II. CONCLUSION

**We would like to meet and confer with you about both deposition scheduling and Defendant's document production. Scott and I are available for a phone conference on Wednesday, May 30th at 10:00 a.m.** If May 30 at 10:00 a.m. is not convenient for you, please let us know when would be a convenient time.

Very truly yours,

THE BLANKENSHIP LAW FIRM, P.S.

Charlotte Sanders

# EXHIBIT D

June 12, 2018

Ken Payson
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

Re: Bolding et al. v Banner Bank June 4, 2018 Discovery Conference

Dear Mr. Payson,

This letter memorializes our discovery conference of June 4, 2018. At that conference, I asked you to respond by June 11 as to a number of Defendant's discovery deficiencies. You agreed to either substantively respond or try to respond by June 11, 2018. It is now June 12. Defendant has not substantively responded to any of the numerous issues we discussed on June 4. Defendant also has not disclosed any additional documents since we last spoke. It has now been nearly three weeks since Defendant received our May 22, 2018 deficiency letter.

I have been clear as to the responses we believe are deficient, and as to what Defendant must do to remedy its deficiencies. Because Defendant has not substantively responded to any of the issues we discussed on June 4, I assume we are at an impasse. If I am incorrect, please provide dates certain by close of business tomorrow, June 13, when I can expect substantive responses to the deficiencies discussed below, as well as dates certain when I can expect to receive the documents Banner agrees are discoverable but has not disclosed.

I have also received your e-mail of June 11. While I am more than happy to continue to try and reach a resolution without needing to involve the court, Defendant cannot use delay tactics to avoid producing relevant discovery. We have conferred in good faith on these issues. Defendant's failure to respond will likely require Plaintiffs to file a motion to compel.

Please let me know if you are available some time in the next week for a discussion. I would like to continue discussing disclosure of e-mails; I believe we agreed to circle back on that topic. I would also like to continue discussing Banner's ESI preservation efforts.

## I.     THE PROTECTIVE ORDER

After over a month of discussions regarding a stipulated protective order, and after repeated assurances you would send a finalized order, you stated during our June 4 discovery conference that you hoped to send me a finalized protective order by the end of the week of June 4. It is now June 12, and I have not received a final stipulated protective order from you. Your e-mail of June 11 stated that you hope to send a finalized protective order this week, delaying the protective order yet again. As I stated during our call, Plaintiffs plan to file a motion to compel on June 14 if we do not receive the protective order from you before that date.

## II.     DEPOSITIONS

We briefly discussed the depositions of Michael Manfredi, Kelly Bolding, Sarah Ward, Miranda Taylor, Rick Clark, and Armando Ortiz, now scheduled for the week of July 9. You stated you are unavailable July 9, but are available July 10-13, giving us four days to complete the six depositions.

With respect to the depositions of Kelly Bolding and Miranda Taylor, we discussed one possible scenario of completing both depositions on Friday, July 13 in Seattle, with one deposition in the morning and one deposition in the afternoon. I explained I needed to confer with our clients about their availability on July 13 before committing to this schedule.

With respect to the depositions of Michael Manfredi and Sarah Ward, you stated that Banner is demanding that Mr. Manfredi and Ms. Ward travel to Washington State for their depositions. You stated that, because they are named plaintiffs, Mr. Manfredi (who lives in California) and Ms. Ward (who lives in Oregon) must travel to Seattle to be deposed. You also stated that Banner would not pay for their travel expenses. We do not agree that Named Plaintiffs must travel to Seattle at their own expense, for a deposition called by Defendant.

If you have any authority for the proposition that the Named Plaintiffs in a class action suit must travel to the forum for their depositions, please let me know. If you ultimately insist on forcing Mr. Manfredi and Ms. Ward to travel to Washington State to be deposed, we may be forced to seek guidance from the Court. However, at this juncture, we would like to discuss further with you and attempt to resolve the dispute.

Finally, with respect to the depositions of non-party declarants Rick Clark and Armando Ortiz, you stated you would be "open to" travelling to Arizona and California (respectively) for those depositions. However, you would not commit to holding the depositions in the deponents' home states. Please advise at your soonest convenience if you will agree to depose Rick Clark and Armando Ortiz in their home states. If you insist that non-party deponents Mr. Clark and Mr. Ortiz must travel to Seattle at their own expense to be deposed, we will be at an impasse.

### III.     CURRENT STATUS OF DEFICIENCIES

#### A.  Outlook Calendars For Named Plaintiffs and All Opt-In FLSA Plaintiffs

June 4 Discussion: I requested Outlook calendars for Named Plaintiffs and all FLSA opt-ins, with the understanding we will ask for calendars of all MLOs who fall within the class period if a class is certified. You did not disagree that the Outlook calendars of Named Plaintiffs and the FLSA opt-ins are discoverable. You stated that you needed to drill down with the client to "understand the issue" with respect to Mr. Manfredi's and Mr. Bolding's calendars. You also asked for a copy of the orders from the *Erickson v. AWB* case, that were referenced in the first deficiency letter. I have enclosed two orders from that case related to preservation of Outlook accounts.

I asked you for a response by Monday, June 11, as to: (1) Why Banner has not disclosed the Outlook calendars of Ms. Bolding and Mr. Manfredi; and (2) If Banner will agree to disclose calendars of the FLSA opt-ins, and if so, the timeline for disclosure. You stated you would "try to" provide an answer by Monday, June 11. It is now June 12. **As I have not received a response, I must assume we are at an impasse on this issue; if that assumption is incorrect, please provide a date certain when Banner will disclose Outlook calendars of FLSA opt-ins. Please also immediately respond as to why Banner cannot disclose the Outlook calendars of Ms. Bolding and Mr. Manfredi.**

#### B.  Outlook Calendars For Managers

June 4 Discussion: You asked me to articulate the relevance of managers' calendars. You stated that whether or not Banner "will want to produce" the calendars depends upon the reason we articulate. You did not yourself provide any authority supporting Banner's decision to withhold the calendars. I explained the calendars are, among other things, relevant to managers' knowledge of off-the-clock work. You disagreed, but stated you would discuss with your client.

I asked for a response by Monday, June 11, as to whether or not Banner will agree to disclose outlook calendars for all employees who managed MLOs, after April 17, 2014. You stated you would try to provide an answer by Monday, June 11. **I have not received a substantive response from you. As I have not received a response, I assume Banner refuses to disclose the calendars and we are at in impasse. If that assumption is incorrect, please immediately respond and state whether or not Banner agrees to disclose managers' Outlook calendars.**

C.  Timekeeping Information For All Opt-In Plaintiffs, April 14, 2014 To Present

June 4 Discussion: I explained that Banner has disclosed excel spreadsheets with some timekeeping information.  The spreadsheets were presumably compiled from timekeeping data. However, the spreadsheets do not show what information Named Plaintiffs, opt-ins, and supervisors actually put into the various timekeeping systems. For example, the spreadsheets do not show what timecards supervisors approved and disapproved. To the extent supervisors did not approve timecards, the spreadsheets also do not show what information Named Plaintiffs and opt-ins may have entered when they re-submitted corrected timecards. As I mentioned, Banner supervisors have declared they were responsible for approving (and presumably disapproving if warranted) electronic timecard entries.  I explained that we are requesting the timekeeping data for Named Plaintiffs and the opt-ins in its native format-not just spreadsheets aggregating some of that information.

You stated you are unsure if Banner's and AWB's various timekeeping systems tracked supervisors' approval and disapproval of timecards. You stated you were willing to explore this. You also stated you would need to further explore how Banner could disclose timekeeping information in its native format.  You agreed to loop back, with the goal or providing at least some additional information by Monday, June 11.

It is now June 12. To date, I have not received your response as to: (1) if Banner's and AWB's various timekeeping systems tracked approval and disapproval of timecards; and (2) if Banner agrees to disclose timekeeping information in its native format for Named Plaintiffs and opt-ins. **As I have not received a substantive response from you, I will assume we are at an impasse on this issue. If that is incorrect, please provide a date certain when Banner will disclose timekeeping information for Named Plaintiffs and the opt-ins.**

D.  All E-mails and Other Internal Documents Related To Defendant's Timekeeping Procedures

June 4 Discussion: I asked if Banner has disclosed all internal documents (other than e-mails) relating to timekeeping, including but not limited to internal memos and meeting notes. I explained that while Banner has disclosed some training materials related to timekeeping, it has not disclosed a single internal memo or other internal document related to timekeeping. I explained we are concerned Banner has additional responsive documents. You stated that "your belief is" Banner has disclosed internal documents.

I asked you to advise by June 11 if Banner has in fact disclosed all responsive internal timekeeping documents, or not.  I have not yet received your response.

With respect to e-mails, you stated that Banner has not searched, at all, for responsive e-mails. You stated that Banner has not talked with its supervisors or others involved in timekeeping policies, to determine if they have responsive documents.  You

stated Banner believes this request is overbroad (despite the fact it has not actually looked for responsive documents), but is open to developing agreed-upon search terms. Finally, you stated that Banner does not want to disclose some documents and then be told to re-do its disclosure because the terms and/or scope was wrong.

I stated that we may be open to search terms, but were also troubled by the fact Banner has neither looked for e-mails nor made any effort to determine who might have responsive e-mails. I explained it would be helpful to know the universe of responsive documents that exist, and the likely custodians of those documents, especially if Banner is contending this request is overbroad. You suggested a conversation to develop search terms.

We both agreed to look at the Model ESI agreement and circle back. It is difficult for us to agree to search terms when we do not have any idea how many responsive documents there might be, or who at Banner controls them. If most or all of the responsive documents are contained in the e-mails of Banner's MLO managers/supervisors (of which there appear to be less than ten), search terms may be unnecessary. We are prepared to discuss this further at your soonest convenience.

E. <u>Electronic Files For All Opt-In FLSA Class Members, April 14, 2014 To Present</u>

June 4 Discussion: You do not dispute that the requested electronic files are discoverable. I requested an update by June 11, 2017 as to: (1) if Banner agrees to disclose responsive electronic files for all opt-in FLSA class members; and (2) what steps Defendant has taken to find responsive electronic files for Named Plaintiffs. You stated that you would "try" to provide an update by June 11, 2018, but could not give me any guarantees. **I have not heard from you to date. If you agree to disclose responsive electronic files, please immediately provide a date certain when I can expect disclosure. If I do not hear from you, I will assume we are at an impasse.**

F. <u>Training Materials</u>

June 4 Discussion: You agreed the requested documents are discoverable. You stated you "believe" Banner has produced all responsive training documents, but that you would go back and check with banner. You said you would try to get me an answer by Monday, June 11 (one week from our discussion). I have not received a response from you to date. **Please confirm in writing that no responsive documents exist. I await your response.**

G. <u>Policies and/or Procedures Related to Overtime, Overtime Pre-Approval, Attendance, Compensable Time, and Clocking In and Out</u>

June 4 Discussion: You stated you "believe" Banner has produced all responsive documents. But you were not willing to confirm or deny with certainty. **Please confirm in writing that no further responsive documents exist. I await your response.**

### H.  Communications Related to MLOs' Requests For Approval Of Overtime

June 4 Discussion: With respect to documents other than e-mails, you stated that you will "check and confirm" that all responsive documents have been produced. You stated you would try to respond by June 11. You did not object to the request for documents (other than e-mails) related to MLOs' requests for overtime pre-approval and/or to supervisors' approval or rejection of request. I have not received any further responsive documents from you. **Please either provide a date certain when we can expect disclosure of documents, or confirm in writing that no responsive documents exist. I await your response.**

With respect to responsive e-mails, our discussion was substantively the same as our discussion about e-mails summarized in (D). You stated you felt the request was overbroad, but would be open to agreed search terms. I stated that we might be open to search terms, but were troubled by the fact Banner had not searched at all for responsive documents, and had not spoken with employees about who may possess responsive documents. We agreed to circle back after reviewing the Model ESI Agreement. I am prepared to discuss this with you at your soonest convenience.

### I.  Documents Related To Warnings

June 4 Discussion: You did not commit to producing informal warnings, as requested by RFP Q. You stated you were "willing to recommend" production to Banner, but would need to confer with your client. I asked for a response on or before June 11. We have not received a response from you to date. **Please either immediately provide a date certain when we can expect disclosure of documents, or confirm in writing Banner will not disclose responsive documents. I await your response.**

### J.  Documents Reflecting Negative Employment Action Related to Unapproved Overtime

June 4 Discussion: You stated you would need to confer with your client. I asked for a response on or before June 11. We have not received a response from you to date. **As I have received no response from you, I will assume Banner is refusing to produce responsive documents, meaning that we are at an impasse and will need to submit our dispute to the Court. If this is incorrect, please immediately provide a date certain when we can expect responsive documents.**

### K.  Identity of All Managers

June 4 Discussion: You stated you would "think about" disclosure. I explained Plaintiffs believe the requested information is unquestionably within the scope of discovery, and that we will need to file a motion if Banner does not respond. **As I have received no response from you, I will assume Banner is refusing to identify its**

**managers, meaning that we are at an impasse and will need to submit our dispute to the Court. If this is incorrect, please immediately disclose the identity of all managers as requested by Plaintiffs' original ROG.**

L.  Communications To or From Managers Related to Overtime

June 4 Discussion: With respect to responsive e-mails, our discussion was substantively the same as our discussion about e-mails summarized in (D). You stated you felt the request was overbroad, but would be open to agreed search terms. I stated that we might be open to search terms, but were troubled by the fact Banner had not searched at all for responsive documents, and had not spoken with employees about who may possess responsive documents. We agreed to circle back after reviewing the Model ESI Agreement. I would like to discuss this with you at your soonest convenience.

M.  Organizational Charts

June 4 Discussion: We explained that we are looking for charts that show who managed whom, particularly with respect to MLOs. We stated we are especially interested in branch-specific charts. You pointed out that charts which do not include any information about MLOs or their management may be irrelevant. I conceded there may be irrelevant charts, but that we presume there are some charts that contain both relevant and irrelevant information about management structures, and are therefore discoverable.

You agreed to speak with Banner about disclosing organizational charts. I have heard nothing further from you on this issue to date. **As I have received no response from you, I must assume Banner is refusing to disclose organizational charts, meaning that we are at an impasse and will need to submit our dispute to the Court. If this is incorrect, please provide a date certain when I can expect disclosure.**

N.  Documents Reflecting Unapproved Overtime Hours

June 4 Discussion: You stated that, with respect to the Named Plaintiffs and opt-ins, you agree the requested documents are discoverable. You did not provide a timeline for actually disclosing responsive documents. I asked for a substantive response, if not outright disclosure, of responsive documents for the Named Plaintiffs and opt-ins by June 11. I have received no further response from you to date. **As I have received no response from you, I will assume we are at an impasse. If this is incorrect, please provide a date certain when I can expect disclosure.**

O.  Documents Instructing MLOs As To "On-the-Clock" Work

June 4 Discussion: You stated that you "think" Banner will agree to search e-mails, if we are able to agree on search terms. I re-iterated we believe Banner has an affirmative duty to at least ascertain the universe of responsive document, before insisting

upon search terms. We agreed to circle back on this issue after you talked with your client. I would like to continue our discussion at your soonest convenience.

P.      Description Of and Documents Related To Meeting with HR and AWB Western Washington Team

June 4 Discussion: You stated you would speak with your client about providing a substantive response to this request. I asked for a response by June 11. We have not received a response to date. **As I have received no response from you, I must assume we are at an impasse. If this is incorrect, please immediately provide a date certain when I can expect disclosure.**

Q.      Description Of Efforts To Preserve ESI

June 4 Discussion: You asked for authority that obligates Banner to substantively respond to this request and describe its efforts to preserve ESI. You did not, yourself, provide any authority that would allow Banner to avoid answering this ROG. In *Woodburn Construction Co. v. Encon Pacific, LLC et al.*, 2007 WL 4883533 (W.D. Wash. March 23, 2007), "EnCon also requested information relating to Woodburn's backup tapes, servers, laptops, notebooks, and what 'efforts and procedures' had been utilized for the preservation of responsive ESI." In response to the request, Woodburn participated in "negotiations" about retrieval and production of ESI. Ultimately, after lengthy negotiations, Woodburn attested that it did not keep a backup of emails. However, as it turned out, Woodburn had in fact collected and reviewed the responsive e-mails, despite representing that they were lost. Woodburn ultimately disclosed the e-mails in its possession, but by that point, much of the metadata was destroyed. The Court imposed a variety of sanctions on Woodburn.

*Woodburn Construction Co.* stands for the proposition that a party cannot both refuse to disclose its document preservation procedures and contend that responsive documents (including emails) have been lost and/or destroyed. If Banner had disclosed all responsive documents, that would be one thing; but Banner has not. Banner answered multiple discovery requests by stating that it "could not locate" a variety of responsive ESI, including Named Plaintiffs' Outlook calendars, electronic files, and log in data. Under these circumstances, Banner without question has a duty to explain both its document preservation procedures, and how it implemented those procedures (or did not) to preserve responsive ESI.

You stated you would "keep an open mind," but did not commit to a substantive response. **Please provide me with a substantive response. I also look forward to conferring with you further on this issue.**

R.    Identity of Disciplined MLOs

June 4 Discussion: You stated this request as written is overbroad, that it should
be limited to overtime-related performance discipline, and that if we insist on ROG 13 as
written, you would be happy to tee this one up for a motion. It is our position that the
requested performance discipline records are unquestionably relevant to Plaintiffs'
claims. Performance discipline records are relevant because Defendant contends MLOs
could complete their essential job duties within 40 hours a week. Performance discipline
records inform the question of whether MLOs could in fact complete their essential job
duties within 40 hours a week, or whether their attempts to do so resulted in performance
discipline. **Please let me know if I am mistaken, but it appears that we have reached
an impasse as to RFP 13.**

S.    Identity Of All MLOs Who Made Complaints Related to Overtime

June 4 Discussion: I agreed to narrow this Request to the identity of all persons
who made complaints *related to overtime compensation*, from April 17, 2014 to present.
You agreed that the requested documents are discoverable under this narrowed request.
You stated Banner will search for responsive persons who made complaints. You also
stated that, with respect to the request for documents, Banner would be open to search
terms. I would like to continue conferring with you on this issue, at your soonest
convenience.

T.    Identity Of All FLSA Lawsuits Against Defendant In the Past Ten Years

June 4 Discussion: We agreed this was a purely legal issue. You stated you would
look at the authority I cited in my previous letter to you, *Johnson v. City of Philadelphia*,
1994 WL 612785 (E.D. Pa. 1994), and let me know if Banner agreed to disclose
responsive documents or not. As with the other issues outline above, I asked for a
substantive response by June 11. **I have not yet heard from you on this issue. I
therefore assume we are at an impasse. If I am incorrect, and Banner agrees to
disclose responsive lawsuits, please immediately provide a date certain when I can
expect disclosure.**

Very truly yours,

THE BLANKENSHIP LAW FIRM, P.S.

Charlotte Sanders



FILED
KING COUNTY, WASHINGTON

JUN 24 2015

SUPERIOR COURT CLERK

THE HONORABLE DOUGLASS A. NORTH
**Note on Motion Calendar: June 23, 2015**
Opposing Party

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

STEVEN ERICKSON, BETH THOMPSON, DANA COPELAND, WENDY ANDERSON, and TRACI BIOTTI,

        Plaintiffs,

  v.

AMERICANWEST BANK, a Washington Corporation,

        Defendant.

No. 15-2-01976-7 SEA

[PROPOSED] ORDER DENYING DEFENDANT'S MOTION FOR PROTECTIVE ORDER

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

THIS MATTER, having come before the Court on Defendant's Motion for Protective Order. The Court has considered the following:

1. Defendant's Motion for Protective Order;

2. Declaration and Exhibits filed in support of Defendant's Motion;

3. Plaintiffs' Opposition to Defendant's Motion for Protective Order;

4. Declaration of Richard E. Goldsworthy in Support of Plaintiffs' Opposition to Defendant's Motion and the exhibits attached thereto;

5. Declaration of Scott Blankenship in Support of Plaintiffs' Opposition to Defendant's Motion;

6. Declaration of Dana Copeland;

7. Declaration of Traci Biotti;

8. Declaration of Beth Thompson

9. Defendant's Reply; *of Charles Moomaw*

10. Declaration~~s~~ and Exhibits filed in support of Defendant's Reply, ~~if any, and;~~

11. 

12. 

*D.A.N.*

The Court has considered the briefs of the parties and has reviewed the pleadings and records on file.

**THE COURT HEREBY ORDERS:**

1. Defendant's Motion for a Protective Order is DENIED.

2. Defendant must produce to Plaintiffs their entire Outlook accounts in native .pst format within 10 days of the entry of this Order.

3. Defendant must produce any files or documents culled during any search of Troy Sims' and David Sorsabal's computers in native format within 10 days of the entry of this Order.

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

4.      Defendant must conduct a diligent search for the electronic communications requested by Plaintiffs and produce any discoverable information it locates.

DATED this _23rd_ day of _June_, 2015.

_Douglass A. North_
THE HONORABLE DOUGLASS A. NORTH

Presented by:

THE BLANKENSHIP LAW FIRM, P.S.

By: _s/ Richard E. Goldsworthy_
Scott C. G. Blankenship, WSBA No. 21431
Robin J. Shishido, WSBA No. 45926
Richard E. Goldsworthy, WSBA No. 40684
The Blankenship Law Firm, P.S.
1000 Second Avenue, Suite 3250
Seattle, WA 98104
Telephone: (206) 343-2700
Facsimile: (206) 343-2704
Email: sblankenship@blankenshiplawfirm.com
        rshishido@blankenshiplawfirm.com
        rgoldsworthy@blankenshiplawfirm.com
Attorneys for Plaintiffs

[PROPOSED] ORDER DENYING DEFENDANT'S MOTION FOR
PROTECTIVE ORDER
Page 2

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

IN THE SUPERIOR COURT OF THE STATE OF
WASHINGTON FOR KING COUNTY

| | |
|---|---|
| ERICKSON ET AL,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICANWEST BANK,<br><br>Defendant. | No. 15-2-01976-7 SEA<br><br>ORDER DENYING PLAINTIFFS'<br>MOTION TO COMPEL AND<br>DENYING DEFENDANT'S MOTION<br>FOR A PROTECTIVE ORDER |

The court having reviewed the motion, response and reply (plus accompanying declarations) for both the Plaintiffs' Motion to Enforce Court Order and Compel Discovery Responses and Defendant's Motion for Protective Order Regarding Email Preservation Plan, enters this order.

The court DENIES Plaintiff's Motion to Compel and DENIES without prejudice Defendant's Motion for Protective Order.

Counsel on both sides bear some responsibility for the issues involved being more contentious and confusing than necessary. Plaintiffs' counsel are primarily at fault, however, for repeatedly refusing to reasonably specify which employees they were seeking contact information and personnel files for. The court previously addressed this

issue in its September 4, 2015 order. The court is no longer willing to go on fishing expeditions with plaintiffs' counsel; plaintiffs must specify who they want information on by name. Plaintiffs should be able to name those employees who they think are most likely to have relevant information. Surely plaintiffs know who they worked with and who Mr. Sims and Mr. Sorsabal worked with.

Furthermore, plaintiffs' counsel have repeatedly refused to recognize that defendant's personnel files contain less than all the information which plaintiffs' counsel seeks. An order to produce the personnel files only produces the information which they contain. If counsel want additional information, they should specifically ask for that information rather than complain that the information they seek is not in the personnel file.

Plaintiffs have sought to place the burden upon the defense to justify withholding any information requested in discovery. Plaintiffs' argument, however, confuses two different types of discovery. As to general discovery, as long as the material sought could lead to the discovery of admissible evidence, all the material is presumptively discoverable and the burden is on the party resisting discovery to demonstrate why the material is not discoverable. However, when the material sought is the personal information of non-parties, then their privacy interests require that the party seeking discovery provide a clear explanation of how the information is likely to lead to the discovery of admissible evidence.

Defendant's Motion for Protective Order seeks the court's permission to preserve certain archived email records and then change its email system as a result of its merger with Banner Bank. The court denies the motion until there has been appropriate

production of contact information and personnel files. After the completion of the procedure described below, the defendant can renew its motion.

Plaintiffs shall designate by noon on November 30, 2016 the individuals for whom they are asking production from the defendant:

(1) Personnel files

(2) Contact information.

For each such individual, the plaintiffs will designate the individual by name and briefly indicate what the relationship of that individual is to this case (e.g. "member of the residential lending group reporting to Sims" or "part of management groups who met frequently with Sorsabal"). Defendant will then make any objection it has to providing this information by noon on December 4, 2016, providing a short explanation of why it objects to providing any information. Defendant will produce the contact information or personnel file by noon on December 10, 2016. Plaintiffs can then file a motion to compel if they disagree with defendant's objections.

If plaintiffs do not pay the $2,000 previously awarded in terms by December 15, 2015, the court will consider the imposition of further sanctions.

Dated this 19th day of November, 2015.


Honorable Douglass A. North

# EXHIBIT E

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KELLY BOLDING, and MICHAEL MANFREDI, individually and on behalf of a class of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANNER BANK, a Washington Corporation,<br><br>Defendant. | No. 2:17-cv-0601 RSL<br><br>PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION TO DEFENDANT BANNER BANK |

PLAINTIFFS' SECOND SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page i

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

that the response was incorrect when made, or (2) you know that the response, though correct when made, is no longer true, and failure to amend the answer would be, in substance, a knowing concealment.

## DEFINITIONS

A. The terms "**and**" and "**or**" shall be construed either disjunctively or conjunctively whenever appropriate in order to bring within the scope of these interrogatories information or documents which might otherwise be considered to be beyond their scope.

B. The singular form of a word shall be interpreted as plural and the plural form of a word shall be interpreted as singular whenever appropriate in order to bring within the scope of these interrogatories any information which might otherwise be considered to be beyond their scope.

D. **Bolded Words** used in these requests refer to these definitions, and any other words used in these discovery requests are defined according to standard American use, as shown in a dictionary of the English language.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. GGG:** Produce, in their native format, the complete Outlook e-mail accounts for Kelly Bolding, Michael Manfredi, Sarah Ward, Rick Clark, Miranda Taylor, **and** Armando Ortiz.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. HHH:** Produce, in their native format, the complete Outlook e-mail accounts for all opt-in FLSA Plaintiffs.

**RESPONSE:**

PLAINTIFFS' SECOND SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page 2

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

**REQUEST FOR PRODUCTION NO. MMM:** Produce, in its native format, all pay data that supports the contention of Kristina Boettcher-Milleville that Banner Bank paid 7,200 overtime hours to MLOs.

**RESPONSE:**

DATED this 5th day of June, 2018.

THE BLANKENSHIP LAW FIRM, P.S.

By: *s/ Charlotte S. Sanders*
    Scott C. G. Blankenship, WSBA No. 21431
    Charlotte S. Sanders, WSBA No. 45051
    The Blankenship Law Firm, P.S.
    1000 Second Avenue, Suite 3250
    Seattle, WA 98104
    Telephone: (206) 343-2700
    Facsimile: (206) 343-2704
    Email:   sblankenship@blankenshiplawfirm.com
            csanders@blankenshiplawfirm.com
    *Attorneys for Plaintiffs*

PLAINTIFFS' SECOND SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO DEFENDANT BANNER
BANK (Cause No. 2:17-cv-0601 RSL)
Page 4

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

# EXHIBIT F

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KELLY BOLDING, and MICHAEL
MANFREDI, individually and on behalf of a
class of all others similarly situated,

Plaintiff,

v.

BANNER BANK, a Washington Corporation,

Defendant.

No. 2:17-cv-0601-RSL

BANNER BANK'S OBJECTIONS
AND RESPONSES TO
PLAINTIFFS' SECOND SET OF
INTERROGATORIES AND
REQUESTS FOR PRODUCTION

Banner Bank objects and responds to Plaintiffs' Second Set of Interrogatories and

Requests for Production of Documents as follows:

## RESPONSES TO ALL INTERROGATORIES AND DOCUMENT REQUESTS

1. **Privilege.** Banner Bank objects to the discovery requests to the extent they seek

documents or information protected from disclosure by privileges and other protections from

production including, without limitation, the attorney-client privilege, the work-product

doctrine, joint-defense or common interest privilege, or any other constitutional, statutory,

common law or regulatory protection, immunity or proscription from disclosure. Where

Banner Bank withholds documents or information under a claim of privilege or other protection

from production, Banner Bank will so indicate on a privilege log, except with respect to

privileged or work-product information generated after commencement of this action. Banner

Bank does not intend the inadvertent production of any privileged or protected documents or

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 1
4822-4967-5112v.3 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

## OBJECTIONS AND RESPONSES TO REQUESTS
## FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. GGG:** Produce, in their native format, the complete Outlook e-mail accounts for Kelly Bolding, Michael Manfredi, Sarah Ward, Rick Clark, Miranda Taylor, **and** Armando Ortiz.

**RESPONSE:** Banner Bank objects to this Request because it seeks documents potentially containing AWB's and Banner Bank's confidential business information and information regarding Banner Bank's and AWB's customers, including but not limited to social security numbers, banking account numbers and other banking information, income and asset information, background and credit checks, dates of birth, and drivers' license information. Banner Bank has a statutory obligation to protect that information under the Gramm Leach Bliley Act. Banner Bank further objects to this Request as overbroad, unduly burdensome, disproportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence on the grounds that it seeks complete Outlook e-mail accounts without any limitation on time period or subject matter.

Without waiving the foregoing objections, Banner Bank responds that, subject to an appropriate protective order that the parties are working to finalize, it will produce Outlook email accounts for Bolding, Manfredi, Ward, Clark, Taylor, and Ortiz from April 17, 2014, forward to the extent Banner locates those files following a reasonably diligent search and inquiry.

**REQUEST FOR PRODUCTION NO. HHH:** Produce, in their native format, the complete Outlook e-mail accounts for all opt-in FLSA Plaintiffs.

**RESPONSE:** Banner Bank objects to this Request because it seeks documents potentially containing AWB's and Banner Bank's confidential business information and information regarding Banner Bank's and AWB's customers, including but not limited to social security numbers, banking account numbers and other banking information, income and asset information, background and credit checks, dates of birth, and drivers' license information.

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 3
4822-4967-5112v.3 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

Banner Bank has a statutory obligation to protect that information under the Gramm Leach

Bliley Act.  Banner will produce this information subject to entry of a protective order stating

the Plaintiffs will not disclose in this lawsuit or otherwise consumer information protected

under the Gramm Leach Bliley Act.  Banner Bank further objects to this Request as overbroad,

unduly burdensome, disproportionate to the needs of the case, and not likely to lead to the

discovery of admissible evidence on the grounds that it seeks complete Outlook e-mail

accounts without any limitation on time period or subject matter.

Without waiving the foregoing objections, Banner Bank responds that, subject to an

appropriate protective order that the parties are working to finalize, it will produce Outlook

email accounts for the opt-in FLSA plaintiffs from April 17, 2014, forward to the extent Banner

locates those files following a reasonably diligent search and inquiry.


**REQUEST FOR PRODUCTION NO. III:**  Produce, in their native format, the

complete Outlook e-mail accounts for Alastair Brewer, Jeffrey Case, Henry Martin Schroder,

Ryan Froehlich, Aaron Miller, Leanne Mullikin, and Matthew Towery.

**RESPONSE:**  Banner Bank objects to this Request because it seeks documents

potentially containing AWB's and Banner Bank's confidential business information and

information regarding Banner Bank's and AWB's customers, including but not limited to social

security numbers, banking account numbers and other banking information, income and asset

information, background and credit checks, dates of birth, and drivers' license information.

Banner Bank has a statutory obligation to protect that information under the Gramm Leach

Bliley Act.  Banner will produce this information subject to entry of a protective order stating

the Plaintiffs will not disclose in this lawsuit or otherwise consumer information protected

under the Gramm Leach Bliley Act.  Banner Bank further objects to this Request as overbroad,

unduly burdensome, disproportionate to the needs of the case, and not likely to lead to the

discovery of admissible evidence on the grounds that it seeks complete Outlook e-mail

accounts without any limitation on time period or subject matter.  For example, the Request is

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 4
4822-4967-5112v.3 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

to this Request to the extent it seeks documents protected by the attorney-client privilege and work-product doctrines.

**REQUEST FOR PRODUCTION NO. MMM:** Produce, in its native format, all pay data that supports the contention of Kristina Boettcher-Milleville that Banner Bank paid 7,200 overtime hours to MLOs.

**RESPONSE:** Banner Bank objects to this Request seeking documents and information regarding current or former AWB and Banner Bank employees who have not opted-in to the collective action as overbroad, unduly burdensome, and disproportionate e to the needs of the case—particularly at this stage of the litigation when the Court has not decided whether to certify a class, or if a class is certified, the composition of that class. *See* Responses to All Interrogatories and Document Requests ¶ 2. Banner Bank further objects to this Request— which seeks confidential, personal information regarding pay—because the Request seeks to invade individuals' rights to privacy under state and federal law. Banner Bank further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and work-product doctrines.

DATED this 5th day of July, 2018.

Davis Wright Tremaine LLP
Attorneys for Defendant Banner Bank

By */s/ Ryan Hess*
    Kenneth E. Payson, WSBA #26369
    Sheehan Sullivan Weiss, WSBA #33189
    Ryan Hess, WSBA #50738
    Laura-Lee Williams, WSBA #51358
    1201 Third Ave, Suite 2200
    Seattle, WA 98101-3045
    Telephone: 206.622.3150
    Fax: 206.757.7700
    E-mail: kennethpayson@dwt.com
          sheehansullivanweiss@dwt.com
          ryanhess@dwt.com
          lauraleewilliams@dwt.com

BANNER BANK'S OBJS. & RESPONSES TO PLAINTIFFS' SECOND SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – 7
4822-4967-5112v.3 0058243-000340

Davis Wright Tremaine LLP
LAW OFFICES
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
206.622.3150 main · 206.757.7700 fax

# EXHIBIT G



Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045

**Ken Payson**
(206) 757-8126 tel
(206) 757-7126 fax

kenpayson@dwt.com

June 14, 2018

***Via Email Only***

Charlotte Sanders
The Blankenship Law Firm, P.S.
100 Second Avenue, Suite 3250
Seattle, WA 98104
csanders@blankenshiplawfirm.com

Re:     Bolding v. Banner Bank

Dear Charlotte,

I write in response to your letter of June 12, 2018, regarding discovery issues in follow up to our discovery conference on June 5, 2018 (which you mistakenly referenced as occurring on June 4, 2018). As I mentioned in my email to you of June 11, we understood that you would promptly be sending us a letter memorializing that conference to which we planned to respond on June 11. In any event, as I mentioned throughout our calls on June 5 and again on June 11, Banner is happy to discuss reasonable search parameters to locate relevant responsive documents. While we disagree with many of your characterizations of our discussions, I will not detail them here in order to focus on the substance of the parties' discovery issues.

As discussed in more detail below, subject to a further discussion about cost allocation, Banner Bank is willing to produce much of the information Plaintiffs have requested. As for timing, Plaintiffs' broad requests for email, calendars, hard-copy documents, and timekeeping information for dozens of MLOs and their managers, will require us to confer with more than a dozen different Banner Bank employees, so we will need more than the two days since you sent your last letter to work through scheduling issues. We will, however, promptly update you when we have a better idea on timing.

## I.     PROTECTIVE ORDER

We provided minor proposed revisions to the stipulated protective order before you sent your June 12 letter, but have yet to hear back from you. Please let us know whether we may submit that version to the Court for approval.

| Anchorage | New York | Seattle |
| Bellevue | Portland | Shanghai |
| Los Angeles | San Francisco | Washington, D.C. |

www.dwt.com

## II.    DEPOSITIONS

It has been more than a week now and you apparently still have not conferred with Ms. Bolding and Ms. Taylor about their availability for depositions in Seattle on July 13.  Please let us know by the end of this week whether those depositions will proceed in Seattle.  And since Plaintiffs committed in their response to our motion to compel to making not only Ms. Bolding and Ms. Taylor, but also Mr. Manfredi, Ms. Ward, Mr. Clark, and Mr. Ortiz available for depositions the week of July 9 with overflow the following week if necessary, please promptly advise which dates/times any of these witnesses are ***not*** available during the window Plaintiffs proposed so that we can get all of those depositions set.  As we mentioned, we expect to need no more than half-a-day per deposition so we can schedule two per day.

As for location, it is well settled that named plaintiffs have an obligation to appear for their depositions in the venue where they chose to file suit, so Mr. Manfredi and Ms. Ward also must make themselves available for deposition in Seattle.  "Ordinarily, plaintiff will be required to make himself or herself available for examination in the district in which suit was brought.  Since plaintiff has selected the forum, he or she will not be heard to complain about having to appear there for a deposition."  Wright & Miller, Federal Practice and Procedure § 2112 (3d ed.); *Fenerjian v. Nong Shim Co., Ltd*, 2016 WL 1019669, at *2 (N.D. Cal. Mar. 15, 2016) ("Courts ordinarily presume that a plaintiff may be deposed in the judicial district where the action was brought, inasmuch as the plaintiff, in selecting the forum, has effectively consented to participation in legal proceedings there.").  That rule applies to named plaintiffs in the class action context.  *See, e.g.*, *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 4216193, at *4 (E.D. Mich. Sept. 22, 2017) (ordering named plaintiffs in a class action to appear for deposition in the forum state, explaining that "[t]he individual plaintiffs chose to sue the defendant in the Eastern District of Michigan, and, in contrast with potential absent class members who as yet may not even be aware of this consolidated litigation, the named plaintiffs presumably contemplated the costs and inconvenience to them that could result from their choice of forum"); *Mullins v. Premier Nutrition Corp.*, 2014 WL 4058484, at *1 (N.D. Cal. Aug. 15, 2014) (holding general rule that "a plaintiff will be required to make himself or herself available for examination in the district in which suit was brought" applied to named plaintiff in a class action (quotation omitted)).

As for FLSA opt-in Mr. Clark, since we understand he lives in Federal Way, Washington, it is not clear why you seem to be teeing up a dispute over whether we can depose him in Seattle.  And as for Mr. Ortiz, as he has since opted in to this litigation, he is also subject to deposition here in Seattle absent undue burden.  *See Peterson v. Alaska Commc'ns Sys. Grp., Inc.*, 2017 WL 2312952, at *5 (D. Alaska Mar. 6, 2017) (granting, in part, the defendant's motion to compel an opt-in plaintiff residing in New York to appear for a deposition in either Alaska or Oregon where plaintiff failed to show that travel would impose an undue burden); *Gipson v. Sw. Bell Tel. Co.*, 2008 WL 4499972, at *5 (D. Kan. Oct. 1, 2008) (compelling an opt-in plaintiffs to appear for a deposition in the forum state where they "present[ed] no persuasive reason to deviate from the general rule that a plaintiff should be deposed in the forum district where he or she chose to file the lawsuit" given that each opted in "knowing full well that [the collective action] was filed [out of state]" and failed to show that traveling would impose an undue burden).

Please let us know if you stand on your objection to producing Mr. Manfredi, Ms. Ward, and Mr. Ortiz for deposition in Seattle so we may bring a motion to compel.

## III.    INFORMATION PLAINTIFFS SEEK

A.    Outlook calendars for named plaintiffs and FLSA opt-ins.

Thank you for sending the November 19, 2015, Order Denying Plaintiffs' Motion to Compel and Denying Defendants' Motion for a Protective Order in *Erickson v. American West Bank* and the June 23, 2015, Order Denying Defendants' Motion for a Protective Order in that same matter.  Neither order substantiates your claim that those orders somehow subjected AWB and Banner Bank to sweeping obligations to preserve all MLO Outlook accounts in perpetuity.  To the contrary, *Erickson* was brought individually by Steven Erickson, Beth Thompson, Dana Copeland, Wendy Anderson, and Traci Botti.  The June 23, 2015, order simply ordered American West Bank to produce to plaintiffs (represented by your firm) those five plaintiffs' Outlook accounts.  And the other order simply denied without prejudice AWB's request to change over its email system before producing certain information relevant to plaintiffs' claims.  In any event, the *Erickson* matter concluded on September 16, 2016, upon entry of the order of dismissal with prejudice, so any document preservation duties arising from that action expired well before Ms. Bolding filed the present action.

Having said that, Banner Bank is willing to collect and produce to the extent reasonably available—i.e., readily available without resort to legacy systems, tape backup, or the like—Outlook calendars for named Plaintiffs and the FLSA opt-in plaintiffs.

B.    Outlook calendars for MLO managers.

While Plaintiffs claim the calendars are "relevant to managers' knowledge of off-the-clock work," they failed to describe what possible entries in a manager's calendar would reflect knowledge of MLOs' off-the-clock work or otherwise would make the entirety of their calendars sufficiently relevant to Plaintiffs' claims to fall within the scope Rule 26(b)(1).

C.    Timekeeping information for named plaintiffs and FLSA opt-ins.

We already produced the named Plaintiffs' and FLSA opt-ins' timekeeping information from AWB's Ceridian system and Banner Bank's Empower and UltiPro systems in Excel format so it would be easily readable and accessible.  As I mentioned in our call, we understand MLO managers did not use these timekeeping systems to "approve or disapprove" timecards, but are in the process of confirming with Banner Bank that no such timecard "approval and disapproval" data exists.

As I also mentioned in our call, we understand that the native file Ceridian, Empower, and UltiPro data will be unintelligible unless Plaintiffs have their own Ceridian, Empower, and UltiPro systems and that producing the native file information would not reveal any additional information beyond that which we already produced.  We are in the process of confirming that with Banner Bank.

D.    Emails and other documents relating to timekeeping policies procedures.

We already produced Banner and AWB timekeeping policies and procedures for MLOs from April 17, 2014, forward.  Banner is also willing to electronically search the .pst files of the named Plaintiffs' and FLSA opt-ins' managers and MLO-related HR individuals for emails discussing timekeeping policies/procedures and to coordinate with you in advance on which search terms to run.  Banner Bank will also conduct additional searches for any other documents comprising or discussing timekeeping policies and procedures.

E.    Electronic files for named plaintiffs' and FLSA opt-ins.

Banner Bank has already responded that it does not have records of when named Plaintiffs logged on or off ABW or Banner Bank systems.  Banner Bank is willing to determine whether it does or does not have log on/off information for the FLSA opt-ins and produce that information if it is reasonably feasible to do so.

As for Plaintiffs' request for all emails of all named Plaintiffs and FLSA opt-ins, that request encompasses many hundreds of thousands of pages of documents, which would need to be reviewed for privilege and sensitive customer data such as SSNs, DOBs, credit reports, income information, and the like.  Banner Bank is willing to make available these emails for inspection and copying subject to a claw back agreement as to any privileged documents and Plaintiffs' agreement not to copy or use any customer sensitive information.

F.    Timekeeping training materials.

We already produced the timekeeping training materials Banner Bank was reasonably able to locate.  But Banner Bank will conduct further review for additional timekeeping training materials, including specifically the "overnight training" you mentioned regarding Jeffrey Case. In particular, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run, as well as seek any other responsive documents from MLO-related HR individuals and the referenced managers.

G.    Policies/procedures regarding OT, OT preapproval, attendance, compensable time, clocking in/out.

We already produced what Banner was reasonably able to locate in this regard.  But Banner Bank will conduct further review of responsive documents.  In particular, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run, as well as seek any other responsive documents from MLO-related HR individuals and the referenced managers.

       H.      <u>MLOs' requests for OT approval</u>.

Banner Bank is willing to electronically search the pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these subjects and work with Plaintiffs' counsel on search terms to run, as well as seek responsive documents from HR and the referenced managers.

       I.      <u>Documents warning/admonishing MLOs about working unapproved OT</u>.

Banner Bank is willing to electronically search the pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these subjects and work with Plaintiffs' counsel on search terms to run, as well as seek responsive documents from HR and the referenced managers.

       J.      <u>Documents reflecting negative employment action against MLOs working unapproved OT</u>.

Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these subjects and work with Plaintiffs' counsel on search terms to run, as well as seek responsive documents from HR and the referenced managers.

       K.      <u>MLO manager identification</u>.

Banner Bank will identify managers of named Plaintiffs and FLSA opt-ins.

       L.      <u>Communications to/from MLO managers regarding OT</u>.

Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run, as well as seek responsive documents from HR and the referenced managers.

       M.      <u>Supervisory chain of command information</u>.

Banner Bank will supplement its Rog 6 response to include for named Plaintiffs and FLSA opt ins not only their managers, but further up the chain to the highest level that would have any involvement in timekeeping (particularly OT) policies, procedures, training, etc.

       N.      <u>Documents reflecting unapproved OT hours</u>.

Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run, as well as seek responsive documents from MLO-related HR individuals and the referenced managers.

O.     Documents instructing MLOs regarding on-the-clock work.

Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run, as well as seek responsive documents from MLO-related HR individuals and the referenced managers.

P.     More information about HR and manager meeting referenced in Jeffrey Keeney's declaration.

Banner Bank will search for additional responsive information and supplement its response.

Q.     ESI preservation efforts.

Banner Bank's ESI preservation efforts are privileged and protected from disclosure. *Agne v. Papa John's Int'l, Inc.*, 2012 WL 12882903, at *3 (W.D. Wash. Feb. 6, 2012) ("Generally, litigation hold notices are not discoverable, 'particularly when a party has made an adequate showing that the letters include material protected under attorney-client privilege or the work-product doctrine.'" (quoting *Major Tours, Inc. v. Colorel*, 2009 WL 2413631, *2 (D.N.J. Aug. 4, 2009))); *Ingenco Holdings, LLC v. ACE Am. Ins. Co.*, 2015 WL 11715014, at *3 (W.D. Wash. Apr. 7, 2015) (stating that documents that discussed a "litigation hold" were "plainly reflective of the advice of counsel, and [were] privileged.").

Banner Bank is, however, willing to describe why it no longer has named Plaintiffs' Outlook calendars and why Banner Banks's systems no longer contain system log on/off information for named Plaintiffs.

R.     Identities of disciplined MLOs.

Plaintiffs want Banner Bank to identify all MLOs who have been disciplined for any reason without limitation.  We objected that MLOs could be disciplined for a host of reasons unrelated to the overtime claims at issue, such as inappropriate workplace conduct as but one example.  As you know, we offered to look for and identify MLOs (if any) who were disciplined for overtime-related issues.  In light of the additional examples in your June 12 letter, we are also willing to look for and identify MLOs (if any) who were disciplined for not "complet[ing] their essential job duties within 40 hour a week, or whether their attempts to do so resulted in performance discipline."

S.     Identities of MLOs who made OT-related complaints.

Plaintiffs initially asked for Banner Bank to identify all MLOs who made complaints or raised concerns about compensation, including OT, to which Banner Bank objected as overbroad.  Given Plaintiffs willingness to limit the request to overtime-related complaints, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails discussing these subjects and work

with Plaintiffs' counsel on search terms to run, as well as seek responsive documents from MLO-related HR individuals and the referenced managers.

       T.      <u>Identity of all FLSA lawsuits against Banner in the past 10 years</u>.

      Banner Bank is willing to identify any other FLSA lawsuits filed since April 14, 2017.

Sincerely,

DAVIS WRIGHT TREMAINE LLP

Ken Payson

cc:    Sheehan Sullivan
       Ryan Hess
       Laura-Lee Williams

# EXHIBIT H

THE BLANKENSHIP LAW FIRM, P.S.

1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

CHARLOTTE SANDERS

Facsimile (206) 343-2704

June 28, 2018

Ken Payson, Ryan Hess, and Laura-Lee Williams
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

**RE:** **Letter Memorializing** *Bolding et al. v. Banner Bank* **June 20, 2018 Discovery Conference**

Dear Ken, Ryan, and Laura-Lee,

This letter memorializes our telephonic discovery conference of June 20, 2018. The June 20 conference was the third conference about Defendant's discovery deficiencies. Yourself, Ms. Williams, Mr. Hess, myself, and Mr. Blankenship all participated in the conference. We discussed Defendant's discovery deficiencies outlined in both Plaintiffs' May 22 and June 12 letters. We also discussed the proposed protective order, disclosure of an updated list of putative class members, deposition scheduling, and Defendant's discovery requests.

At our prior discovery conference on June 5, 2018, you agreed to provide a number of substantive responses to Defendant's discovery deficiencies by June 11. Aside from providing certain documents related to Defendant's timekeeping systems and to employee training, Defendant did not in fact provide substantive responses and documents by that date. However, your letter of June 14 stated generally that "Banner Bank is willing to produce much of the information Plaintiffs have requested."

In light of this statement, we agreed to confer for a third time with you on June 20, and did confer on that date. With respect to some deficiencies, you have now stated Defendant will either provide certain substantive responses and documents, or provide a schedule for production, by July 6. Specific agreements are memorialized below. We look forward to receiving your production on July 6. With respect to other deficiencies, including disclosure of managers' Outlook calendars, an explanation as to why Defendant does not have the Outlook calendars and log in/log out information for Named Plaintiffs, and a description of Defendant's ESI preservation efforts, we are at an impasse. We also appear to be at an impasse with respect to the proposed protective order.

## I. PROTECTIVE ORDER

We discussed the proposed protective order yet again at the June 20 conference. We still do not have an agreement from you on the proposed protective order, despite over two months of conferring with you about it. On June 12, you sent us a draft protective order that included edits agreed on by both parties. However, that draft also included new language that would allow Defendant to designate certain documents "attorney's eyes only." The new "attorney's eyes only" language was not, as you characterized it in your June 14 letter, a minor revision. It was a major change that altered the nature of our agreement. You did not mention "attorney's eyes only" during any of our many prior discussions about the proposed protective order.

At our June 20 conference, we explained that we cannot agree to "attorneys eyes only." We explained that "attorney's eyes only" creates a number of serious issues, such as requiring our clients to leave the room if we need to use an "attorney's eyes only" document in deposition. "Attorney's eyes only" appears to be another attempt by Defendant to prevent our clients from seeing documents that they are entitled to see, and that they need to see in order to prepare for depositions.

We eventually were able to agree with you that Defendant's concerns can likely be addressed by Plaintiffs' agreement to redact financial and certain other customer information, such as social security numbers. We offered to take on the burden of redaction, so that Defendant could simply disclose the documents subject to our law firm's agreement to redact. You offered to describe the type of information you believe Plaintiffs will need to redact. However, you also stated you would need to check with your client before agreeing to anything.

To date, we have not received any further communication from you about the proposed protective order. You have not confirmed that Defendant will agree to redaction as an alternative to "attorney's eyes only." You have also not provided any description of the financial and other customer information that Defendant believes needs to be redacted. While we are more than willing to work with you to reach an agreement, we have spent two months conferring with you in an attempt to agree on a proposed protective order, only to have Defendant propose a new "attorney's eyes only" requirement after we thought we had reached an agreement. Unless we hear from you immediately as to: (1) if your client agrees to redaction in lieu of "attorneys eyes only" language and agrees to remove the "attorney's eyes only" language from the proposed protective order (meaning the order can be entered); and (2) what financial and other customer information Defendant believes will need to be redacted, we anticipate moving on this issue.

## II.  LIST OF CURRENT EMPLOYEES

We re-iterated we need an updated list of all the individuals who worked or work for Defendant as a Mortgage Loan Officer or mortgage lender, since Defendant last disclosed a list of Mortgage Loan Officer employees on December 29, 2017. We have repeatedly asked Defendant for an updated list, including in an April 17, 2018 e-mail from Rick Goldsworthy. At our June 20 conference, you stated you would "pass the request along" to Defendant, and that you would respond if possible by the following Friday (June 29).

You also raised concerns about Defendant having an ongoing obligation to supplement the list of employees. However, you did not dispute that Plaintiffs are entitled to a list of employees that is up-to-date at least through the present. We have heard nothing from you on this issue to date, and must assume we are at an impasse. If that assumption is incorrect, please immediately disclose an updated list of all individuals who worked or work for Defendant as a Mortgage Loan Officer/mortgage lender, through present.

## III.  DEFICIENCIES

### A.  Outlook Calendars For Named Plaintiffs and All Opt-In FLSA Plaintiffs/E-mail Accounts for Named Plaintiffs and All Opt-In FLSA Plaintiffs

You committed to producing the Outlook calendars for deponents Rick Clark, Armando Ortiz, Miranda Taylor, and Sarah Ward (whose depositions are all now noted for July), and agreed to prioritize the production of those Outlook calendars.  Scott Blankenship clarified that Plaintiffs would like Defendant to prioritize production of deponents' calendars. You stated you should be able to disclose those Outlook calendars in "a week or so." You also committed to providing a "schedule for production" of all the FLSA opt-ins' Outlook calendars. We have received nothing from you to date. We look forward to receiving both deponents' Outlook calendars and a schedule for production of all FLSA opt-ins' Outlook calendars by June 29.

At our June 20 conference, you also said you are "not prepared to explain today" why Defendant no longer has Named Plaintiffs' Outlook calendars. Mr. Hess said Defendant has some calendar-related data for Named Plaintiffs, including some dates for calendar invites that were sent or received, but would need to "go back and check" exactly what data Defendant still has. You committed to providing a substantive response as to what data Defendant does and does not have by July 6. You did not provide a date certain when Defendant would explain why it no longer has Named Plaintiffs' complete Outlook calendars.

Finally, with respect to e-mail accounts of Named Plaintiffs and FLSA opt-ins, you stated you anticipated providing a "schedule for disclosure" of the e-mail accounts of Named Plaintiffs and FLSA opt-ins, by July 6.  You also agreed to prioritize disclosing e-

mail accounts in .pst format for Named Plaintiffs and for deponents Sarah Ward, Rick Clark, Miranda Taylor, and Armando Ortiz.

### B. Outlook Calendars For Managers

You re-iterated that Defendant refuses to disclose the Outlook calendars of Mortgage Loan Officers' managers. It has come to our attention that MLOs in fact at least occasionally shared their Outlook calendars and/or specific calendar appointments with their managers. Managers' Outlook calendars (with metadata intact) thus reflect not only their own scheduled activities, but also what appointments their MLOs shared with them via Outlook (and that they thus unquestionably knew about). In light of the fact that MLOs at least occasionally shared Outlook calendars and specific calendared appointments with managers, making managers' calendars unquestionably relevant to what they knew or should have known about MLOs' activities outside business hours, please let us know if you will stand on your objection to disclosing managers' calendars. If you intend to stand on the objection, we anticipate moving to compel.

### C. Timekeeping Information For All MLOs, April 17, 2014 To Present

We discussed disclosure of timekeeping data in its native format, including disclosure that preserves metadata showing when timekeeping entries were made and by whom, and if those entries were changed after initial entry ("change data"). Mr. Hess stated that, for the Empower system, Defendant can run a report that shows some change information, but the report will not say who made the change or how it was made. Mr. Hess stated Defendant is reaching out to Ultipro. Mr. Hess stated that Defendant has not found a report that will show change data for Ceridian. We asked if the change data still exists, in some form, in the original timekeeping systems. Mr. Hess stated that Defendant is still determining what data exists in the systems. You stated you would provide a report of your findings about what data exists in the Empower, Ultipro, and Ceridian systems, and how that data can be accessed, by July 6.

### D. All E-mails and Other Internal Documents Related To Defendant's Timekeeping Procedures

We explained our position that Defendant has an affirmative duty to look for responsive documents, including e-mails. Managers and others who have responsive e-mails presumably know where at least some of those e-mails are. We stated that we would like to discuss and agree on search terms, but that we would like the discussion about search terms to take place concurrently with Defendant's own search for documents.

You confirmed again that you believe Defendant has produced all documents other than e-mails that are responsive to this request. You also confirmed Defendant will interview both all currently employed Mortgage Loan Officer managers (including managers "up the chain") and currently employed Human Resources employees, and will

ask them if they are aware of responsive documents related to timekeeping procedures, <u>including e-mails</u>. You stated Defendant will complete this process and disclose all responsive documents by July 6.

### E. Electronic Files For All MLOs, April 17, 2014 To Present

You stated that Defendant does not have log in/log out information for Named Plaintiffs. You declined to explain why that is, or if that information has been destroyed.

<u>You agreed to provide a "schedule for disclosure" of log in/log out data for other FLSA opt-ins by July 6.</u> You did not commit to a date when Defendant would actually disclose responsive data.

### F. Training Materials

You stated Defendant is double checking whether or not it has disclosed all responsive training materials. You stated Defendant would be finished checking, and would disclose any additional responsive training materials, by July 6. When you disclose any additional responsive documents on or before July 6, <u>please also formally supplement your discovery responses and state that all responsive documents have been disclosed.</u> Fed. R. Civ. P. 26(e)(1)(a).

### G. Policies and/or Procedures Related to Overtime, Overtime Pre-Approval, Attendance, Compensable Time, and Clocking In and Out

Our discussion about this issue was similar to our discussion about (D). You confirmed Defendant will interview both Mortgage Loan Officers' managers/supervisors (including managers "up the chain") and Human Resources employees, and will ask them if they are aware of documents responsive to this specific request, <u>including any responsive e-mails</u>. <u>You stated Defendant will complete this process and disclose all responsive documents it locates, including e-mails, by July 6.</u>

### H. Communications Related to MLOs' Requests For Approval Of Overtime

Our discussion about this issue was similar to our discussion about (D). You confirmed Banner will interview both its managers (including managers "up the chain") and Human Resources employees, and will ask them if they are aware of any responsive documents, <u>including e-mails,</u> that relate to MLOs' requests for approval of overtime. <u>You stated Defendant will complete this process and disclose all responsive documents it locates, including e-mails, by July 6.</u>

### I. Documents Related To Warnings

Our discussion about this issue was similar to our discussion about (D). You confirmed Defendant will interview both its managers (including managers "up the

chain") and Human Resources employees, and will ask them if they are aware of any responsive documents, <u>including e-mails</u>, related to warning/admonishing any MLO about working overtime. <u>You stated Defendant will complete this process and disclose all responsive documents it locates, including e-mails, by July 6.</u>

J. <u>Documents Reflecting Negative Employment Action Related to Unapproved Overtime</u>

Our discussion about this issue was similar to our discussion about (D). You confirmed Defendant will interview both its managers (including managers "up the chain") and Human Resources employees, and will ask them if they are aware of any responsive documents, <u>including e-mails</u>. <u>You stated Defendant will complete this process and disclose all responsive documents by July 6.</u>

K. <u>Identity of All Managers</u>

Defendant has now disclosed the names, primary branch locations, titles, and dates of employment of all employees who managed/supervised Mortgage Loan Officers, from April 17, 2014 to present.

At our June 20 conference, you also confirmed Defendant is working on determining the "chain of command," as to who managed whom. You stated this is a complicated issue, and is taking time. <u>Please provide us an update on Defendant's progress, together with all substantive information Defendant has gathered, by July 6.</u>

L. <u>Communications To or From Managers Related to Overtime</u>

Our discussion about this issue was similar to our discussion about (D). You confirmed Defendant will interview both its managers (including managers "up the chain") and Human Resources employees, and will ask them if they are aware of documents responsive to this specific request, <u>including e-mails</u>. <u>You stated Defendant will complete this process and disclose all responsive documents by July 6.</u>

M. <u>Organizational Charts</u>

You confirmed Defendant is working on this. <u>Please disclose responsive organizational charts by July 6.</u>

N. <u>Documents Reflecting Unapproved Overtime Hours</u>

Our discussion about this issue was similar to our discussion about (D). You confirmed Defendant will interview both its managers (including managers "up the chain") and Human Resources employees, and will ask them if they are aware of any responsive documents, <u>including e-mails</u>. <u>You stated Defendant will complete this process and disclose all responsive documents it locates by July 6.</u>

O. Documents Instructing MLOs As To "On-the-Clock" Work

Our discussion about this issue was similar to our discussion about (D). You confirmed Defendant will interview both its managers (including managers "up the chain") and Human Resources employees, and will ask them if they are aware of any documents responsive to this request, including e-mails. You stated Defendant will complete this process and disclose all responsive documents it locates by July 6.

P. Description Of and Documents Related To Meeting with HR and AWB Western Washington Team

You stated Defendant will search for responsive documents, and will provide responsive documents by July 6.

Q. Description Of Efforts To Preserve ESI

In your June 14 letter, you stated Defendant was "willing to describe why it no longer has named Plaintiffs' Outlook calendars and why Defendant's systems no longer contain system log on/off information for Named Plaintiffs. You stated that apart from this specific information, Defendant's ESI preservation efforts are privileged and protected from disclosure.

However, at our June 20 conference, you stated you were not in fact prepared to describe why Defendant no longer has Outlook calendars and log on/log off information for Named Plaintiffs. You did not provide a date certain when you would be prepared to describe this. We are at an impasse on this issue, both with respect to a description of Defendant's ESI preservation efforts and with respect to an explanation of why Defendant no longer has Named Plaintiffs' Outlook calendars and log on/log off data.

R. Identities of Disciplined MLOs

You stated Defendant will interview both its managers (including managers "up the chain") and Human Resources employees, and will ask them to identify all MLOs who have been disciplined for overtime related issues or for not "complet[ing] their essential job duties within 40 hour a week, or whether their attempts to do so resulted in performance discipline." You stated Defendant would supplement its response with the identities of all such employees by July 6.

You also stated you will ask managers and human resources employees if they are aware of any documents responsive to this request, including e-mails, and disclose the same by July 6.

S. Identities of MLOs who made OT-related complaints.

You confirmed that this request encompasses MLOs who were discouraged from reporting overtime, who were told their production numbers do not justify working and/or reporting overtime, or who were told they were too new to work and/or report overtime. You also confirmed you will interview managers and Human Resources employees about this request, and will identify all MLOs who made overtime-related complaints by July 6.

T.  Identity Of All FLSA Lawsuits Against Defendant In the Past Ten Years

In your letter of June 14, you stated Defendant is willing to identify FLSA lawsuits filed since April 14, 2017 (which you clarified was intended to be April 14, 2014).  At our conference on June 20, we explained we do not think this request should be limited to only the last three years.  You stated that this might be the first FLSA class action even filed against Defendant, and that you would need to look into this issue further.  We asked you to respond if possible by Friday, June 22.  You stated you would "make the ask" and see if that would be possible.  We have received nothing from you to date. If Defendant does not disclose all FLSA lawsuits against the Bank in the past ten years by July 6 (the date Defendant agreed to disclose a number of other documents), or respond in writing that no responsive documents exist, we will assume we are at an impasse on this issue.

Very truly yours,

THE BLANKENSHIP LAW FIRM, P.S.

Charlotte Sanders

# EXHIBIT I



Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045

**Ken Payson**
(206) 757-8126 tel
(206) 757-7126 fax

kenpayson@dwt.com

July 6, 2018

*Via Email Only*

Charlotte Sanders
The Blankenship Law Firm, P.S.
100 Second Avenue, Suite 3250
Seattle, WA 98104
csanders@blankenshiplawfirm.com

Re: Bolding v. Banner Bank

Dear Charlotte,

I write in response to your letter of June 28, 2018, regarding discovery issues and to follow up regarding our discovery conference on June 20, 2018.

## I. PROTECTIVE ORDER

With this letter, I am enclosing proposed revisions to the draft protective order to address plaintiffs' concerns regarding the attorneys' eyes only provision while also ensuring Banner meets its obligations under the Gramm Leach Bliley Act to safeguard customers' personally identifiable information. In short, the revisions propose Banner will produce emails and other documents without redaction and that plaintiffs' counsel will redact any customer personally identifiable information before sharing them with plaintiffs, the opt-ins, or others. Please let us know if you agree to this approach.

## II. MLOS HIRED SINCE DECEMBER 2016

Pursuant to Charlotte's and Sheehan's email correspondence on July 5, 2018, Banner will supplement the prior list of MLOs with individuals hired since December 2016 based on plaintiffs' representation that they will not issue any further FLSA opt-in notices without the Court's approval. We plan to supplement the list by July 13, 2018.

## III. INFORMATION PLAINTIFFS SEEK

A.  <u>Outlook calendars for named plaintiffs and FLSA opt-ins.</u>

Pursuant to your request, we have prioritized locating information regarding the scheduled deponents' Outlook calendars and .pst files. I've summarized that information regarding the deponents below.

**Deponent's Outlook Calendars**: To preserve Outlook calendars in a .pst format, Banner must complete a process called an "email restore." Those restores can only be completed while an employee is currently employed or very shortly after the employee leaves. Here, all of the deponents (including the named plaintiffs) left Banner (or AWB) well before they joined this lawsuit, except for Rick Clark. We are pulling his Outlook calendar .pst file and hope to provide it to you by the end of next week. (This assumes the parties finalize their protective order by then because we understand that entries in the Outlook calendar .pst sometimes contain customer information, such as customer names.)

**Deponent's Outlook Emails**: Banner also uses the "email restore" process to capture Outlook email .psts. Here, we have an Outlook email .pst for Ricky Clark because he (unlike the other deponents) was employed by Banner when he joined the lawsuit. We also have an Outlook .pst for Kelly Bolding because that .pst was pulled in the prior *Erickson* litigation.

Banner also has obtained a "compliance search" tool that allows it to search active Outlook users' emails for emails they sent to or received from users who are no longer active. Using that tool, we obtained emails for Sarah Ward and Miranda Taylor, and additional emails for Mr. Clark (which likely duplicate the emails in his .pst file). The tool did not return search results for the other deponents.

Finally, Banner has been using an email journaling tool to capture emails sent to and from MLOs, managers, and others. That journal contains additional emails for Mr. Clark because he was the only deponent employed after the lawsuit started.

We are working to produce emails from these sources for the deponents by July 23, 2018, although retrieving the emails from the journal may take longer because we will need to send an employee to an offsite server to retrieve the emails. (This production schedule assumes the parties finalize their protective order by then.) We also have located a few emails sent to or from Bolding, Manfredi, and Ortiz that were produced in the *Erickson* litigation as one-off loose emails (i.e., emails outside .pst files), and we have re-produced them with today's letter because they do not contain client information.

**Other Outlook calendars and emails**: We are continuing to work to obtain emails and Outlook calendars, to the extent available, for the other opt-ins. We hope to complete production of those data by August 10, 2018.

B.    <u>Outlook calendars for MLO managers</u>.

Thank you for the additional information regarding why plaintiffs contend manager outlook calendars are relevant. We will confer with our client and report back by July 13th.

C.    <u>Timekeeping information for named plaintiffs and FLSA opt-ins</u>.

We have investigated our ability to retrieve audit data regarding the timekeeping systems used by AWB (Ceridian) and Banner (Empower and UltiPro) during the purported liability period.

**Ceridian**: When Ceridian was decommissioned around the time of the merger with Banner in late 2015, Ceridian provided Banner an extract of the data from the system. However, that extract did not include audit data. Therefore, Banner does not have audit data for the Ceridian system.

**Empower and UltiPro**: I have enclosed with this letter examples of the audit reports Banner can run on the Empower and UtliPro data. (The UltiPro report has been redacted because the sample is for a non-MLO). These are the only pre-set audit reports that we have been able to locate in the Empower and UtliPro system. Please let us know if you would like us to retrieve these reports for the named plaintiffs and opt-ins.

D.     <u>Emails and other documents relating to timekeeping policies procedures</u>.

As Ken mentioned in his prior letter, we already produced Banner and AWB timekeeping policies and procedures for MLOs from April 17, 2014, forward.

Pursuant to your request, we also have contacted MLO managers and MLO-related HR employees to ask if they have any documents, including emails, related to timekeeping policies or procedures for MLOs. We have spoken with all but one of the managers and all but two of the HR individuals. Those individuals have been on vacation. We plan to finish reaching out to those individuals next week.

To date, the interviews have not produced any additional documents related to timekeeping policies and procedures for MLOs. As Ken previously stated, we are willing to confer with plaintiffs on email search terms in a further effort to locate documents regarding MLO timekeeping policies and procedures. Please let us know your thoughts regarding search terms on this topic.

E.     <u>Electronic files for named plaintiffs' and FLSA opt-ins</u>.

We have collected additional information regarding log-in and log-out information. We have located log-in/out information for Banner's mortgage document management system called Encompass. Although Banner could not access those data directly, we were able to access them using a vendor. The data cover the putative liability period. We are working to pull those data for the deponents first and then for the rest of the opt-ins. We plan to have data for the deponents pulled by July 13, 2018, and data for the other opt-ins pulled by July 20, 2018. We have not yet located log-on/log-off information for AWB's legacy systems.

F.     <u>Timekeeping training materials</u>.

We already produced the timekeeping training materials Banner Bank was reasonably able to locate. Pursuant to plaintiffs' request, we contacted MLO managers and MLO-related

HR employees to ask if they have any additional training materials, including training materials in emails.  As discussed above, we are following up with a handful of additional interviews because some interviewees have been out of the office for vacation.

To date, those interviews have not produced any additional documents.  As Ken previously mentioned, we are willing to confer with plaintiffs on email search terms in a further effort to locate documents regarding MLO trainings regarding overtime, timekeeping, and hours worked.   Please let us know your thoughts regarding search terms on this topic.

G.      Policies/procedures regarding OT, OT preapproval, attendance, compensable time, clocking in/out.

We already produced what Banner was reasonably able to locate in this regard.  Pursuant to plaintiffs' request, we contacted current MLO managers and MLO-related HR employees to ask if they have any additional policies or procedures regarding the issues listed above.  As discussed above, we are following up with a handful of additional interviews because some interviewees have been out of the office for vacation.

To date, those interviews have not produced any additional documents.  As Ken previously mentioned, we are willing to confer with plaintiffs on email search terms to ensure we have located all responsive policies and procedures.   Please let us know your thoughts regarding search terms on this topic.

H.      MLOs' requests for OT approval.

Pursuant to plaintiffs' request, we contacted current MLO managers and MLO-related HR employees to ask if they have any documents related to MLOs requesting pre-approval for overtime.  While we are continuing to follow up with certain individuals as discussed above, we have located two overtime pre-approval requests, which we are producing with this letter.

As Ken previously mentioned, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run.  Please let us know your thoughts regarding search terms.

I.      Documents warning/admonishing MLOs about working unapproved OT.

Pursuant to plaintiffs' request, we contacted current MLO managers and MLO-related HR employees to ask if they have any documents related to warning or admonishing MLOs about working unapproved overtime.  While we are continuing to follow up with certain individuals as discussed above, we have not located any responsive documents.

As Ken previously mentioned, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run.  Please let us know your thoughts regarding search terms.

   J.  <u>Documents reflecting negative employment action against MLOs working unapproved OT</u>.

   Pursuant to plaintiffs' request, we contacted current MLO managers and MLO-related HR employees to ask if they have any documents related to warning or admonishing MLOs about working unapproved overtime. While we are continuing to follow up with certain individuals as discussed above, we have not located any responsive documents.

   As Ken previously mentioned, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these subjects and work with Plaintiffs' counsel on search terms to run. Please let us know your thoughts regarding search terms.

   K.  <u>MLO manager identification</u>.

   Reconstructing the managerial chains for the FLSA opt-ins by manually manipulating date from three different systems is proving highly time consuming. We anticipate completing the process by July 27, 2018.

   L.  <u>Communications to/from MLO managers regarding OT</u>.

   Pursuant to plaintiffs' request, we contacted current MLO managers and MLO-related HR employees to ask if they have any communications to or from MLO managers regarding overtime. While we are continuing to follow up with certain individuals as discussed above, we have located the two emails discuss in sub-section III.H, above.

   As Ken previously stated, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run. Please let us know your thoughts regarding search terms.

   M.  <u>Supervisory chain of command information / Organizational Charts</u>

   We have not been able to locate organizational charts that show the chain of command for the opt-in plaintiffs, but as discussed in section III.K, above, we are working to reconstruct the chain of comment for the opt-ins and anticipate completing that process by July 27, 2018.

   N.  <u>Documents reflecting unapproved OT hours</u>.

   Pursuant to plaintiffs' request, we contacted current MLO managers and MLO-related HR employees to ask if they have documents regarding unapproved overtime hours. While we are continuing to follow up with certain individuals as discussed above, we have not located any responsive documents.

   As Ken previously mentioned, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and HR for emails discussing these

subjects and to work with Plaintiffs' counsel on search terms to run. Please let us know your thoughts regarding search terms.

O.      Documents instructing MLOs regarding on-the-clock work.

Banner Bank previously produced documents discussing what hours count as hours worked that it located after a reasonable search and inquiry. Pursuant to plaintiffs' request, we contacted current MLO managers and MLO-related HR employees to ask if they have additional documents regarding what constitutes hours worked. While we are continuing to follow up with certain individuals as discussed above, we have not located any additional responsive documents.

As Ken previously mentioned, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails discussing these subjects and to work with Plaintiffs' counsel on search terms to run. Please let us know your thoughts regarding search terms.

P.      More information about HR and manager meeting referenced in Jeffrey Keeney's declaration.

We spoke with Mr. Keeney regarding this request and he has not located any documents regarding the meeting. One of the Human Resources individuals whom we believe was at the meeting has been on vacation, and we plan to touch base with her next week when she return to see if she has documents from this meeting.

Q.      ESI preservation efforts.

Please see the information provided in sections III.A and III.E, above, regarding Plaintiffs' Outlook calendars, emails, and log-in/log-off data. Please let us know if plaintiffs require additional information.

R.      Identities of disciplined MLOs.

Pursuant to plaintiffs' requests, we contacted current MLO managers and MLO-related HR employees to ask if they have documents regarding MLOs being disciplined for overtime related issues and for not completing their essential job duties within 40 hours a week, or whether their attempts to do so resulted in performance discipline. While we are continuing to follow up with certain individuals as discussed above, we have not located any such MLO discipline.

As with the other requests, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails regarding responsive discipline. Please let us know your thoughts regarding search terms.

S.     Identities of MLOs who made OT-related complaints.

Based on our interviews with current MLO managers and MLO-related Human Resources individuals, here are the names of individuals who raised concerns about not having recorded all their hours worked during the putative liability period: Madeleine Roozen Cook, Jennifer Cecil, Triana Gaitan, Janele Haan, Dave Holmly, David Howard, Bonnie Thompson, Karen Wright, Christy King, Lisa Knight, and Jeff Enrico.  We also have located some documents regarding their concerns and are producing the documents we've located so far.

As Ken previously mentioned, Banner Bank is willing to electronically search the .pst files of named Plaintiffs, FLSA opt-ins, their managers, and MLO-related HR individuals for emails regarding MLO concerns about overtime compensation and to work with Plaintiffs' counsel on search terms to run.  Please let us know your thoughts regarding search terms.

T.     Identity of all FLSA lawsuits against Banner in the past 10 years.

Please see the information I provided in my email dated June 28, 2018.

Sincerely,

DAVIS WRIGHT TREMAINE LLP

/s/ Ryan Hess

Ryan Hess


cc:    Sheehan Sullivan
       Ken Payson
       Laura-Lee Williams

# EXHIBIT J

| | |
|---|---|
| **From:** | Charlotte Sanders |
| **Sent:** | Monday, July 9, 2018 4:07 PM |
| **To:** | Hess, Ryan |
| **Cc:** | Scott Blankenship; Rick Goldsworthy; Erica Brunette; Payson, Kenneth; Williams, Laura-Lee; Sullivan, Sheehan; Childs, Stephanie; Nathan Durham |
| **Subject:** | RE: Banner/Bolding - July 6, 2018, Discovery Correspondence |
| **Attachments:** | Banner_Bolding- Stipulated Protective Order-Edited.docx |

Hi Ryan,

Thank you for your letter and for the production. We have reviewed your letter and the proposed protective order.  Our responses to several different issues are below.

1. Protective order

   With respect to the proposed protective order, we are happy to take on the burden of redacting confidential information before using documents as deposition exhibits or filing them with the Court.  However, we cannot agree to redact customer names and other information before showing documents to our clients, or to experts and consultants.  The confidentiality language in the protective order, together with the acknowledgment recipients are required to sign, is more than sufficient to ensure recipients keep the information confidential.  Our clients need to see certain information, and specifically customer names, in order to work with the documents. For example, if a document refers to a "closing" but does not state the customer name, the client may have no way to determine if the document relates to one of their customers or to something they have knowledge of.  Requiring that we redact a wide array of customer information before showing documents to our clients also imposes an undue burden on us, especially considering the scope of the information to be redacted.

   I have attached a proposed protective order that requires redaction of confidential information before Plaintiff uses documents as deposition exhibits or file them with the Court, but allows us to show unredacted documents to clients and others who have signed the acknowledgment and agreement to be bound. Please let me know by COB Tuesday, July 10 if Defendant will agree to this language.  As Defendant proposes to withhold responsive e-mails and other documents pending entry of a protective order, it is urgent that we either reach an agreement on this or, if at an impasse, ask the Court to resolve the issue.

2. Outlook calendars and e-mails for Named Plaintiffs and FLSA opt-ins

   Our original discovery requests asked for Outlook calendars.  You stated that Defendant did not preserve Named Plaintiffs' Outlook calendars (but declined to explain how this happened).  However, you agreed to produce Outlook calendars of other FLSA opt-ins "to the extent they were reasonably available."  At our June 20 conference, you stated you should be able to produce deponents' Outlook calendars in a "week or so," followed by a schedule for production of FLSA opt-ins' calendars. In response to a supplemental discovery request for Outlook e-mail accounts, you stated you would also produce e-mail accounts to the extent they were available.  You did not, at any of our multiple discovery conferences on this issue, ever indicate that a broad swath of responsive Outlook accounts or e-mails may have been lost, destroyed, and/or otherwise rendered unrecoverable.  On the contrary, you led us to believe the calendars and e-mails existed, and that you would disclose them.

   In your letter of July 6, you now reveal for the first time that Defendant can only produce deponents' Outlook calendars and e-mail accounts in .pst format through an "e-mail restore" process, which in turn can only be used to restore information for MLOs 'currently employed or very shortly after that employee leaves." As a result, you can only produce the e-mail account and calendar for deponent Rick Clark.  You state that the other deponents all left Defendant's employment "well before" opting in (implying that Defendant lost and/or destroyed the accounts

1

and calendars for those deponents). You also state that a process called "e-mail journaling" can be used to capture "some" other e-mails. You do not explain how this process works, what other e-mails can be captured, or why the full e-mail accounts and calendars are not retrievable. You also state that some e-mails may be recoverable by searching for e-mails between current employees and deponents. Finally, Defendant continues to refuse to explain how Named Plaintiffs' Outlook calendars (and in Michael Manfredi's case, both his calendar and e-mail account) came to be lost and/or destroyed.

Our discovery requests did not ask for Outlook calendars and e-mails in .pst format only; they asked for Outlook calendars and e-mail accounts for FLSA opt-ins, regardless of format. While we appreciate Defendant's efforts to disclose e-mail accounts in .pst format, and while that format is certainly preferable, Defendant needs to disclose all responsive Outlook calendars and e-mail accounts, even if they are in another format and/or are archived. Based on your July 6 letter, where Defendant can only produce the Outlook calendars and e-mail accounts in .pst format for deponents who either are current employees or who left Defendant's employment after opting in, we must conclude that Defendant has destroyed the Outlook calendar information and e-mail accounts for all MLO employees who are not either "current" employees, or who left employment only after opting in. This is despite the fact that suit was filed in April of 2017, and despite the fact Defendant knew or should have known about pending wage and hour litigation as a result of the prior *Erickson v. AWB* litigation.

If this conclusion is incorrect, and if Defendant does in fact have Outlook calendars and e-mail accounts for FLSA opt-ins (including deponents) *other than* current employees and employees who left Defendant's employment only after opting in (even if the data is archived, on hard drives, or in some format other than .pst), please immediately let us know that the calendars and e-mail accounts do exist, and let us know when we can expect production. Please also define the term "very shortly after the employee leaves," so we know the exact time period after an employee leaves when an e-mail "restore" can be performed.

3. Timekeeping information in native format, including "change" metadata.

In your letter of July 6, you briefly explained that Defendant can run pre-set "audit reports" for the Empower and Ultipro systems. Defendant has disclosed two examples of pre-set audit reports that can be run from the Empower and Ultipro systems, and offered to disclose the same for other opt-ins. You have stated that audit reports are not available from the Ceridian system. We appreciate the example audit reports. However, Defendant's response to this request is still deficient. Defendant has still not disclosed a complete explanation of what data is available in native format from the three timekeeping systems, and how that data (including metadata related to changes) can be accessed, whether through "audit reports" or other means. For example, we still do not know if change metadata is preserved in some format either within the systems or outside them. The audit reports themselves are also not self-explanatory. I would like to confer with you further as to disclosure of timekeeping information, specifically as to what the "pre-set" audit reports show, and to what extent responsive information is recoverable outside those reports. Note that LCR 26(f)(2) requires both parties to review and understand how their clients' ESI is stored and how it can be retrieved, before any meet and confer regarding ESI.

I am available to confer with you as to timekeeping information tomorrow any time before 3:00 p.m. If you are not available then, please let me know when you would be available to confer this week.

Thank you,


Charlotte


--
**The Blankenship Law Firm, P.S.**
**Charlotte Sanders**
**1000 Second Ave., Suite 3250**
**Seattle, Washington 98104**
**Phone: 206-343-3467**
**Facsimile: 206-343-2704**
**csanders@blankenshiplawfirm.com**

[http://www.blankenshiplawfirm.com](http://www.blankenshiplawfirm.com)


**NOTICE:** This communication and any items attached are privileged and confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

\* \* \* \* \* \* \* \* \* \*

**ATTORNEY CLIENT RELATIONSHIP:** You are not a client of this law firm unless you have signed a formal written fee agreement prepared and signed by an authorized agent of The Blankenship Law Firm P.S., notwithstanding the fact that this communication and others may be privileged, confidential, and subject to the work-product doctrine.

---

**From:** Hess, Ryan <RyanHess@dwt.com>
**Sent:** Friday, July 06, 2018 5:39 PM
**To:** Erica Brunette <ebrunette@blankenshiplawfirm.com>; Rick Goldsworthy <rgoldsworthy@blankenshiplawfirm.com>; Nathan Durham <ndurham@blankenshiplawfirm.com>; Scott Blankenship <sblankenship@blankenshiplawfirm.com>; Charlotte Sanders <csanders@blankenshiplawfirm.com>
**Cc:** Payson, Kenneth <KennethPayson@dwt.com>; Williams, Laura-Lee <LauraLeeWilliams@dwt.com>; Sullivan, Sheehan <sulls@dwt.com>; Childs, Stephanie <StephanieChilds@dwt.com>
**Subject:** Banner/Bolding - July 6, 2018, Discovery Correspondence

Hi all – Please see the attached correspondence.  We have uploaded today's production to the same file transfer site as before (link below).  The password is the same.  I've also attached an updated version of the proposed protective order, which is discussed further in the attached letter.

[https://www.dropbox.com/sh/1whnt8yo8j89jcy/AAC2grMgsfGMOnzjduJzctlJa?dl=0](https://www.dropbox.com/sh/1whnt8yo8j89jcy/AAC2grMgsfGMOnzjduJzctlJa?dl=0)

Thanks,

Ryan

**Ryan Hess** | Davis Wright Tremaine LLP
Admitted in Washington and California
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8141 | Fax: (206) 757-7141
Email: ryanhess@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

# EXHIBIT K

CHARLOTTE SANDERS

July 16, 2018

Ryan Hess
Laura-Lee Williams
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045

Dear Ryan and Laura-Lee,

This letter memorializes what we discussed at the meet and confer Friday, July 13th.

A. <u>Timekeeping Information For All Opt-In Plaintiffs, April 14, 2014 To Present</u>

We discussed the sample audit reports that you sent from the Empower and Ultipro timekeeping systems, and what those reports show. Thank you very much for your explanation. As we discussed, Defendant agrees to disclose audit reports from the Empower and Ultipro timekeeping systems for all FLSA opt-ins and for Named Plaintiffs. Defendant also agrees to disclose the names that go together with the employee numbers in those reports, so we can tell which employee made a particular entry. <u>You agreed Defendant will provide a schedule for disclose of the audit reports by next Friday, July 20. You also agreed Defendant will prioritize disclosure of reports for the Named Plaintiffs and for Plaintiff' declarants.</u>

With respect to the Ceridian timekeeping system used by AWB, you stated that timekeeping metadata for the Ceridian system, including when timekeeping entries were made and by whom, is not in Banner Bank's possession or control. However, you stated the data may have been kept in some form by Ceridian itself. You agreed to check with Ceridian, ascertain whether and to what extent timekeeping metadata is available from them, and provide that information to us.

Finally, we discussed data related to supervisors' approval. Both the Empower and Ultipro timekeeping systems required managers to approve time cards. We are requesting any and all metadata related to manager's approval of timekeeping for FLSA opt-ins and Named Plaintiffs, including when each entry was approved and by whom. As we both noted, the timekeeping records disclosed thus far from the Ultipro system show a "null" in the "approval" column. You stated you are not sure if this information is in

Defendant's possession or control, but you will check with your client. <u>We look forward to receiving information as to whether or not "approval" metadata is in possession of Ceridian.</u>

B. <u>RFP V: Outlook Calendars For Managers</u>

We discussed Defendant's position that it will not disclose the Outlook calendars of its managers. I explained that calendars were at least occasionally shared between managers and MLOs, and that managers' calendars (inclusive of metadata) should show which MLO calendars were shared with them. I also explained that managers' calendars are extremely relevant because they presumably show work activities outside business hours that managers attended together with MLOs (and thus knew MLOs were working during that time period). I gave the example of the baseball game attended by manager Matt Towery, MLO Michael Manfredi, and others. You stated you would circle back with your client, but that Defendant refuses to disclose managers' calendars at this juncture. We continue to be at an impasse.

C. <u>RFP J (training materials related to timekeeping): Responsive Empower/Bannertime Documents</u>

We discussed the fact that, based on Plaintiffs' review of Defendant's document production to date, it appears Defendant has not disclosed any training materials or other documents at all related to the Empower/Bannertime timekeeping system. Plaintiffs understand that Banner Bank used this system from at least 2011 to 2017. You stated you would check on this issue. <u>Please disclose any and all responsive documents immediately.</u> Plaintiffs presume responsive documents exist, and these documents should have been disclosed long ago. Unless and until Defendant either produces responsive documents related to the Empower/Bannertime system, or states in writing that it has no responsive training documents at all related to Empower/Bannertime, Defendant's response to RFP J is deficient.

D. <u>Plaintiffs' RFP JJJ (Outlook e-mail accounts for Defendant's MLO declarants) and RFP KKK (timekeeping information for Defendant's MLO declarants)</u>

You explained that Defendant is at this time unwilling to disclose their MLO declarants' full e-mail accounts in .pst formats. I asked if Defendant would agree to disclose Outlook calendars for Defendant's declarants, together with timekeeping information responsive to RFP KKK. In asking this, Plaintiffs do not concede that declarants' full e-mail accounts are somehow protected from disclosure.

You stated you would respond by Friday, June 20 as to: (1) If Defendant agrees to disclose Outlook calendars and timekeeping information for their MLO declarants; and (2) a schedule for disclosure. <u>Please be advised that if we do not receive disclosure of all responsive Outlook calendars and timekeeping information by June 25, we will have no choice but to move on this issue.</u> Plaintiffs are requesting timekeeping information and

Outlook calendars for less than ten people, and considering that all of Defendant's MLO declarants are current employees, this information is presumably not difficult to access. Defendant has already had over 30 days to locate and produce responsive information. Further delay is unreasonable.

E. <u>Plaintiff's RFP LLL and MMM (pay data supporting contention of overtime hours)</u>

You stated that Defendant believes names of MLOs should be redacted from pay data. I explained that the recently signed and filed protective order addresses any confidentiality concerns, and Defendant needs to disclose responsive unredacted pay data. <u>You stated you would respond by June 20 as to: (1) if Defendant agrees to disclose information responsive to RFP JJ; and (2) a schedule for disclosure. Please be advised that if we do not receive disclosure of all responsive pay data by June 25, we will have no choice but to move on this issue.</u> Defendant has already had over 30 days to locate and produce responsive information. In addition, Defendant presumably has already compiled the responsive pay data. Otherwise, Defendant would not have been able to file declarations stating the total overtime hours that Banner Bank and AWB claim they provided compensation for. Further delay is unreasonable.

F. <u>Outlook calendars and e-mail accounts of opt-in Plaintiffs</u>

We discussed the fact that Defendant has apparently lost and/or destroyed e-mail accounts and Outlook calendars for MLOs including FLSA opt-in Plaintiffs. I stated that I read your July 6 letter to mean that Defendant failed to preserve the full Outlook calendars and e-mail accounts for *all former employees except those who left employment after they opted into the FLSA collective action*. This would include employees who left employment after Plaintiffs filed suit in April 2017. You did not deny this.

I then explained that I would like to substantively discuss what responsive Outlook calendars and e-mail accounts Defendant does and does not have, in any format, whether and to what extent these Outlook calendars and e-mail accounts can be produced in any format, the extent to which Defendant has searched for responsive information, and whether responsive accounts have been lost and/or destroyed. <u>You asserted that all this information is privileged.</u> You could only say that Defendant would disclose responsive information to the extent available, including on backup tapes or hard drives. But you declined to say whether any information was in fact preserved in this way. I referred to LCR 26(f), which requires a discussion of the nature, scope, and location of discoverable ESI. If a party has stated it cannot produce responsive ESI, this discussion should include a substantive discussion about the party's difficulty in producing responsive ESI, and the extent to which the party has searched for ESI to date.

Unless and until Defendant participates in a full and substantive discussion about what responsive Outlook e-mail accounts and Outlook calendars do and do not exist in any format, Defendant's difficulty in producing this responsive ESI, and the extent of

Defendant's search for this ESI, we are at an impasse. The case I mentioned during our conversation is enclosed.

In addition, Defendant has not, to date, produced a single Outlook calendar or e-mail account for either Named Plaintiffs or the FLSA opt-ins. Your letter of July 6 stated that Defendant now "hopes" to complete production of Outlook calendars and e-mail accounts for the FLSA opt-ins "to the extent available" by August 10, 2018. While we appreciate Defendant's production efforts, the letter did not state when or if Defendant would ever actually complete responsive production, or why Defendant has been unable to produce a single Outlook calendar or e-mail account to date. Defendant has also repeatedly refused to discuss the meaning of "to the extent available," meaning Plaintiffs have no way of knowing what information Defendant considers "available," or what subset of responsive information will eventually be disclosed.

Defendant's continued delay in producing existing Outlook calendars and e-mail accounts for the FLSA opt-ins is unreasonable, especially when Defendant refuses to participate in a substantive discussion about its search for responsive ESI. <u>Unless and until Defendant produces each and every responsive e-mail account and Outlook calendar that still exists, in whatever format it exists, we are at an impasse.</u>

G. <u>Fee Agreements</u>

I reiterated Plaintiffs' position that fee agreement are privileged and not subject to disclosure. You acknowledged that Defendant seeks the fee agreements primarily in order to ascertain if there are "kickback" agreements or other monetary agreements between Plaintiffs' counsel and the Named Plaintiffs and/or FLSA opt-ins. As Mr. Blankenship stated during Michael Manfredi's deposition, Plaintiffs' counsel is willing to stipulate in writing that there are no "kickback" agreements or monetary incentive agreements between any of the Named Plaintiffs or FLSA opt-ins and Plaintiffs' counsel. This stipulation should be more than sufficient to address Defendant's concerns.

Very truly yours,

THE BLANKENSHIP LAW FIRM, P.S.

Charlotte Sanders

WESTLAW

2008 WL 1805727
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
Seattle.

Mikron Industries, Inc. v. Hurd Windows & Doors, Inc.
United States District Court, W.D. Washington, at Seattle | April 21, 2008 | Not Reported in F.Supp.2d | 2008 WL 1805727 *(Approx. 3 pages)*

MIKRON INDUSTRIES, INC., Plaintiff,

v.

HURD WINDOWS & DOORS, INC., et al., Defendants.

No. C07-532RSL.

April 21, 2008.

**Attorneys and Law Firms**

Gavin Williams Skok, Michael Pierson, Riddell & Williams, Seattle, WA, for Plaintiff.

Jeffrey S. Eden, Bullivant Houser Bailey, Portland, OR, Barbara J. Rhoads-Weaver, Charles A. Lyman, Bullivant Houser Bailey, Seattle, WA, for Defendants.

ORDER DENYING MOTION FOR PROTECTIVE ORDER REGARDING ESI

ROBERT S. LASNIK, District Judge.

*\*1* This matter comes before the Court on defendants' "Motion for Protective Order Regarding ESI." Dkt. # 35. Relying on Fed.R.Civ.P. 26(b)(2), defendants ask the Court to shift the costs of defendants' remaining electronic discovery to plaintiff. Defendants allege that searching through their electronically stored information ("ESI") would generate substantial costs and yield cumulative results. Aside from the cost-shifting request, defendants raise no objection to discovery of their ESI. In response, plaintiff contends that defendants have not reasonably complied with discovery requests to date. In particular, plaintiff continues to seek communications relating to the inception and termination of plaintiff's business relationship with defendants.

Having reviewed the memoranda, declarations, and exhibits submitted by the parties, the Court finds that defendants failed to discharge their meet and confer obligation in good faith, as required by Fed.R.Civ.P. 26(c). Accordingly, defendants' motion for protective order regarding ESI is DENIED for failure to comply with Rule 26(c).

The conference requirement of Rule 26(c) is imposed for the benefit of both the Court and the parties and is intended to ensure that only genuine disagreements are brought before the Court. In the circumstances presented here, compliance with the Rule would have involved a more **substantive** discussion regarding defendants' difficulty in producing responsive **ESI**, the extent to which defendants have searched **ESI** to date, and the foundation for defendants' belief that a more thorough search of ESI, including backup tapes, would yield only information that has already been produced. Plaintiff's counsel stated that no meaningful discussion of these issues took place before the motion was filed, and defendants have submitted no evidence to dispute this fact. Instead, plaintiff's counsel received no response when it identified specific "gaps" in production and reasonably asked defendants to articulate the foundation for their assertion that unsearched ESI would produce "little additional responsive information." *See* Dkt. # 39 (Skok Decl.) at ¶ 13; Dkt. # 39, Ex. H. A conversation with opposing counsel does not become a "meet and confer" conference simply because a party has attached that label to the discussion.

Even considering defendants' arguments on their merits, the Court finds that defendants have not met their burden of demonstrating that plaintiff's discovery requests are unduly burdensome and/or cumulative. The rules of discovery presume that "the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). Congress added

**SELECTED TOPICS**

Federal Civil Procedure

Depositions and Discovery
  Requesting Party Discovery Demands

**Secondary Sources**

**How to Conduct International Discovery**
71 Am. Jur. Trials 1 (Originally published in 1999)
...In an increasingly global economy, lawyers are more likely to encounter litigants who are based primarily, if not entirely, in foreign countries. Dealing with an entity based outside of the United Stat...

**11.494. Extraterritorial Discovery**
Ann. Manual Complex Lit. § 11.494 (4th ed.)
...Laws of the United States. The procedures for obtaining evidence from other countries are prescribed by the Federal Rules of Civil Procedure, particularly Rule 28(b) (depositions in a foreign country);...

**APPENDIX III - FDA PREAMBLE, GUIDANCE AND OTHER ADVISORY DOCUMENTS**
Guide to Med. Device Reg. Appendix III
...AGENCY: Food and Drug Administration, HHS. ACTION: Statement of Policy for Regulating Biotechnology Products. SUMMARY: This notice describes the regulatory policy of the Food and Drug Administration ap...

See More Secondary Sources

**Briefs**

**Brief for Respondent and Real Parties in Interest**
1986 WL 727508
SOCIETE NATIONALE INDUSTRIELLE AEROSPATIALE and Societe De Construction D'avions De Tourisme, Petitioners, v. UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA, Respondent. (Dennis Jones, John and Rosa George, Real Parties in Interest)
Supreme Court of the United States
Oct Term 1986
...FN\* Counsel of Record Respondent United States District Court for the Southern District of Iowa together with Dennis Jones and John and Rosa George, real parties in interest, respectfully submit this b...

**Brief for Anschuetz & Co. GmbH and Messerschmitt-Boelkow-Blohm GmbH as Amici Curiae in Support of Petitioners**
1986 WL 727496
SOCIETE NATIONALE INDUSTRIELLE AEROSPATIALE and Societe de Construction d'Avions de Tourism, Petitioners, v. UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IOWA, Respondent.
Supreme Court of the United States
Mar. 31, 1986
...This amicus curiae brief is submitted in support of petitioners Societe Nationale Industrielle Aerospatiale and Societe de Construction d'Avions de Tourism. By letters filed with the Clerk of the Court...

Fed.R.Civ.P. 26(b)(2)(B) [1] in 2006 in response to concerns that the broad discovery principle announced in Fed.R.Civ.P. 26(b)(1) could cause responding parties to incur unreasonable costs in producing electronically stored information. *See* Advisory Committee's Notes on 2006 Amendment to Fed.R.Civ.P. 26(b)(2). The responding party bears the burden of showing that "identified sources are not reasonably accessible in light of the burdens and costs required to search for, retrieve, and produce whatever responsive information may be found." *Id.* In meeting this burden, the responding party should present details sufficient to allow the requesting party to evaluate the costs and benefits of searching and producing the identified sources. *Id.* This requirement mirrors the "meet and confer" obligation established by Fed.R.Civ.P. 26(c). If the responding party meets its burden, the court may consider a range of options, including cost-shifting, to alleviate the responding party's hardship. Fed.R.Civ.P. 26(c) (1). *See Oppenheimer Fund,* 437 U.S. at 358.

*2 ESI can be preserved in a wide range of diverse formats, some of which are more accessible than others. *See Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309, 318-20 (S.D.N.Y.2003). Although defendants directed their employees to search their hard drives for responsive information, Dkt. # 36 (Lex Decl.) at ¶ 3, defendants have not demonstrated any search efforts beyond that limited inquiry. Responsive information may be discovered during a more thorough search of defendants' non-backup ESI, including employee hard drives and active e-mail servers. Cost-shifting would not be appropriate in the context of this kind of search, as this ESI is considered reasonably accessible within the meaning of Fed.R.Civ.P. 26(b) (2)(C). *See id.*

With regard to ESI located on defendants' backup tapes, those courts that considered shifting the costs of electronic discovery to the requesting party were presented with more detailed information than that provided by the defendants in this case. [2] In alleging that continued discovery of their ESI would be unduly burdensome, defendants offer little evidence beyond a cost estimate and conclusory characterizations of their ESI as "inaccessible." Defendants have not provided the Court with details regarding, for example: (1) the number of back-up tapes to be searched; (2) the different methods defendants use to store electronic information; (3) defendants' electronic document retention policies prior to retaining an outside consultant; (4) the extent to which the electronic information stored on back-up tapes overlaps with electronic information stored in more accessible formats; or (5) the extent to which the defendants have searched ESI that remains accessible. Beyond the estimated costs, defendants have not demonstrated an unusual hardship beyond that which ordinarily accompanies the discovery process. Therefore, the Court finds that defendants have not met their burden of demonstrating that the requested ESI is "not reasonably accessible because of undue burden or cost."[3] *See* Fed.R.Civ.P. 26(b)(2)(B).

The Court also finds that plaintiff's requested discovery is neither "unreasonably cumulative or duplicative" nor outweighed by its likely benefit within the meaning of Fed.R.Civ.P. 26(b) (2) (C). In conclusory language, defendants assert that their ESI contains cumulative information of little value to plaintiff. Defendants' representation that responsive documents relating to their relationship with plaintiff exist primarily in paper form, Dkt. # 36 (Lex Decl.) at ¶ 4, appears largely speculative. The Court finds that defendants have not provided plaintiff with sufficient information to evaluate whether a search of defendants' ESI would be cumulative. *See* Dkt. # 39 (Skok Decl.) at ¶ 13; Dkt. # 39, Ex. H.

For all the foregoing reasons, defendants' motion for protective order regarding ESI is DENIED. The parties shall meet and confer regarding discovery of ESI before any related motions will be considered by the Court.

## All Citations

Not Reported in F.Supp.2d, 2008 WL 1805727

| Footnotes | |
|---|---|
| 1 | Fed.R.Civ.P. 26(b)(2)(B) provides: "A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery." |

**Brief for the United States and the Securities and Exchange Commission as Amici Curiae**

1986 WL 727504
SOCIETE NATIONALE INDUSTRIELLE AEROSPATIALE and Societe De Construction D'Avions de Tourism, Petitioners, v. UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA. (Dennis Jones, John and Rosa George, Real Parties in Interest)
Supreme Court of the United States
Aug. 22, 1986

...The United States is a party to the Hague Evidence Convention and has a strong interest in promoting international judicial cooperation consistent with domestic law. The Securities and Exchange Commiss...

See More Briefs

**Trial Court Documents**

**Lima LS PLC v. PHL Variable Ins. Co.**

2014 WL 11320831
LIMA LS PLC, Plaintiff, v. PHL VARIABLE INSURANCE COMPANY, a Connecticut corporation; Phoenix Life Insurance Company, a New York corporation; The Phoenix Companies, Inc., a Connecticut corporation; James D. Wehr, an individual; Philip K. Polkinghorn, an individual; and Dona D. Young, an individual, Defendants
United States District Court, D. Connecticut.
Feb. 20, 2014

...FN* admitted pro hac vice WHEREAS, certain materials and testimony sought and/or produced during the course of discovery may contain Confidential information, as defined herein; and WHEREAS, a protecti...

**In re Matterhorn Group, Inc.**

2012 WL 523592
In re: MATTERHORN GROUP, INC., Debtor; Vitafreze Frozen Confections, Inc., Debtor; Deluxe Ice Cream Company, Debtor
United States Bankruptcy Court, E.D California.
Feb. 10, 2012

...X Affects All Debtors Affects only Matterhorn Group, Inc. Affects only Vitafreze Frozen Confections, Inc. Affects only Deluxe Ice Cream Company. Chapter 11 Cases Hearing: Date: November 10, 2010 Tim...

**In re Color Star Growers of Colorado, Inc.**

2014 WL 657744
In re: COLOR STAR GROWERS OF COLORADO, INC., Vast, Inc., and Color Star, LLC, Debtors.
United States Bankruptcy Court, E.D. Texas, Sherman Division.
Jan. 14, 2014

...The matter having come before this Court on the Motion for Order(s) Approving/Authorizing (a) Sale(s) of Certain or Substantially All of the Estates' Assets Free and Clear of All Liens, Claims, Encumbr...

See More Trial Court Documents

2       *See generally Semsroth v. City of Wichita*, 239 F.R.D. 630 (D.Kan.2006);
        *Zubulake*, 217 F.R.D. 309 (S.D.N.Y.2003); *Rowe Entertainment, Inc. v. William
        Morris Agency, Inc.*, 205 F.R.D. 421 (S.D.N.Y.2002).

3       Because defendants have not met their threshold burden to show undue
        burden or cost, the Court will not apply the cost-shifting factors proposed by
        *Zubulake*, 217 F.R.D. at 322-24.

---

**End of
Document**                      © 2018 Thomson Reuters. No claim to original U.S. Government Works

---



# EXHIBIT L

Page 2

1                    UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF WASHINGTON

3                            AT SEATTLE

4    _____

5    KELLY BOLDING and MICHAEL        )
     MANFREDI, individually and       )
6    on behalf of a class of all      )
     others similarly situated,       )
7                                     )
                        Plaintiffs,   )
8                                     )
                        vs.           ) No. 2:17-cv-0601-RSL
9                                     )
     BANNER BANK, a Washington        )
10   Corporation,                     )
                                      )
11                      Defendant.    )

12   _____

          VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
13                             OF
                      MIRANDA S. TAYLOR
14   _____

15

16            Taken at Davis Wright Tremaine

17                 1201 Third Avenue

18                Seattle, Washington

19

20

21

22

23

24   DATE TAKEN:  JULY 19, 2018

25   REPORTED BY:  MELONIE RAINEY, RPR, CCR 2797

1    Q.   When you were in the office at Banner Bank

2  during your tenure as a mortgage loan officer, did --

3  did you work continuously at least from nine am to 5

4  p.m. in -- engaged in compensable work on Banner Bank's

5  behalf?

6              MR. BLANKENSHIP:  Object to the form.

7    A.   Can you repeat the question.

8              MR. PAYSON:  Can you read back the question.

9              (Last question read.)

10   A.

11             MR. BLANKENSHIP:  Object to the form and

12  foundation as to work.

13   A.   I had would say as soon as I wake up I am

14  checking my email so is it nine to five, no.  It is as

15  soon as I wake I am checking emails, responding to those

16  emails, responding to texts, phone calls, whatever

17  happened in the night where I wasn't -- where I was

18  sleeping and unavailable.

19   Q.   My question was when you're in the office from

20  nine to five, understanding you may work before or after

21  work but when you're in the office from nine to five,

22  month through Friday, did you spend every minute of

23  those 8 hours engaged in compensable work for Banner

24  Bank?

25   A.   Yes.

1      Q.    Your practice at both AWB bank and Banner Bank

2    for the entire time you were employed regardless of as

3    loan assistant or mortgage loan officer is you only

4    recorded 8 hours a day Monday through Friday with no

5    overtime?

6               MR. BLANKENSHIP:   I object to form to the

7    extent it is vague and ambiguous and to the extent the

8    dongle.

9      A.    When -- when I was an assistant at AmericanWest

10   Bank, there was a different system.  And then when we

11   became Banner, that's when I got the dongle and you had

12   to punch in -- bless you -- punch in and punch out but

13   as soon as they told me we're going to -- this is how we

14   record the time.  So I'm still a loan assistant and they

15   said you get this little dongle, you log into the

16   system, you punch in when you get into the office, you

17   punch out when you go to lunch, punch back in when you

18   come back from lunch, punch out when you're done for the

19   day.  But -- I was working more as a loan officer than I

20   was a loan officer assistant so I was still performing

21   the same duties as a loan officer which was checking my

22   email first thing when I wake um, contacting borrowers,

23   nights and weekends, doing all of those things, so the

24   dongle didn't work because I can't enter my time on my

25   phone.  It won't let you record outside of on your desk

Page 170

1    drove that year.

2                    MS. SANDERS:  Counsel I'm going to put an

3    objection on the record.  This wasn't produced.  We have

4    asked for all of Ms. Taylor's emails and you handed one

5    across the table that as far as I know it's never been

6    produced to us.

7                    MR. PAYSON:  That's a speaking objection.

8    So the objection is we didn't produce it?

9                    MS. SANDERS:  You didn't produce the

10   document to us.

11                   MR. PAYSON:  Okay.  Noted.

12                   MS. SANDERS:  If you hand us another

13   document we might have to stop this and get the judge on

14   the phone, another document that wasn't produced.  You

15   have given us no time to prepare Ms. Taylor or to even

16   show her this.  You're catching us by surprise with this

17   and I can only assume that's deliberate that you

18   withheld this.

19                   MR. PAYSON:  That's a nice long speaking

20   objection as well, Counsel, but the -- what you are in

21   the mist with others of my colleagues on a dispute over

22   the vast overbreadth of your email request which I think

23   is in the process we're working through.  I think that's

24   a proper form to resolve that, but if your objection is

25   that we haven't produced this, then I appreciate you

1    note that for the record and we can deal with it.

2              MS. SANDERS:  Not --

3              MR. PAYSON:  -- in a meet and confirm or on

4    the scope of the request.

5              MS. SANDERS:  It's more than that, it's that

6    you represented that you didn't have it.  You

7    represented you didn't have Ms. Taylor's email account

8    and you hand me across the table an email that I can

9    presume is from her email account.  That is a huge issue

10   and it's more than an objection to form.

11             MR. PAYSON:  That's inaccurate and this

12   isn't the proper forum for that.  I ask you to not

13   continue to engage in speaking objections and we can

14   continue for the process on the scope of your email

15   request.

16        Q.   Ms. Taylor, do you have any -- sitting here

17   today you don't recall whether you traveled to Olympia

18   to your sister's house in or around December 20th, 2016

19   by car or whether you flew, is that fair?

20        A.   That's fair.  We traveled to my sister's a lot.

21   And if it is wintertime, sometimes we fly and sometimes

22   we drive.  I just don't remember if that year we flew or

23   if we drove.

24        Q.   And is it your testimony that even during that

25   period December 20th through December 26th, 2016 that

DRAFT COPY

# EXHIBIT M

I will be out of the office starting December 20th thru December 26th, returning back to the office December 27th. I will be answering emails as I am able. If this is regarding a new application please contact Lisa Knight at 509-462-5809. Thank you for your patience and have a very Merry Christmas!

14

# EXHIBIT N

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

KELLY BOLDING and MICHAEL     )
MANFREDI, individually and    )
on behalf of a class of all   )
others similarly situated,    )
                         )
        Plaintiffs,   )
                         )
    vs.          ) No. 2:17-cv-0601-RSL
                         )
BANNER BANK, a Washington     )
Corporation,           )
                         )
        Defendant.    )
_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF
MICHAEL A. MANFREDI
_____

Taken at Davis Wright Tremaine

1201 Third Avenue

Seattle, Washington

DATE TAKEN:  JULY 12, 2018
REPORTED BY:  MELONIE RAINEY, RPR, CCR 2797

bc6a783a-b736-4f68-88d1-e0e06fe71e91

1    whether you had flexibility in your schedule to be able

2    to not be at a branch between normal business hours?

3        A.   Okay.  I thought I was answering that by saying

4    if someone expected me to be there or if somebody walked

5    in and needed those services, then I was there.

6        Q.   I get that.  It's -- I guess it's pulling up a

7    bigger picture question.  When you're looking at your

8    week, are you spending the hours of 9:00 to 5:00 in

9    the -- in a branch every single day?

10       A.   And more.  But --

11       Q.   I understand that.  But you don't have the --

12   the question really is:  Do you have the flexibility to,

13   you know, work from home or work from a, you know, a

14   broker's open house during any of those weeks?

15       A.   That's a very difficult question to answer

16   because it's not an "either/or," it's an "and."  So yes,

17   I had to work from home; yes, I had to work in my car on

18   the street in the branch.

19       Q.   But the question I'm asking is really about the

20   hours of 9:00 to 5:00.  That's what I'm trying to

21   understand.  Because, right, those are the branch hours

22   that you were just talking about?

23       A.   So then you'd prioritize your schedule based on

24   what the company's expectations were, so if there was a

25   really loud voice saying, You haven't been in my branch

bc6a783a-b736-4f68-88d1-e0e06fe71e91

1              MS. SULLIVAN:  Let me ask, and then you can

2      try to strike this one if you'd like.

3      BY MS. SULLIVAN:

4        Q.  But do you have a -- do you see the job as

5      being -- as having a flexible schedule?

6        A.  I see the job as an enormous burden on someone's

7      time in order to be successful in this business.  Time

8      and stress are so enormous in this business if you make

9      a good living at it that most of the loan officers that

10     I know that were good at it had health problems.  And

11     even myself was rushed to the hospital twice, almost had

12     a stroke because my blood pressure was 250 over 125 and

13     my cardiologist told me I needed to get a new job or I

14     was going to die.  That was primarily not from a

15     flexible schedule, but an awful lot of burden that we

16     carried.

17       Q.  So I understand that.  It sounds like -- I'm

18     sorry to hear about the health implications.

19            But the question I'm asking is a little

20     different.  I mean, did you find that you were able to

21     have flexibility in your schedule to accommodate other

22     things that were going on in your life while you were

23     working as a mortgage loan officer; for example,

24     personal commitments, you know, taking care of kids,

25     that type of thing?

1      A.  You know, I would say that that would be more of

2   what a realtor is like.  But as far as a loan officer,

3   if you turn your phone off or you don't pay attention to

4   your emails all day and all night, you're out of

5   business.  You are on, you're not off.  You're not

6   taking the afternoon off for a tee time, that's a

7   realtor.

8          A loan officer has got lots of things that they

9   are doing that never amount to income, but they have to

10   anyway.  Then there are all the things that do amount to

11   income.

12      Q.  And -- I mean, I'm trying to understand, you

13   know, your view of this.  Was it something -- were you

14   ever able while you worked at America West Bank,

15   AmericanWest Bank, to take time during your regular work

16   week to address personal issues?

17         MR. BLANKENSHIP:  I object to the form.

18      A.  Was I able to?  Yes.  Did I want to?  No.  I

19   wanted to fulfill my obligations and expectations.

20   BY MS. SULLIVAN:

21      Q.  Okay.  Did you?

22      A.  Did I fulfill them?

23      Q.  No, did you take time off to address, you know,

24   obligations as it relates to your family or, you know,

25   going to the doctor or getting haircuts, that type of

1    management or HR told you that you could not enter more

2    than 40 hours a week into the timekeeping system?

3        A.  You can say it two different ways.  You can say,

4    You're not allowed to enter any more than 40 hours a

5    week, or, I don't have any overtime approved so don't

6    put it in there because it's just going to get sent

7    back.

8        Q.  So is the time that you put into the Ceridian,

9    is the time that you recorded in there accurate?

10       A.  No.

11       Q.  Are the start times generally accurate?

12       A.  No.

13       Q.  Are the end times generally accurate?

14       A.  No.

15       Q.  Do you have any record that you have maintained

16   for any period of your employment at AmericanWest Bank

17   that reflects your actual hours worked?

18           MR. BLANKENSHIP:  I object to the form.

19           Go ahead, you can answer.

20       A.  I do.

21   BY MS. SULLIVAN:

22       Q.  And what is that?

23       A.  Because everything was done in the company

24   system and then there were, you know, many rules because

25   it was a bank that information could not be shared

bc6a783a-b736-4f68-88d1-e0e06fe71e91

1   outside of the company system.  Almost everything was

2   done through the company system that I no longer have

3   access to and that would be appointments, etc., etc.,

4   emails, even the phone that they issued.

5           However, because some of these clients were my

6   business that I brought from a previous employer, so

7   they already knew me, they had a personal email, and I

8   did have some emails.  Also, I did have some open houses

9   on my own personal Google calendar.

10          So I did find some of that information.

11      Q.  Okay.

12          So you're referring to looking at your emails or

13  Google calendar --

14      A.  Yeah.

15      Q.  -- to identify your work hours?

16      A.  Well, yeah.  So if I go back and to my personal

17  email, am I going to find hundreds of emails from my

18  bank clients?  No, because we weren't really allowed to

19  use that system.  But a couple or the handful of them

20  that came with me from other places knew how to contact

21  me there and there were, at the time I was working at

22  America West, communications with them during those

23  times.

24      Q.  Other than those -- what you just described, did

25  you maintain any other record or document that reflects

bc6a783a-b736-4f68-88d1-e0e06fe71e91

1        MR. BLANKENSHIP:  I don't really -- I'm not

2    going to take the time.  I don't -- I don't necessarily

3    think that we need to do that at this point.  In any

4    case, we're -- I'm certainly looking forward to getting

5    the documents that would certainly assist Mr. -- Mr. --

6        MS. SULLIVAN:  Counsel, if you want to talk

7    about discovery we can do that off the record.  Is there

8    anything more?

9        MR. BLANKENSHIP:  I might have something.

10

11         E X A M I N A T I O N

12   BY MR. BLANKENSHIP:

13      Q.  Would it assist you if you could see the emails

14   that you sent from AmericanWest Bank as far as knowing

15   what hours you worked?

16      A.  On their system you mean?

17      Q.  Yes.

18      A.  Yes, absolutely.

19      Q.  What else would help you -- I mean, I know that

20   you believe you can come up with estimates, but what I'm

21   asking is:  Are there other records that you believe

22   would prove decisively that you worked overtime?

23      A.  Well, certainly any kind of paper trail on the

24   work I was doing on a day-to-day basis, whether it be

25   the phone records, the email records, use of the

bc6a783a-b736-4f68-88d1-e0e06fe71e91

1    computer system.  I know that management had the ability

2    to see log on and log off times.  So all of that would

3    help.

4        Q.   And, for example, when an appraisal was

5    approved -- or not an appraisal, if you were let's say

6    prequalifying somebody after hours, would the time be

7    reflected as to when that happened if you sent that back

8    to AmericanWest Bank?

9            MS. SULLIVAN:  Objection.  Lack of

10   foundation.

11       A.   Well, I don't really know.  But my question is

12   would the data input time be recorded?  Probably so.

13           MR. BLANKENSHIP:  All right.  And any other

14   areas that counsel didn't get into we can save for

15   trial.  Thank you, sir.

16           MS. SULLIVAN:  Okay.  We're keeping the

17   deposition open.  I know we have a disagreement about

18   that, but...(pause.)

19           MR. BLANKENSHIP:  I don't -- I think we're

20   done as far as I'm concerned.  And we're not going to

21   agree to have it reopened at this point, that's for

22   certain.

23           MS. SULLIVAN:  We don't agree because we

24   have documents that are outstanding that we have asked

25   for and that have not been produced, but we can resolve

1          C E R T I F I C A T E

2

3      STATE OF WASHINGTON

4      COUNTY OF SNOHOMISH

5

6

7          I, Melonie Rainey, a Certified Shorthand Reporter

8      and Notary Public in and for the State of Washington, do

9      hereby certify that the foregoing transcript is true and

10     accurate to the best of my knowledge, skill and ability.

11

12         IN WITNESS WHEREOF, I have hereunto set my hand

13     and seal this 19th day of July, 2018.

14

15

16

17

18

19     _____

20     MELONIE RAINEY, RPR, CCR 2797

21

22

23

24     My commission expires:

25     SEPTEMBER 2021

# EXHIBIT O

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

KELLY BOLDING and MICHAEL    )
MANFREDI, individually and    )
on behalf of a class of all   )
others similarly situated,    )
                              )
         Plaintiffs,   )
                              )
     vs.          ) No. 2:17-cv-0601-RSL
                              )
BANNER BANK, a Washington    )
Corporation,            )
                              )
         Defendant.   )
_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF
RICKY C. CLARK

_____

Taken at Davis Wright Tremaine

1201 Third Avenue

Seattle, Washington

DATE TAKEN:  JULY 11, 2018

REPORTED BY:  MELONIE RAINEY, RPR, CCR 2797

e0185652-80fb-4056-b437-aeb81c67ca0b

1    Q.  Okay.

2        During the time that you were working in the

3    Federal Way branch -- actually let me strike that.

4        During the period of time that you were working

5    for Banner Bank, did you yourself keep a sort of strict

6    office schedule as far as when you were in a particular

7    branch?

8    A.  I tried.

9    Q.  And what was your --

10   A.  I tried to get in at least by 9:00 and stay as

11   late as possible.

12   Q.  Which I'm asking what was your typical office

13   schedule, what would that have been?

14   A.  Probably 9:00 to 4:30 or 5:00.

15   Q.  If there were -- were there ever occasions where

16   you knew you were going to be working late because of an

17   event or a closing or something like that?

18   A.  Yes.

19   Q.  What are some examples of that?

20   A.  If I had a loan application after hours I would

21   drive to the client's house and take their application

22   or I'd arrange a phone appointment to take an

23   application after banking hours or to maybe have a

24   meeting with a real estate agent or a builder.

25   Q.  So on those days where you knew you had

1          MS. SULLIVAN:  I understand that so I

2     clarified that.

3          THE WITNESS:  The technology today, even

4     today is much better than it was even at Banner Bank.

5      Q.   And with all this discussion I missed your

6     answer.

7      A.   Ask the question again.

8      Q.   My question is:  Does most -- during the time

9     you were at Banner Bank, did most of your communication

10    with clients in sort of transmitting documents and the

11    like, did that occur via email?

12     A.   Oh, the documents they would send me?

13     Q.   Communicating, transmitting documents, like the

14    bulk of the communication, whether it's coming from them

15    or coming from you, was that occurring on email?

16     A.   It was phone calls, email, text messages.

17     Q.   So it's --

18     A.   It's whatever we can communicate with.

19     Q.   All right.

20          I understand that you testified you're -- the

21    first time that you really started recording or keeping

22    track of your time in your career as a mortgage loan

23    officer was when you came to Banner Bank?

24     A.   Correct.

25     Q.   And I think I recall you testified that you

e0185652-80fb-4056-b437-aeb81c67ca0b

1          C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF SNOHOMISH

5

6

7          I, Melonie Rainey, a Certified Shorthand Reporter

8    and Notary Public in and for the State of Washington, do

9    hereby certify that the foregoing transcript is true and

10   accurate to the best of my knowledge, skill and ability.

11

12         IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 20th day of July, 2018.

14

15

16

17

18

19   _____

20         MELONIE RAINEY, RPR, CCR 2797

21

22

23

24   My commission expires:

25   SEPTEMBER 2021

e0185652-80fb-4056-b437-aeb81c67ca0b

# EXHIBIT P

# Timecard & Pay Records with Comments
## Banner Bank
Date Range : 01/01/2013 Thru 08/31/2017

| Day | Date | Time | Punch Type | Error | Pay Type | Hours/Dollars | Comments |
|-----|------|------|-----------|-------|----------|---------------|----------|
| **Emp ID :** | **1459** | **Name :** | Clark, Ricky | | | | |
| Thu | 12/29/2016 | | P-REC | | VAC | 8.00 | |
| Fri | 12/30/2016 | | P-REC | | VAC | 8.00 | |
| Mon | 01/02/2017 | | P-REC | | HOL | 8.00 | |
| Mon | 01/16/2017 | | P-REC | | HOL | 8.00 | |
| Tue | 01/17/2017 | | P-REC | | REG | 8.00 | |
| Wed | 01/18/2017 | | P-REC | | REG | 8.00 | |
| Thu | 01/19/2017 | | P-REC | | REG | 8.00 | |
| Fri | 01/20/2017 | | P-REC | | REG | 8.00 | |
| Mon | 01/23/2017 | | P-REC | | REG | 8.00 | |
| Tue | 01/24/2017 | | P-REC | | REG | 8.00 | |
| Wed | 01/25/2017 | | P-REC | | REG | 8.00 | |
| Thu | 01/26/2017 | | P-REC | | REG | 8.00 | |
| Fri | 01/27/2017 | | P-REC | | REG | 8.00 | |
| Mon | 01/30/2017 | | P-REC | | REG | 8.00 | |
| Tue | 01/31/2017 | | P-REC | | REG | 8.00 | |
| Wed | 02/01/2017 | | P-REC | | REG | 8.00 | |
| Thu | 02/02/2017 | | P-REC | | REG | 8.00 | |
| Fri | 02/03/2017 | | P-REC | | REG | 8.00 | |
| Mon | 02/06/2017 | | P-REC | | REG | 8.00 | |
| Tue | 02/07/2017 | | P-REC | | REG | 8.00 | |
| Wed | 02/08/2017 | | P-REC | | REG | 8.00 | |
| Thu | 02/09/2017 | | P-REC | | REG | 8.00 | |
| Fri | 02/10/2017 | | P-REC | | REG | 8.00 | |
| Mon | 02/13/2017 | | P-REC | | REG | 8.00 | |
| Tue | 02/14/2017 | | P-REC | | REG | 8.00 | |
| Wed | 02/15/2017 | | P-REC | | REG | 8.00 | |
| Thu | 02/16/2017 | | P-REC | | REG | 8.00 | |
| Fri | 02/17/2017 | | P-REC | | REG | 8.00 | |
| Mon | 02/20/2017 | | P-REC | | HOL | 8.00 | |
| Tue | 02/21/2017 | | P-REC | | REG | 8.00 | |
| Wed | 02/22/2017 | | P-REC | | REG | 8.00 | |
| Thu | 02/23/2017 | | P-REC | | REG | 8.00 | |
| Fri | 02/24/2017 | | P-REC | | REG | 8.00 | |
| Mon | 02/27/2017 | | P-REC | | REG | 8.00 | |
| Tue | 02/28/2017 | | P-REC | | REG | 8.00 | |
| Wed | 03/01/2017 | | P-REC | | REG | 8.00 | |
| Thu | 03/02/2017 | | P-REC | | REG | 8.00 | |
| Fri | 03/03/2017 | | P-REC | | REG | 8.00 | |
| Mon | 03/06/2017 | | P-REC | | REG | 8.00 | |
| Tue | 03/07/2017 | | P-REC | | REG | 8.00 | |
| Wed | 03/08/2017 | | P-REC | | REG | 8.00 | |
| Thu | 03/09/2017 | | P-REC | | REG | 8.00 | |
| Fri | 03/10/2017 | | P-REC | | REG | 8.00 | |
| Sat | 03/11/2017 | | P-REC | | REG | 7.00 | |
| Mon | 03/13/2017 | | P-REC | | REG | 8.00 | |
| Tue | 03/14/2017 | | P-REC | | REG | 8.00 | |
| Wed | 03/15/2017 | | P-REC | | REG | 8.00 | |
| Thu | 03/16/2017 | | P-REC | | REG | 8.00 | |
| Fri | 03/17/2017 | | P-REC | | REG | 8.00 | |
| Sat | 03/18/2017 | | P-REC | | REG | 7.00 | |
| Sun | 03/19/2017 | | P-REC | | REG | 7.00 | |
| Mon | 03/20/2017 | | P-REC | | REG | 8.00 | |
| Tue | 03/21/2017 | | P-REC | | REG | 8.00 | |
| Wed | 03/22/2017 | | P-REC | | REG | 8.00 | |
| Thu | 03/23/2017 | | P-REC | | REG | 8.00 | |
| Fri | 03/24/2017 | | P-REC | | REG | 8.00 | |
| Mon | 03/27/2017 | | P-REC | | REG | 8.00 | |
| Tue | 03/28/2017 | | P-REC | | REG | 8.00 | |
| Wed | 03/29/2017 | | P-REC | | REG | 8.00 | |
| Sun | 04/02/2017 | | P-REC | | REG | 7.00 | |
| Mon | 04/03/2017 | | P-REC | | REG | 8.00 | |
| Tue | 04/04/2017 | | P-REC | | REG | 8.00 | |
| Wed | 04/05/2017 | | P-REC | | REG | 8.00 | |

**BB004057**

# EXHIBIT Q - Filed Under Seal

# EXHIBIT R

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| STEVEN ERICKSON, BETH THOMPSON, ) | |
| DANA COPELAND, WENDY ANDERSON, and ) | No. 15-2-01976-7 SEA |
| TRACI BIOTTI, ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | |
| ) | |
| AMERICANWEST BANK, a Washington ) | |
| Corporation, ) | |
| ) | |
| Defendant. ) | |

---------------------------------------

VIDEOTAPED DEPOSITION OF KELLY BOLDING

Taken at the instance of Defendant

June 10, 2016

9:18 a.m.

1002 W. Riverside Avenue

Spokane, Washington

1      Q.      Do you remember any specifics about what Paige

2  Hall said?

3      A.      She said that if you work overtime, you need

4  to log overtime.  If you take a call at home in the

5  evening or a Saturday or a Sunday, any time on your off

6  hours, or take an application, that you need to add that

7  to your time for the week, because loan officers are now

8  salary non-exempt.

9      Q.      And was there any discussion about whether you

10  needed to seek preauthorization for overtime if you could?

11      A.      I don't -- I don't remember that discussion.

12      Q.      Was there a time where you came to understand

13  that Ken Hunt -- from Ken Hunt that he wanted

14  preauthorization of overtime?

15      A.      I -- I don't remember anything about

16  preauthorization.  What I remember is not having it at

17  all.  He -- he discouraged any overtime of any kind and

18  would make comments about other people that put overtime

19  on their card and on their timecards and with their low

20  production how can they justify ever working any overtime.

21  If you were putting overtime, you better be closing 2

22  million a month, and just comments like that.

23      Q.      Well, so you overheard Ken Hunt directly say

24  comments to the extent of how are they working overtime

25  based on their production numbers?

 1       A.    I didn't overhear.  He directly said to me

 2   that a particular employee was logging overtime, and which

 3   was crazy, but they were logging overtime and that their

 4   production did not justify it.

 5       Q.    And which employee was --

 6       A.    Steven Boyd.

 7       Q.    And when was this?

 8       A.    It's when I had moved downtown already, so it

 9   had to be somewhere in 2014, and I could not tell you

10   when.

11       Q.    Did he ever criticize -- well, how many times

12   did you hear him criticize Steven Boyd for logging

13   overtime?

14       A.    A couple times.

15       Q.    Did he -- did you ever hear him criticize

16   anybody else for logging overtime based on production

17   numbers?

18       A.    Not anybody specifically.  He made comments

19   like when the subject of overtime -- like Lisa would say,

20   "Yeah, I worked an open house Sunday.  I better log my

21   overtime," and he'd say, "Yeah.  Well, you better close 2

22   million then."

23            So he would make comments like that to -- out

24   to us that let us understand that we wouldn't be logging

25   overtime unless we were doubling our production.

1          Q.     Did Mr. Hunt ever tell you that you shouldn't

2     log overtime?

3          A.     He made comments that he didn't want us to log

4     overtime.  He didn't want any overtime, and he actually

5     said, "Rather than work overtime, if you work in the

6     evenings or weekends, then take a longer lunch or

7     something, but I don't want you logging any overtime.

8          Q.     And did Ken Hunt say "I don't want you logging

9     any overtime" specifically to you?

10         A.     To -- I believe to Lisa and I he said that.

11         Q.     All right.  But each time he said

12    that -- well, it was your understanding that if you did

13    have to work outside of the normal working hours, that Ken

14    Hunt's expectations were that you would come in later the

15    next day so that you wouldn't exceed 40 hours in the week;

16    is that correct?

17                     MR. BLANKENSHIP:  I'm going to object to

18    the form.

19         A.     I understood that he would not allow us or

20    approve us to work overtime, period, unless our production

21    was astronomical.  And I believe there was a time, you'll

22    have to ask her, that Lisa actually earlier when she was

23    newer put overtime on there, and he wasn't happy about

24    that.  That she mentioned to me.

25         Q.     Is it something that Lisa Knight related to

1  you?

2        A.      Uh-huh.

3        Q.      What specifically did she say?

4        A.      I don't -- that's what I'm saying, you'd have

5  to ask her.  I just remember her not -- him not being

6  happy with her for putting overtime on her card.  I never

7  put overtime after, basically, the things he said and led

8  me to believe.  I never logged overtime.

9        Q.      Did you understand that Ken Hunt -- Ken Hunt

10  to be authorizing you to take longer lunches if you had to

11  work a later day?

12        A.      Well, he said we could go get a pedicure or

13  take a longer lunch or something rather than put overtime

14  on our card.

15        Q.      Did you understand that Ken Hunt didn't want

16  you to work more than 40 hours a week?

17        A.      He didn't want to pay any overtime on his

18  budget.

19        Q.      Do you understand that Ken Hunt did not want

20  you to work more than 40 hours a week?

21        A.      I don't believe that's true because he would

22  tell us all the time that in order to get the numbers we

23  needed to get, we had to put in more -- more time and work

24  more.  And so I don't believe that he didn't want us.

25              I believe he knew we all worked more than

1    40 hours a week.  I believe he knew we all worked evenings

2    and weekends and he just didn't want us to report overtime

3    on our timecards and so --

4        Q.    And how do you know that he knew when you were

5    working when you weren't in the office?

6        A.    Because he was our manager.  He would get

7    e-mails from us, you know, nighttime, weekends, when we

8    were working on things.  He could see us when we were on

9    our computer putting on an application on a Sunday or

10   Saturday.  He knew what we were doing.  He knew what we

11   were up to.

12       Q.    How do you know he wasn't assuming you were

13   going to take a pedicure the next day?

14       A.    Well, okay.  You can go with that, but he was

15   my manager for almost five years and I know what he knew.

16       Q.    Do you know if the amount of overtime Ken Hunt

17   authorized or didn't authorize affected his compensation

18   or performance evaluation in any way?

19       A.    I don't know that.

20       Q.    Did you ever ask Ken Hunt to authorize

21   overtime at any time while you were at the bank?

22       A.    I did not.

23       Q.    Is it your testimony that you on occasion

24   would work overtime, in other words, more than 40 hours in

25   a week?

1        A.    Yes.

2        Q.    And how many weeks do you recall working more

3    than 40 hours when you were at the bank?

4        A.    I couldn't even -- I couldn't even guess at

5    that over the time I worked there.  I couldn't even tell

6    you that.

7        Q.    Was it more than one week?

8        A.    That I worked overtime?

9        Q.    Yes.

10        A.    Yes.  Absolutely.

11        Q.    Was it more than 52 weeks?

12        A.    In a year, or all the years?

13        Q.    All years.

14        A.    It probably was about -- probably close to

15    that.  Probably about 20 percent of the time, I would

16    guess, I would work more than 40 hours in a week.

17        Q.    And 20 percent of the time your entire time at

18    the bank; correct?

19        A.    Uh-huh.

20        Q.    Yes?

21        A.    If I had to just toss a number out, because I

22    don't know exactly.

23        Q.    And when you would work more than 40 hours a

24    week, how many more hours per week would you work?  Would

25    you work as many as 80 hours or --

1    A.    No.

2         Q.    Okay.  Would you work as many as 70 hours?

3         A.    No.  I never took -- I rarely took lunches.  I

4    worked through my lunch every day at the office, ate at my

5    desk and worked.  Worked evenings, weekends.  I would say

6    average, maybe five hours a week overtime would probably

7    be average.

8              MR. BLANKENSHIP:  And let me just -- let

9    me just lodge an objection.  Move to strike that to the

10   extent that nobody has really defined what overtime is,

11   you know, to -- to that extent, this whole, you know, how

12   overtime is calculated and all that to that extent.  To

13   some extent the testimony is vague and ambiguous.

14        Q.    Are you aware of Ken Hunt taking any negative

15   action against someone who requested authorization for

16   overtime?

17        A.    According to him, I -- from what he said he

18   did against Stephen Boyd.

19        Q.    What did Ken Hunt say he did with respect to

20   Stephen Boyd?

21        A.    That he basically told him not to put any more

22   overtime.

23        Q.    Are you aware of Ken Hunt refusing to

24   authorize overtime?

25        A.    I'm not aware of it.

1      Q.      Are you aware of anybody that reported

2   overtime who didn't get paid for it?

3      A.      I'm not aware of that.

4      Q.      If you had reported any of the overtime that

5   you worked, do you have any reason to believe the bank

6   would not have paid it?

7      A.      I believe the bank would have paid it.  I

8   believe Ken would have been very unhappy with me and I

9   probably wouldn't have still been employed there.

10     Q.      Are you aware of anybody that was terminated

11  from the bank because of their reporting of overtime?

12     A.      I am not aware of that.

13     Q.      Did you report to anybody at the bank that you

14  were working overtime but afraid to report it because of

15  Ken Hunt?

16     A.      No.  And to clarify, I wasn't really afraid.

17  It was just basically what we were instructed.

18     Q.      If you look at this Exhibit 530, there's the

19  statement by Beth Thompson on page 1 to Kelly -- to you,

20  excuse me, on June 12th, 2012.  "Good luck getting Ken to

21  sign off on it... he is evil,"with reference to overtime.

22     A.      Uh-huh.

23     Q.      Yes?

24     A.      Yes.

25     Q.      And you respond, "I know," in regards to the

1    comment that Ken is evil; correct?

2        A.    Well, actually, "I know" was in reference to

3    "Good luck getting Ken to sign off on it," because that

4    was not going to happen.

5        Q.    Did you not think Ken is evil?

6        A.    I do think he's evil, yeah.

7        Q.    Okay.  And that was true as of -- that was

8    true, actually, within months of your employment, as we

9    discussed, you had come to conclude that he was a horrible

10   person?

11                   MR. BLANKENSHIP:  I want to object to the

12   form.

13       A.    I didn't think he was a very nice person from

14   the first couple of months I worked for him and worked

15   there.

16       Q.    He was a total tool?

17       A.    And I wished I had never accepted the job for

18   the whole first year I was there and would have stayed

19   where I was.

20       Q.    Do you have any firsthand knowledge with

21   respect to the interactions that Ken Hunt had with Steven

22   Boyd with respect to his use of overtime?

23       A.    Firsthand meaning that he -- he -- Ken

24   verbally stated that he talked with Steve about his

25   overtime, that it wasn't justified with his numbers that

1    he was producing.

2        Q.    But were you present at any conversation that

3    Ken Hunt had with Steven Boyd?

4        A.    I was not.

5        Q.    I want to talk about Miranda Moen in her role

6    as assistant.  At some point Miranda Moen started

7    assisting Jared Evenson with his loan files; correct?

8        A.    Correct.

9        Q.    And this would have occurred at some point

10   after Christy King left the bank in September of 2015?

11       A.    Correct.

12       Q.    Was it your understanding that Ken Hunt had

13   officially assigned Miranda Moen to assist Jared Evenson?

14       A.    Yes.

15       Q.    And how did you learn that?

16       A.    Well, again, nobody says anything, but it

17   became quite obvious when he -- Jared was spending a lot

18   of time at Miranda's desk, and her back in his office,

19   that they were working together.  And I asked her about it

20   and she said, yes, that Ken assigned her to be Jared's

21   loan assistant.

22       Q.    Did Ken Hunt ever explain to you why he

23   assigned Miranda Moen to assist Jared Evenson instead of

24   you?

25       A.    Well, we had a conversation that I asked him.

1   others that you've raised complaints to?

2                   MR. BARRETT:  Object to form.  Ambiguous.

3   Lacks foundation.

4           A.    I absolutely believe that I was retaliated

5   against because I was honest about the way I and other

6   women were treated.

7           Q.    And you used the word people that -- you know,

8   sometimes referencing how Ken Hunt treated people.  Did

9   you see a marked difference between how he treated people

10  who were women versus people who were men?

11                  MR. BARRETT:  Objection.  Vague.

12          A.    Yes.

13          Q.    Who did he treat better?

14          A.    Men.

15                  MR. BARRETT:  Objection.  Vague.

16          Q.    And -- and when you were questioned about

17  overtime and the number of overtime hours that you may

18  have worked at the bank, did you have any understanding as

19  to what type of things would, for example, count as

20  overtime?

21                  Like if you worked through a lunch, that you

22  should get paid for working through lunch?

23                  MR. BARRETT:  Objection.  Vague.  Leading.

24          A.    I -- I actually didn't think about that when I

25  felt that I just, like, tried to come up with, like, an

1    average number or something.  I didn't actually think of

2    the details like working through lunch or, you know,

3    taking a phone call in the evening or in the morning

4    before I came in, getting on, returning some e-mails while

5    I was getting ready for work.

6                You know, those -- I didn't really -- I didn't

7    write that down or keep track or consider those things.

8         Q.     In order to -- do you think if you sat down

9    and looked at your calendars and your e-mails and got some

10   understanding as to what is compensable for overtime in

11   Washington, that you would have the ability to recreate at

12   least an estimate of the amount of overtime you worked in

13   the five years you were there?

14                MR. BARRETT:  Objection to form.  Leading.

15        A.     I believe that I could estimate.

16        Q.     Okay.

17        A.     But I couldn't exact, no.

18        Q.     Okay.  So -- and as I understand it, nobody

19   even -- did anybody instruct you to bill overtime, say,

20   for example, if you've got a phone call from a customer at

21   eight o'clock at night and you had to talk to them for an

22   hour or so?

23        A.     Paige, in our timecard training, instructed

24   everybody to do that when we had timecard -- a timecard

25   overview as part of what she was required to do when we

1  went to this timekeeping system, but -- but we were

2  discouraged to practice that by Ken.

3         So, yes, she -- yes, in answer, we were told

4  that by Paige when we had a timekeeping class thing, but

5  didn't follow through on that.

6     Q.    Well, why not just, you know, basically put in

7  an accurate timecard that records, we'll say, working

8  through lunch, taking a call at night, maybe taking an

9  early call in the morning or visiting with a Realtor on a

10 weekend or something like that?  Why not just record it

11 and present it to Ken Hunt?  Why wouldn't you do that?

12    A.    Because he, by his comments and his attitude,

13 he discouraged any overtime unless you were a top

14 producer.  He -- you weren't worthy of overtime if you

15 weren't producing enough.

16    Q.    So I think I will, given how late it is, I'm

17 going to conclude, but let me ask you this.  This is

18 not -- you were here today for seven hours on the record.

19 You also attended a deposition earlier that I had noted.

20        Do you remember that?

21    A.    Yes.

22    Q.    So at this point -- and you were there for,

23 what, an hour and a half?

24    A.    Uh-huh.  Approximately.

25             MR. BLANKENSHIP:  Okay.  So I'm going to

1   oppose Ms. Bolding's deposition being reopened by at least

2   by the defendant, and but appreciate you taking the time

3   to -- to be here today.  Thank you.

4                   MR. BARRETT:  All right.

5

6                   FURTHER EXAMINATION

7

8   BY MR. BARRETT:

9       Q.    So I have some follow-up questions.  So now

10  that you've had some time to think at the suggestion of

11  your lawyer about how much overtime you think you might

12  have worked when taking into consideration details that

13  you didn't consider before, let's consider them now.

14            Now, if you were to go recreate when you were

15  working or when you were not working over the course of

16  your employment, what documents would you look at to help

17  you refresh your recollection?

18      A.    Well, unfortunately, I don't have access to

19  any of my e-mails, which I would use my laptop or my

20  e-mail on my phone for work, so I wouldn't be able to do

21  any of those.  One thing I would probably look at is my

22  monthly production reports, because I generally know how

23  long it takes to close a specific amount of loans.

24      Q.    All right.  And how would you determine how

25  many hours you might have worked in a week by looking at

1    your production reports?

2         A.    I would just go back with those in a calendar

3    and try to recreate it.  Like I said, I could only

4    estimate.  I couldn't guarantee that going back that far

5    that I would know exactly.

6         Q.    You testified earlier that you thought that

7    when you did work overtime, it was probably around

8    20 percent of your total weeks at the bank, all told.

9              Do you want to revise that testimony?

10             MR. BLANKENSHIP:  And I'm going to object

11   to the extent it mischaracterizes her guess.

12        A.    I was kind of thinking in an average month I

13   would, minimally, at least one week, work a few hours

14   more.  During a busy time, I would say it would be more

15   than one week.  It could be two or even three weeks out of

16   a month that I had more loans to work on or was taking

17   more applications.  It's the busy time.

18             I mean, we have a season here in Spokane,

19   because unlike other places, the weather basically

20   make -- people don't move in the winter with snow.  So I

21   can tell you what months I tend to work more hours.

22        Q.    Which were those?

23        A.    It usually starts about March or -- March,

24   April, May, June, and then July and August are a little

25   slower, and then September, October are pretty busy again

 1    for some reason.

 2         Q.    All right.  So in an average month over the

 3    course of your employment with AmericanWest Bank, you

 4    would work at least one week a month a few hours more than

 5    40?

 6                   MR. BLANKENSHIP:  And I'm going to just

 7    object to foundation.  Somebody needs to -- you know, you

 8    need to define to her what's compensable time for

 9    overtime.  Otherwise, this is lack of foundation and it's

10    a guess.

11         A.    Could I -- yeah, and that's the hard part.  I

12    mean, without having -- I would need to -- I would really

13    need to just have time and some past, you know, production

14    reports and things like that to even try and -- I haven't

15    thought about it.  This is the first time I've actually

16    thought about it since you brought it up, so I haven't

17    done any work in my mind at all.

18                   So just throwing a number out there over the

19    last five years is kind of scary to just say, oh -- you

20    know, without any preparation or time to just sit down and

21    think about it.

22         Q.    Did you ever feel at the bank that you worked

23    more than 60 hours a week doing loan-related activities?

24                   MR. BLANKENSHIP:  I'm just going to object

25    to the -- to what "work" means and, you know, you're

1   talking about breaks or anything.  So I'm going to object

2   to the extent that "work" is vague and ambiguous and

3   therefore the question is vague and ambiguous.

4        A.    I'm going to say that it would be rare that I

5   would work more than 60 hours a week.  And if it

6   did -- it's possible that it could have happened two or

7   three times during the course of employment just because

8   how -- how busy I was, that I was just so slammed during

9   those times.

10       Q.    Would it also be rare for you to have worked

11  50 hours a week or more?

12                MR. BLANKENSHIP:  I'm going to make the

13  same objection as to work being undefined, therefore vague

14  and ambiguous and calling for a legal conclusion.  Lack of

15  foundation.

16       A.    Not as rare as 60, but not common, either,

17  that I would work 50 hours a week.  I -- like I said, I

18  didn't take lunches.  I brought -- 90 percent of the time,

19  I brought my lunch and would eat at my desk while working.

20                I wouldn't go away from the office or go to a

21  restaurant or go -- I just worked straight through lunch,

22  so that's an hour that is -- you know, comes out of my

23  time automatically on my timecard that I didn't take, so

24  that's why I averaged five.

25       Q.    And typically what time would you show up to

1        Q.      And so if you knew when you were at

2    AmericanWest Bank or Banner that if you could get paid for

3    the overtime that you worked and it would not, would you

4    have worked more over thyme?

5                    MR. BARRETT:  Object to form.

6        Q.      Meaning if you got paid for it, would you have

7    worked more hours?

8                    MR. BARRETT:  Object to form.

9        A.      I don't believe I would have worked more if I

10   got paid for it because I worked what was needed, but it

11   would have been excellent to get paid for the overtime

12   that was being worked.

13       Q.      And let me just -- I just want to try to get a

14   picture of this.  We're going to delve into it right now.

15   If you, let's say, saw a Realtor, okay, on your way into

16   work, did you put that on your timecard?

17       A.      No.

18       Q.      Or if you had to meet a Realtor at a client

19   after work, let's say eight o'clock, would you put that on

20   your timecard?

21       A.      No.

22       Q.      Okay.  And you said you didn't get mileage at

23   some point?

24                    MR. BARRETT:  Object to form.

25       Q.      Did you get --

# EXHIBIT S

# REDACTED

BB004634

REDACTED

BB004635

From: Lisa Knight
Sent: Thursday, January 18, 2018 3:43 PM
To: Tammy Glass
Cc: Lisa Knight
Subject: Overtime hours

I apologize for the delay in figuring my overtime hours since December 2013.
Its hard to put together the last 5 years for what you did, and I wanted to try to provide a fairly accurate timeline on my overtime from AmericanWest Bank/Banner Bank.
Per our telephone conversation today, I have figured an estimate of 5 hours per week overtime.

I believe my hire date was around 12-13-13 and the first paystub I could find with any overtime paid to me was on 5-10-16. Please keep in mind that no overtime was worked the first 2 weeks of employment, I was simply getting accustomed to my office, policies, etc.

Thanks Tammy for your help on this. Once you have some more information from HR, please let me know. If you have any questions for me as well, feel free to let me know.

Lisa Knight
NMLS # 785378
Residential Mortgage Officer
41 W. Riverside, Suite #210, Spokane WA. 99201

Phone 509-462-5809 Cell: 619-206-7019 Fax: 509-344-5509
Lisa.knight@bannerbank.com<mailto:Lisa.knight@bannerbank.com>
[Banner logo]

This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please do not read, copy or re-transmit this communication and destroy any copies. Transmission or use of this information by an unintended recipient is unauthorized, may be illegal, and shall not be deemed a waiver of any privilege (including attorney-client privilege).
This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please do not read, copy or re-transmit this communication and destroy any copies. Transmission or use of this information by an unintended recipient is unauthorized, may be illegal, and shall not be deemed a waiver of any privilege (including attorney-client privilege).

BB004636

# EXHIBIT T

SUPERIOR COURT FOR THE STATE OF WASHINGTON

COUNTY OF KING

| | |
|---|---|
| STEVEN ERICKSON, BETH THOMPSON, DANA COPELAND, WENDY ANDERSON, AND TRACI BIOTTI, | Case No.: 15-2-01976-7 SEA |
| Plaintiffs, | DEFENDANT AMERICANWEST BANK'S MOTION FOR PROTECTIVE ORDER |
| vs. | |
| AMERICANWEST BANK, a Washington Corporation, | |
| Defendant. | |

## **CERTIFICATE OF COMPLIANCE**

Counsel for Defendant AmericanWest Bank ("AWB" or the "Bank") certifies that the conferral requirements of Washington Superior Court Civil Rule ("CR") 26(i) have been met, but the parties were unable to resolve the issues set forth in this Motion.

## **MOTION & RELIEF REQUESTED**

Pursuant to CR 26(c), AWB respectfully moves the Court for an Order setting reasonable guidelines for Plaintiffs' discovery of electronically stored information ("ESI"). AWB is open to two alternative approaches: (1) Require Plaintiffs to confer and reach agreement with AWB on a list of keywords that AWB will use in searching custodians for relevant, responsive documents, as proposed in AWB's Discovery Plan; or, if Plaintiffs refuse to cooperate, (2) Allow AWB to use its own list of keywords based on Plaintiffs' allegations without Plaintiffs' input or second-

DEFENDANT'S MOTION FOR PROTECTIVE ORDER - 1
(CASE NO. 15-2-01976-7 SEA)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503.552.2140 | Fax: 503.224.4518

guessing by Plaintiffs to search those custodians that AWB reasonably believes will most likely have relevant, responsive ESI. As to either approach, AWB further requests that the Court limit its ESI review to a maximum of 5 GB of data and require Plaintiffs to bear the costs of any additional ESI review, absent a showing of good cause.

## STATEMENT OF FACTS

This is an employment lawsuit brought by five Plaintiffs, all of whom are former employees of AWB, a community bank serving Washington, Oregon, Idaho, Utah, and California. (*See* Plaintiffs' First Amended Complaint ("FAC"), *passim.*) Plaintiffs claim AWB subjected each of them to "sexual harassment, discrimination, and retaliation." (*See* Plaintiff's Complaint ("Compl."), ¶ 1.) Plaintiffs further allege that after they opposed the alleged unlawful conduct, AWB "retaliated and took multiple adverse actions" against them, including terminating some of them. (*Id*.) Plaintiffs seek back and front pay, as well as non-economic damages described as "emotional pain, suffering, distress, and loss of enjoyment of life," and punitive damages. (*See* FAC, pp. 9-10.)

Given the lack of factual detail in Plaintiffs' original Complaint, AWB obtained the Court's assistance in requiring Plaintiffs to state their claims with more particularity. In the resulting FAC, Plaintiffs Anderson, Biotti, and Copeland allege that they had received sexually harassing text messages, email messages and instant messages, primarily from two manager-level employees, Troy Sims and David Sorsabal. (FAC ¶¶ 24(b), 24(d)(5), 24(h).) The Plaintiffs have produced none of the alleged harassing ESI, (it is unclear whether they preserved any), but they describe the content as having included "photographs of naked women," "naked or partially naked people in sexual positions," and messages to the effect of, "'Do you like it doggy-style?' 'I take hand jobs.' 'I bet you like it dirty.'" (*Id*.)

To find evidence of the alleged harassing ESI, Plaintiffs propounded a series of discovery requests to AWB broadly seeking every single email they sent or received while employed at the Bank. *See* Anderson, Biotti, Copeland, Erickson RFP B ("Produce all emails including drafts

DEFENDANT'S MOTION FOR
PROTECTIVE ORDER - 2
(CASE NO. 15-2-01976-7 SEA)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503.552.2140 | Fax: 503.224.4518

and messages sent from and received by Plaintiff . . . in electronic format with attachments.");

Thompson RFP UUU (same).[1]   In a subsequent conferral, Plaintiffs' counsel suggested a

possible narrowing of the ESI sought, stating that "(at a minimum) [Plaintiffs] are entitled to

review any communications our clients had with Troy Sims and David Sorsabal during their

employment with AWB," because Sims and Sorsabal are the "key witnesses."   (*See* 5/28/15

Blankenship email, Barrett Decl., Ex. 12.)   However, Plaintiffs' focus on the ESI of Sims and

Sorsabal, while logical given their allegations, is unhelpful.   AWB possesses 29,751 emails

and/or attachments exchanged just between Plaintiffs and either Sims or Sorsabal, and tens of

thousands of additional emails and/or attachments exchanged between Plaintiffs and other

custodians who Plaintiffs have not agreed to exclude from their sweeping requests.   Common

sense dictates that the vast majority of this ESI is wholly irrelevant to Plaintiffs' claims and will

contain sensitive personal and financial information about the Bank and its clients.

To address the need for a workable ESI search protocol, in March 2015, AWB made an

early attempt to confer with Plaintiffs on a CR 26(f) Discovery Plan.   (Barrett Decl., ¶ 8.)

Specifically, AWB proposed an ESI search protocol based on the "Model Agreement re:

Discovery of Electronically Stored Information" approved by the U.S. District Court for the

Western District of Washington.[2]   The proposed ESI search protocol would require Plaintiffs to,

*inter alia*, make an initial identification of the five custodians most likely to have discoverable

ESI, propose reasonable search terms to locate ESI likely to contain discoverable information,

and limit AWB's obligation to review or produce more than 5 gigabytes of data absent a showing

of good cause.   (Proposed Discovery Plan, Barrett Decl., Ex. 16.)   Plaintiffs rejected AWB's

proposed Discovery Plan and refused to propose an alternative plan.   Accordingly, the Bank

moved the Court for a conference on the subject of discovery and for an order approving its

---

[1] RFPs B and UUU are attached as Exhibits 1 through 5 to the Barrett Declaration.

[2] The U.S. District Court's Model ESI Agreement is available at
http://www.wawd.uscourts.gov/news/model-agreement-re-discovery-esi.   A courtesy copy is
attached as Appendix A.

proposed Discovery Plan, currently noted for hearing on September 18, 2015. (*See* Defendant's

Motion for Discovery Conference and Approval of Proposed Discovery Plan, filed May 6, 2015.)

In the weeks following AWB's Motion for a Discovery Conference, Plaintiffs have

continued to demand that, at a minimum, the Bank produce all 29,751 emails and/or attachments

exchanged between Plaintiffs and either Sims or Sorsabal. (*See* 5/28/15 Blankenship email,

Barrett Decl., Ex. 12.) Instead of suggesting proposed search terms to reduce the volume of

information that the Bank would have to review, Plaintiffs have declared search terms

"unnecessary" as well as the need for attorney review by the Bank, proposing instead that AWB

turn over ESI wholesale, without having reviewed it, so that Plaintiffs can run its own searches.

(*Id.*) After additional, unsuccessful attempts to confer with Plaintiffs on search terms and

reasonable limits on the volume of ESI data to be reviewed, AWB is prepared to perform ESI

searches for relevant, responsive information using its own keywords developed without

Plaintiffs' input, but Plaintiffs will not accept this approach either. This Motion followed. (*See*

Barrett Decl., Exs. 8-15.)

## STATEMENT OF ISSUES & EVIDENCE RELIED UPON

The issue to be decided is whether the Court should issue a protective order under

CR 26(c) that requires Plaintiffs to either confer and reach agreement with AWB on custodians

and list of keywords that AWB will use in searching ESI for relevant, responsive documents, as

proposed in AWB's Discovery Plan; or allow AWB to identify custodians most likely to have

relevant ESI and to use its own list of keywords based on Plaintiffs' allegations without

Plaintiffs' input or second-guessing by Plaintiffs. As to either approach, the Court also is asked

to decide whether to limit AWB's ESI review to a maximum of 5 GB of data and require

Plaintiffs to bear the costs of any additional ESI review, absent a showing of good cause. In

support of its Motion, AWB relies upon Plaintiffs' FAC, the supporting Declaration of James M.

Barrett and Exhibits attached thereto, and the Court's file.

1   **NOTE**:  This Motion's concern with establishing a reasonable ESI search protocol is also

2   a concern underlying AWB's pending Motion for Discovery Conference and Approval of

3   Discovery Plan, referenced above.  Because AWB was not able to schedule that motion for a

4   hearing until September, and because Plaintiffs continue to make discovery demands that AWB

5   believes are unreasonable and have threatened a motion to compel, AWB filed this motion in an

6   effort to accelerate the timetable for obtaining the Court's assistance, at least as to ESI discovery.

7   **MEMORANDUM OF AUTHORITIES**

8   The decision to grant a protective order and control discovery is committed to the Court's

9   discretion.  *See Shields v. Morgan Financial, Inc.*, 130 Wn. App. 750, 759, 125 P.3d 164 (2005).

10  Upon good cause shown, the Court "may make any order which justice requires to protect a

11  party or person from annoyance, embarrassment, oppression, or undue burden or expense," such

12  as an order that "discovery may be had only by a method of discovery other than that selected by

13  the party seeking discovery."  CR 26(c)(3).  In addition, the Court must limit discovery if it

14  determines that "the discovery is unduly burdensome or expensive, taking into account the needs

15  of the case, the amount in controversy, limitations on the parties' resources, and the importance

16  of the issues at stake in the litigation."  CR 26(b)(1)(C).

17  In weighing the factors under CR 26(b), courts regularly consider the costs to defendant

18  in searching for and producing ESI.  Where the burden and expense of proposed discovery

19  outweighs its likely benefit, courts deny sweeping ESI discovery.  *See, e.g., Rodriguez-Torres v.*

20  *Gov't Dev. Bank of Puerto Rico*, 265 F.R.D 40, (2010) (finding that, in employment

21  discrimination case, "$35,000 is too high of a cost for the production of the requested ESI in this

22  type of action"); *Madere v. Compass Bank*, 2011 WL 5155643, * (W.D. Tex. Oct. 28, 2011) (in

23  employment discrimination and retaliation case where the amount in controversy was less than

24  $270,000, "even if the actual cost of restoring [email] backup tapes was only a fraction of that

25  amount, it would still outweigh the amount [plaintiff] seeks to recover").

26

### A. Selective Use of Keyword Searches Is a Well-Established and Reasonable Approach to Dealing with Large Amounts of ESI

AWB's motion for a protective order is unsurprising, given the crushing volume of ESI that Plaintiffs are demanding in this case. Various recent studies estimate that a persons of varying experience can review anywhere from 31.5 to 100 documents per hour, and it could take between 300 and 952 hours, ranging in cost from $60,000 to $190,000, for a party to review the nearly 30,000 emails and/or attachments that Plaintiffs contend is the "minimum." *See generally* Nicholas M. Pace & Laura Zakaras, *Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery* 46 (2012). AWB's counsel estimates that the firm's associates and paralegals reasonably could be expected to review approximately 50 documents per hour. (Barrett Decl. ¶ 12, Ex. 11.) At a blended rate of $222, the cost to AWB of reviewing 30,000 emails likely would exceed $133,200. (*Id.*)

To manage the situation, AWB is proposing a reasoned approach that uses keyword searches and that limits the total amount of ESI review absent a showing of good cause. The selective use of keyword searches to deal with large amounts of ESI is "a widely accepted practice, as recognized by the courts." The Sedona Conference, *The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery*, 15 The Sedona Conf. J. 217, 231 (2014).[3] To find a precedent, this Court need look no further than its federal counterpart in the Western District of Washington, which has posted a Model Agreement regarding ESI Discovery that has been continually revised and updated since 2012. In that Model Agreement, the court encourages cooperation in identifying appropriate keyword terms to be used in searching "[t]he five custodians most likely to have discoverable ESI," and, in the absence of such cooperation, imposes strict limitations on the requesting party's ability to

---

[3] The Sedona Conference is a recognized authority on e-discovery matters. Many courts, including the Washington Supreme Court, have relied upon the principles set out in The Sedona Conference materials as guidance in dealing with e-discovery disputes. *See, e.g., O'Neill v. The City of Shoreline*, 170 Wn. 2d 138, 145-46, 240 P.3d 1149 (2010).

second-guess the terms unilaterally selected by the producing party. *See* Model Agreement ¶¶ B(1); E(2)(b) & (c) (absent agreement on terms, "a requesting party is entitled to no more than 5 additional terms or queries . . . absent a showing of good cause[,] and "each search term or query returning more than 250 megabytes of data are presumed to be overbroad.").[4]

The Washington federal court's approach to ESI discovery is hardly unique. Courts across the country routinely have approved and even required keyword searches as a reasonable method of limiting ESI discovery. *See, e.g., Heller v. Cepia L.L.C.*, 2012 U.S. Dist. LEXIS 6452, *8 (N.D. Cal. Jan. 20, 2012) (rejecting plaintiff's position that "he cannot gamble on search terms because potentially relevant documents may be missed," and ordering parties to meet and confer to craft list of appropriate keywords to search defendant's ESI) (citing *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 134-36 (S.D.N.Y. 2009)); *In re CV Therapeutics, Inc.*, 2006 WL 2458720, *2 (N.D. Cal. Aug. 22, 2006) (endorsing search terms as reasonable means of narrowing production); *J.C. Associates v. Fidelity & Guaranty Ins. Co.*, 2006 WL 1445173 (D.D.C. May 25, 2006) (requiring search of files using four specified keywords); *FTC v. Ameridebt, Inc.*, 2006 WL 618563 (N.D. Cal. Mar. 13, 2006) ("email could likely be screened efficiently through the use of electronic search terms that the parties agree upon"); *Windy City Innovations, LLC v. America Online, Inc*., 2006 WL 2224057 (N.D. Ill. July 31, 2006) ("[k]eyword searching permits a party to search a document for a specific word more efficiently"); *Medtronic Sofamor Danek Inc. v. Michelson*, 229 F.R.D. 550, 559-61 (W.D. Tenn. 2003) (ordering searches using keyword searches); *Alexander v. FBI*, 194 F.R.D. 316, 326-28 (D.D.C. 2000) (limiting scope of plaintiffs' proposed keywords to be used to search email).

/ /

/ /

---

[4] *See also, e.g., City of Seattle v. Professional Basketball Club, LLC*, 2008 WL 539809 (W.D. Wash. Feb. 25, 2008) (ordering production of emails using agreed search terms); *Woodburn Const. Co. v. Encon Pacific, LLC*, 2007 WL 1287845 (W.D. Wash. Apr. 30, 2007) (enforcing ESI discovery protocol that used agreed-upon search terms).

The following are three illustrative examples:

- *Thompson v. C&H Sugar Co., Inc.*, 2014 WL 595911 (N.D. Cal. Feb. 14, 2014). The plaintiffs refused to narrow 200 terms that they wanted the defendants to use in searching the ESI of multiple custodians.  The court observed that "[t]hese types of decisions about minute discovery details are typically negotiated by the parties, who are better equipped with knowledge of the needs of their case to make these choices," and ordered the parties "to further meet and confer in an effort to jointly negotiate a list of terms and custodians to be used in searching Defendants' electronic documents."  (*Id.* at *5-6.)  If the defendants did not agree with the plaintiffs' proposed terms and custodians, the court ordered defendants to "propose their own set of terms and custodians" and expected the parties to "work together from there."  (*Id.* at *6.)

- *Viteri-Butler v. University of California*, 2014 WL 60106 (N.D. Cal. Jan. 7, 2014).  The defendant offered to search 20,000 electronic documents using its own combined search terms.  The court agreed that a search was necessary to "narrow the volume of the documents obtained," but found it "unacceptable" for the defendant to conduct a search without obtaining a list of search terms from the plaintiff.  (*Id.* at *5.)  As here, the plaintiff had refused to provide the defendant with such a list, but the court disagreed that the defendant could use that as an excuse to conduct a search on its own terms and ordered the plaintiff to provide the defendant with a list of "no more than 20 individual strings of combined search terms."  (*Id.*)

- *Fleming v. Cobra Electronics Corp.*, 2012 WL 10243649 (D. Idaho Nov. 9, 2012).  The court approved an "E-Discovery Order" similar to AWB's proposed Discovery Plan requiring, among other things, that each party "limit its email production requests to a total of five custodians per producing party" absent leave from the court; that the parties cooperate in identifying search terms that were "narrowly tailored to particular issues"; and shifting the costs of discovery beyond the limits of the Order to the requesting party.  (*Id.* at *2-3.)

/ /

/ /

### B. Requiring AWB to Turn Over Entire Mailboxes of Email to Plaintiffs for Wholesale Review Is Neither Reasonable Nor Justified

Plaintiffs have refused to confer with AWB on a list of ESI search terms, custodians, or data limitations, because they assert that the Bank's attorneys do not need to review the ESI first (or at all) and further assert that the Stipulated Protective Order provides adequate protection for any sensitive, irrelevant information. (*See* 5/28/15 Blankenship email, Barrett Decl., Ex. 12.) Accordingly, Plaintiffs are demanding that AWB "simply produce the emails . . . and mark them confidential under the protective order" and allow Plaintiffs to take responsibility for "redact[ing] any bank customer information" that might be revealed. (*Id.*) Plaintiffs' position is unsupported and contrary to legal authority.

***First***, AWB cannot be forced to turn over tens of thousands of pages of irrelevant or privileged information, simply because Plaintiffs elected to cast the widest possible net. If that were not the rule, there would be no basis to object to requests as overly broad. Indeed, "[t]hat [a party] has no right to discover irrelevant or privileged documents seems self-evident." *In re Biomet M2a Magnum Hip Implant Products Liability Litig.*, 2013 WL 6405156, *1 (N.D. Ind. Aug. 21, 2013). *See also Kay Beer Distrib., Inc. v. Energy Brands, Inc.*, 2009 WL 1649592, *4 (E.D. Wis. Jun. 10, 2009) (court refused to order defendant to turn over five DVDs so that plaintiff could conduct its own search, because "[defendant] has no obligation to turn over to an opposing party in a lawsuit non-discoverable and privileged information").

***Second***, as an employer and regulated financial institution, AWB has obligations of confidentiality to its employees and banking customers. For example, the Gramm-Leach-Bliley Act ("GLBA") requires AWB to maintain the confidentiality of its customers' "personally identifiable financial information," which includes "any information" that a customer provides to the Bank. 12 CFR § 332.3(o). *See also* 15 U.S.C. § 6801 ("[E]ach financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information."). Here, the Plaintiffs all worked within the Residential Lending Team, and their communications with Sims

and Sorsabal naturally would include a large amount of irrelevant, confidential correspondence regarding the Bank's lending customers.

**Third**, even a comprehensive protective order does not relieve AWB from its duty to review for privilege. Should the Bank accidentally make production of a privileged document, it would have the burden of establishing that reasonable steps were taken to prevent the document's disclosure. AWB cannot rely merely on the existence of a protective order. *See Sitterson v. Evergreen School Dist. No. 114*, 147 Wn. App. 576, 583-584, 196 P.3d 735 (2008) (adopting "balanced" approach to analysis of inadvertent waiver of attorney-client privilege and holding that, where counsel offered no evidence of precautionary measures, production of privileged documents in response to discovery requests constituted waiver). *See also Williams v. District of Columbia*, 806 F. Supp. 2d 44, 50 (D.D.C. 2011) (denying producing party's motion to exclude inadvertently produced privileged document, finding that party was unable to explain: "how much time it allocated to the review of documents, the nature of the reviewer's experience, the extent of the alleged supervision of an attorney, whether it conducted multiple rounds of review, and how it segregated privileged documents from non-privileged documents").

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

| DEFENDANT'S MOTION FOR PROTECTIVE ORDER - 10 (CASE NO. 15-2-01976-7 SEA) | OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. The KOIN Tower 222 SW Columbia Street, Suite 1500 \| Portland, OR 97201 Phone: 503.552.2140 \| Fax: 503.224.4518 |
| --- | --- |

**CONCLUSION**

Based on the foregoing, AWB requests the Court require Plaintiffs to either confer and reach agreement with AWB on custodians and a list of keywords that AWB will use in searching ESI for relevant, responsive documents, as proposed in AWB's Discovery Plan; or allow AWB to use its own list of keywords based on Plaintiffs' allegations without Plaintiffs' input or second-guessing by Plaintiffs. As to either approach, AWB requests the Court limit AWB's ESI review to a maximum of 5 GB of data and require Plaintiffs to bear the costs of any additional ESI review, absent a showing of good cause.

Dated: June 12, 2015.        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:        /s/James M. Barrett
           James M. Barrett, WSBA No. 41137
           james.barrett@ogletreedeakins.com
           Elizabeth A. Falcone, OSB No. 111694
             *Admitted Pro Hac Vice*
           elizabeth.falcone@ogletreedeakins.com
           Daniel L. Boyer, WSBA 48221
           daniel.boyer@ogletreedeakins.com
             Of Attorneys for Defendant

DEFENDANT'S MOTION FOR
PROTECTIVE ORDER - 11
(CASE NO. 15-2-01976-7 SEA)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503.552.2140 | Fax: 503.224.4518

| | | |
|---|---|---|
| [Party Name], | ) | Case No. |
| | ) | |
| Plaintiff, | ) | **[MODEL] AGREEMENT** |
| | ) | **REGARDING DISCOVERY OF** |
| v. | ) | **ELECTRONICALLY STORED** |
| | ) | **INFORMATION AND** |
| [Party Name], | ) | **[PROPOSED] ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

*[The italicized portions below set forth guidance and instruction to the parties in formulating their agreement but may be deleted from the text of the final agreement as adopted.]*

The parties hereby stipulate to the following provisions regarding the discovery of electronically stored information ("ESI") in this matter:

## A. General Principles

1. An attorney's zealous representation of a client is not compromised by conducting discovery in a cooperative manner. The failure of counsel or the parties to litigation to cooperate in facilitating and reasonably limiting discovery requests and responses raises litigation costs and contributes to the risk of sanctions.

2. The proportionality standard set forth in Fed. R. Civ. P. 26(b)(2)(C) must be applied in each case when formulating a discovery plan. To further the application of the proportionality standard in discovery, requests for production of ESI and related responses should be reasonably targeted, clear, and as specific as possible.

## B. ESI Disclosures

Within 30 days after the Rule 26(f) conference, or at a later time if agreed to by the parties, each party shall disclose:

1. <u>Custodians.</u> The five custodians most likely to have discoverable ESI in their possession, custody or control. The custodians shall be identified by name, title, connection to the instant litigation, and the type of the information under his/her control.

2. <u>Non-custodial Data Sources.</u> A list of non-custodial data sources (e.g. shared

drives, servers, etc.), if any, likely to contain discoverable ESI.

3. <u>Third-Party Data Sources.</u> A list of third-party data sources, if any, likely to contain discoverable ESI (e.g. third-party email and/or mobile device providers, "cloud" storage, etc.) and, for each such source, the extent to which a party is (or is not) able to preserve information stored in the third-party data source.

4. <u>Inaccessible Data.</u> A list of data sources, if any, likely to contain discoverable ESI (by type, date, custodian, electronic system or other criteria sufficient to specifically identify the data source) that a party asserts is not reasonably accessible under Fed. R. Civ. P. 26(b)(2)(C)(i). [*Section (C)(3)(a)(i) below sets forth data sources and ESI which are not required to be preserved by the parties. Those data sources and ESI do not need to be included on this list.*]

## C. Preservation of ESI

The parties acknowledge that they have a common law obligation to take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. With respect to preservation of ESI, the parties agree as follows:

1. Absent a showing of good cause by the requesting party, the parties shall not be required to modify the procedures used by them in the ordinary course of business to back-up and archive data; provided, however, that the parties shall preserve all discoverable ESI in their possession, custody or control.

2. All parties shall supplement their disclosures in accordance with Rule 26(e) with discoverable ESI responsive to a particular discovery request or mandatory disclosure where that data is created after a disclosure or response is made (unless excluded under (C)(3) or (D)(1)-(2) below).

3. Absent a showing of good cause by the requesting party, the following categories of ESI need not be preserved:

    a. Deleted, slack, fragmented, or other data only accessible by forensics.

    b. Random access memory (RAM), temporary files, or other ephemeral data

that are difficult to preserve without disabling the operating system.

    c.    On-line access data such as temporary internet files, history, cache, cookies, and the like.

    d.    Data in metadata fields that are frequently updated automatically, such as last-opened dates (see also Section (E)(5)).

    e.    Back-up data that are substantially duplicative of data that are more accessible elsewhere.

    f.    Server, system or network logs.

    g.    Data remaining from systems no longer in use that is unintelligible on the systems in use.

    h.    Electronic data (e.g. email, calendars, contact data, and notes) sent to or from mobile devices (e.g., iPhone, iPad, Android, and Blackberry devices), *provided* that a copy of all such electronic data is routinely saved elsewhere (such as on a server, laptop, desktop computer, or "cloud" storage).

[*The parties should confer regarding any other categories of ESI that may not need to be preserved, such as text messages and social media data, in light of the General Principles set forth above, and determine whether they can agree that such categories can be added to the non-preservation list above.*]

## D.    Privilege

[*The parties should confer regarding the nature and scope of privilege logs for the case, including whether categories of information may be excluded from any logging requirements and whether alternatives to document-by-document logs can be exchanged.*]

    1.    With respect to privileged or work-product information generated after the filing of the complaint, parties are not required to include any such information in privilege logs.

    2.    Activities undertaken in compliance with the duty to preserve information are protected from disclosure and discovery under Fed. R. Civ. P. 26(b)(3)(A) and (B).

    3.    Information produced in discovery that is protected as privileged or work product shall be immediately returned to the producing party, and its production shall not constitute a waiver of such protection, if: (i) such information appears on its face to have been inadvertently produced or (ii) the producing party provides notice within 15 days of discovery by the

producing party of the inadvertent production.

**E.      ESI Discovery Procedures**

1.      <u>On-site inspection of electronic media.</u> Such an inspection shall not be permitted absent a demonstration by the requesting party of specific need and good cause or by agreement of the parties.

2.      <u>Search methodology.</u> [*The Court presumes that in the majority of cases, the use of search terms will be reasonably necessary to locate or filter ESI likely to contain discoverable information.*] The parties shall timely attempt to reach agreement on appropriate search terms, or an appropriate computer- or technology-aided methodology, before any such effort is undertaken. The parties shall continue to cooperate in revising the appropriateness of the search terms or computer- or technology-aided methodology.

In the absence of agreement on appropriate search terms, or an appropriate computer- or technology-aided methodology, the following procedures shall apply:

a.      A producing party shall disclose the search terms or queries, if any, and methodology that it proposes to use to locate ESI likely to contain discoverable information. The parties shall meet and confer to attempt to reach an agreement on the producing party's search terms and/or other methodology.

b.      If search terms or queries are used to locate ESI likely to contain discoverable information, a requesting party is entitled to no more than 5 additional terms or queries to be used in connection with further electronic searches absent a showing of good cause or agreement of the parties.  The 5 additional terms or queries, if any, must be provided by the requesting party within 14 days of receipt of the producing party's production.

c.      Focused terms and queries should be employed; broad terms or queries, such as product and company names, generally should be avoided.  Absent a showing of good cause, each search term or query returning more than 250 megabytes of data are presumed to be overbroad, excluding Microsoft PowerPoint files, image and audio files, and similarly large file

types.

        d.     The producing party shall search both non-custodial data sources and ESI maintained by the custodians identified above.

       3.     <u>Format.</u> The parties agree that ESI will be produced to the requesting party with searchable text, in a format to be decided between the parties. Acceptable formats include, but are not limited to, native files, multi-page TIFFs (with a companion OCR or extracted text file), single-page TIFFs (only with load files for e-discovery software that includes metadata fields identifying natural document breaks and also includes companion OCR and/or extracted text files),and searchable PDF. Unless otherwise agreed to by the parties, files that are not easily converted to image format, such as spreadsheet, database and drawing files, should be produced in native format.

       4.     <u>De-duplication.</u> The parties may de-duplicate their ESI production across custodial and non-custodial data sources after disclosure to the requesting party.

       5.     <u>Metadata fields.</u> If the requesting party seeks metadata, the parties agree that only the following metadata fields need be produced: document type; custodian and duplicate custodians; author/from; recipient/to, cc and bcc; title/subject; file name and size; original file path; date and time created, sent, modified and/or received; and hash value.

DATED:PARTY 1                 PARTY 2

By _____     By _____

**ORDER**

Based on the foregoing, IT IS SO ORDERED.

DATED:


_____

The Honorable _____
United States District Court Judge

**ADDITIONAL PROVISIONS FOR MORE COMPLEX CASES**

In addition to the provisions set forth in the Model ESI Agreement above, parties may find the following provisions appropriate and useful in addressing more complicated ESI discovery issues. The complexity of ESI discovery varies from case to case and is not necessarily tied to the number or size of the parties or the amount in controversy. The additional provisions below are intended to assist parties in anticipating and addressing early on more complicated ESI discovery issues but may not be appropriate or necessary in every case. The following provisions are intended as suggested provisions from which parties may pick and choose, taking into consideration the needs of the particular case.

1.  Search methodology.

Upon reasonable request and if appropriate for the particular case, a party shall also disclose information relating to network design, the types of databases, database dictionaries, the access control list and security access logs and rights of individuals to access the system and specific files and applications, the ESI document retention policy, organizational chart for information systems personnel, or the backup and systems recovery routines, including, but not limited to, tape rotation and destruction/overwrite policy.

2.  Format.

a.  Each document image file shall be named with a unique Bates Number (e.g. the unique Bates Number of the page of the document in question, followed by its file extension). File names should not be more than twenty characters long or contain spaces. When a text-searchable image file is produced, the producing party must preserve the integrity of the underlying ESI, i.e., the original formatting, the metadata (as noted below) and, where applicable, the revision history. The parties shall produce their information in the following format: single-page images and associated multi-page text files containing extracted text or with appropriate software load files containing all requisite information for use with the document management system (e.g., Concordance® or Summation®), as agreed to by the parties.

b.     If appropriate to the particular case, the parties shall consider whether or not the full text of each electronic document shall be extracted ("Extracted Text") and produced in a text file. If the parties so agree, the Extracted Text shall be provided in searchable ASCII text format (or Unicode text format if the text is in a foreign language) and shall be named with a unique Bates Number (e.g. the unique Bates Number of the first page of the corresponding production version of the document followed by its file extension).

c.     If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as they existed in the original document.

3.     <u>Metadata fields.</u> The parties are to confer and agree on whether metadata is to be produced or may be excluded from discovery. Metadata may not be relevant to the issues presented or, if relevant, may not be reasonably subject to discovery, or may be subject to cost-shifting, considering the cost-benefit factors set forth in Fed. R. Civ. P. 26(b)(2)(C). For example, if one party is producing only paper documents, and the other party is producing ESI, the parties should confer on whether the additional cost and burden of producing metadata by the party producing ESI is reasonable or should be shifted under the facts and circumstances of the case. If the parties agree to produce metadata, and unless otherwise agreed, each party shall produce the following metadata associated with ESI to the extent reasonably accessible: (a) the author(s) of the ESI; (b) the recipient(s) of the ESI; (c) the date the ESI was created; and (d) the source from which the ESI was produced. The "source" of ESI shall be the name of the person who was the custodian of the ESI or, if the name of a person is not available, the storage location (e.g., "Regulatory Shared Drive–Wayne, PA"). This information will be included in the "Author," "Recipient," "Date," and "Source" fields (respectively) for each document in the load file associated with the document images. Although it is presumed generally that the above list of metadata fields will be provided, the list of metadata fields is intended to be flexible and may be changed by agreement of the parties, particularly in light of advances and changes in technology, vendor and business practices.

4.      <u>Hard-Copy Documents.</u> If the parties elect to produce hard-copy documents in an electronic format, the production of hard-copy documents shall include a cross-reference file that indicates document breaks and sets forth the Custodian or Source associated with each produced document.  Hard-copy documents shall be scanned using Optical Character Recognition technology and searchable ASCII text files shall be produced (or Unicode text format if the text is in a foreign language), unless the producing party can show that the cost would outweigh the usefulness of scanning (for example, when the condition of the paper is not conducive to scanning and will not result in accurate or reasonably useable/searchable ESI). Each file shall be named with a unique Bates Number (e.g. the Unique Bates Number of the first page of the corresponding production version of the document followed by its file extension).

5.      <u>Privilege Log Based on Metadata.</u>  The parties agree that privilege logs shall be provided 30 days after the date agreed upon for final production in this matter.  The privilege log shall include a unique identification number for each document and the basis for the claim (attorney-client privileged or work-product protection).  For ESI, the privilege log may be generated using available metadata, including author/recipient or to/from/cc/bcc names; the subject matter or title and date created.  Should the available metadata provide insufficient information for the purpose of evaluation the privilege claim asserted, the producing party shall include such additional information as required by the Federal Rules of Civil Procedure.

**CERTIFICATE OF SERVICE**

I certify that on June 12, 2015, I served the foregoing DEFENDANT AMERICANWEST

BANK'S MOTION FOR PROTECTIVE ORDER on:

> Scott C.G. Blankenship
> Robin J. Shishido
> Richard E. Goldsworthy
> The Blankenship Law Firm, P.S.
> 1000 Second Avenue, Suite 3250
> Seattle, WA 98104
> sblankenship@blankenshiplawfirm.com
> rshishido@blankenshiplawfirm.com
> rgoldsworthy@blankenshiplawfirm.com
> pdecarlo@blankenshiplawfirm.com
> kdonahoe@blankenshiplawfirm.com

*Attorneys for Plaintiffs*

☒ by **electronic** means through the Court's eFiling system, which will send automatic notification of filing to each person listed above.

☐ by **mailing** a true and correct copy to the last known address of each person listed. It was contained in a sealed envelope, with postage paid, addressed as stated above, and deposited with the U.S. Postal Service in Portland, Oregon.

☐ by causing a true and correct copy to be **hand-delivered** to the last known address of each person listed. It was contained in a sealed envelope and addressed as stated above.

☐ by causing a true and correct copy to be delivered **via overnight courier** to the last known address of each person listed. It was contained in a sealed envelope, with courier fees paid, and addressed as stated above.

☒ by **emailing** a true and correct copy to the last known email address of each person listed.

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

By: s/James M. Barrett
    James M. Barrett, WSBA No. 41137
    james.barrett@ogletreedeakins.com
    Of Attorneys for Defendant

21462843.1

CERTIFICATE OF SERVICE - 1

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503.552.2140 | Fax: 503.224.4518

# EXHIBIT U

SUPERIOR COURT FOR THE STATE OF WASHINGTON

COUNTY OF KING

STEVEN ERICKSON, BETH THOMPSON,
DANA COPELAND, WENDY ANDERSON,
AND TRACI BIOTTI,

            Plaintiffs,

    vs.

AMERICANWEST BANK, a Washington
Corporation,

           Defendant.

Case No.: 15-2-01976-7 SEA

DEFENDANT'S RENEWED MOTION
FOR PROTECTIVE ORDER
REGARDING EMAIL
PRESERVATION PLAN

(CR 26(c)(2))

## **CERTIFICATE OF COMPLIANCE**

Counsel for Defendant AmericanWest Bank ("AWB"), the predecessor in interest to Banner Bank ("Banner"), certifies that the conferral requirements of Washington Superior Court Civil Rule ("CR") 26(i) have been met. Counsel for the Bank made a good faith effort to confer with counsel for Plaintiffs, but was unsuccessful.

## **RELIEF REQUESTED**

Banner acquired AWB by merger on October 1, 2015. Pursuant to CR 26(c)(2), AWB requests a Court order approving Banner's plan to integrate AWB's and Banner's email systems in a reasonable manner that minimizes the risk of inadvertent loss of electronically stored information ("ESI") that is relevant or potentially relevant to this litigation.

DEFENDANT'S RENEWED MOTION FOR
PROTECTIVE ORDER
(CASE NO. 15-2-01976-7 SEA) - 1

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503.552.2140 | Fax: 503.224.4518

## STATEMENT OF FACTS

Effective October 1, 2015, Banner acquired AWB by way of merger. AWB is now inactive, and Banner is the surviving entity. Swizer Decl. ¶ 2.[1]

Banner is integrating AWB's email systems so that the combined workforces use the same "bannerbank.com" email address. Until the integration is accomplished, Banner employees who formerly worked for AWB are still using email addresses using the "awbank.net" domain name. This presents a risk of confusion in the marketplace. Swizer Decl. ¶ 3. For that reason, it is essential to complete the integration.

Once completed, the integration of email systems will result in the elimination of the "awbank.net" Internet domain name and, unless certain preventative steps are taken, it will also result in the deletion of all archived emails for former AWB employees who are using an "awbank.net" email address. Swizer Decl. ¶ 4. Those archives date back to 2008. *Id*. ¶ 6.

To preserve archived emails, Banner is required to extract, convert, and import (*i.e.* "migrate") those emails from their current location to an in-house system called Symantec E-Vault. Swizer Decl. ¶ 5. The migration process is both time consuming and expensive. In an attempt to impose a reasonable limit on the number of archived emails that it would need to migrate, on October 23, 2015, AWB moved for a protective order requesting that the Court approve its plan to migrate (1) approximately 58 mailboxes of all persons who Plaintiffs had identified in their September 15, 2015 disclosure of "possible witnesses"; (2) date-limited to emails sent or received after May 1, 2011, which is earliest date any Plaintiff or alleged harasser/retaliator known to the Bank was hired.

On November 19, 2015, the Court denied AWB's Motion with leave to renew after Plaintiffs had identified employees for whom they were asking discovery and after the Bank had produced contact information and personnel files:

---

[1] The Swizer Decl. was originally filed October 23, 2015 and is attached as Exhibit 1 to Barrett Declaration filed herewith.

Defendant's Motion for Protective Order seeks the court's permission to preserve certain archived email records and then change its email system as a result of its merger with Banner Bank. The court denies the motion until there has been appropriate production of contact information and personnel files. After the completion of the procedure described below, the defendant can renew its motion.

Plaintiffs shall designate by noon on November 30, 2016, the individuals for whom they are asking production from the Defendant:

(1) Personnel files.
(2) Contact information.

For each such individual the Plaintiffs will designate the individual by name and briefly indicate what the relationship of that individual is to this case (e.g. "member of the residential lending group reporting to Sims" or "part of management groups who met frequently with Sorsabal"). Defendant will then make any objection it has to providing this information by noon on December 4, 2016, providing a short explanation of why it objects to providing any information. Defendant will produce the contact information or personnel file by noon on December 10, 2016. Plaintiffs can then file a motion to compel if they disagree with defendant's objections.

11/19/2015 Order, pp. 2-3.

In response to this Order, Plaintiffs designated 77 current and former Bank employees, which included overlapping lists of so-called "comparators," witnesses of unspecified "conduct, performance, and potential harassment, discrimination, and retaliation," and all persons who Plaintiffs had identified as having "worked in Residential Lending under Troy Sims." Barrett Decl. Ex. 2.

On December 4, 2015, the Bank agreed to provide contact information and personnel files as to some of the 77 individuals and objected as to others. Barrett Decl. Ex. 3. Relevant here, however, the Bank ensured that *everyone* listed on Plaintiffs' designation was added to the list of persons whose email archives it will migrate and preserve. Accordingly, the Bank has now identified ***117 current and former AWB employees*** that it is migrating to Symantic E-

DEFENDANT'S RENEWED MOTION FOR
PROTECTIVE ORDER
(CASE NO. 15-2-01976-7 SEA) - 3

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503.552.2140 | Fax: 503.224.4518

Vault.  Barrett Decl. ¶ 5.  A list of those 117 employees has been provided to Plaintiffs.  *Id*.  Included in the list are everyone who Plaintiffs have identified as having a connection to their cases, as follows:

- All 5 Plaintiffs;
- All 54 current and former employees who Plaintiffs identified as potential witnesses at trial;
- All 50 alleged comparators who Plaintiffs identified;
- All 29 witnesses who Plaintiffs identified as having witnessed alleged misconduct; and
- All 73 persons who Plaintiffs identified as having worked for Troy Sims in Residential Lending.

Barrett Decl. ¶ 5.

Banner is undertaking the migration of the email archives of these 117 individuals entirely at its own, significant expense, without requiring that Plaintiffs make any showing of good cause as to why that is necessary.  It has hired a third party vendor to assist in the effort, which is estimated to cost *in excess of $63,000*.  Barrett Decl. ¶ 6.  Once again, the Bank seeks this Court's approval of its preservation plan.

## STATEMENT OF ISSUES

Whether the Court should approve Banner's plan to preserve the archived emails for 117 current or former AWB employees that includes all Plaintiffs, all alleged comparators, all alleged witnesses, and all persons who Plaintiffs identified as having worked for Troy Sims in Residential Lending.

## EVIDENCE RELIED UPON

This Motion is supported by the Declaration of James M. Barrett (which includes the previously filed Declaration of Duane Swizer), and the Court file.

DEFENDANT'S RENEWED MOTION FOR
PROTECTIVE ORDER
(CASE NO. 15-2-01976-7 SEA) - 4

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone:  503.552.2140 | Fax: 503.224.4518

# AUTHORITY

The decision to grant a protective order and control discovery is committed to the Court's discretion. *See Shields v. Morgan Financial, Inc.*, 130 Wn. App. 750, 759, 125 P.3d 164 (2005). Upon good cause shown, the Court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," such as an order that "discovery may be had only by a method of discovery other than that selected by the party seeking discovery." CR 26(c)(3). In addition, the Court must limit discovery if it determines that "the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation." CR 26(b)(1)(C).

In weighing the factors under CR 26(b), courts regularly consider the costs to defendant. Where the burden and expense of proposed discovery outweighs its likely benefit, courts deny sweeping ESI discovery. *See, e.g., Rodriguez-Torres v. Gov't Dev. Bank of Puerto Rico*, 265 F.R.D 40, (2010) (finding that, in employment discrimination case, "$35,000 is too high of a cost for the production of the requested ESI in this type of action"); *Madere v. Compass Bank*, 2011 WL 5155643, * (W.D. Tex. Oct. 28, 2011) (in employment discrimination and retaliation case where the amount in controversy was less than $270,000, "even if the actual cost of restoring [email] backup tapes was only a fraction of that amount, it would still outweigh the amount [plaintiff] seeks to recover").

Here, no Plaintiff has ever specified an amount of controversy, either before or after filing this lawsuit. Barrett Decl. ¶ 7. Moreover, Plaintiffs have not made any showing that the archived emails of the vast majority of the 117 individuals that are being preserved contain any relevant data. Nevertheless, Plaintiffs refuse to agree that the Bank is doing enough based on the mere possibility that, after having litigated this case for a year, and at some indeterminate point in the future, they might learn of another name they want added to the list. Notably, however, Plaintiffs have already deposed the key witnesses in the case, and the preservation that the Bank

DEFENDANT'S RENEWED MOTION FOR
PROTECTIVE ORDER
(CASE NO. 15-2-01976-7 SEA) - 5

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503.552.2140 | Fax: 503.224.4518

is undertaking is already so sweeping, it is difficult to fathom that critical evidence would be lost. Indeed, the possibility of that happening is vanishingly small, and the Court, in weighing that reality against the needs of this case under CR 26(b)(1)(C), should not require the Bank to do anything further.

It is essential for Banner to resolve the confusion in the marketplace that is being caused by a delay in integrating AWB's emails, a delay that has been caused by Banner's caution in ensuring that no archived emails are inadvertently lost. Banner has proposed a preservation plan to preserve the archived emails in its possession of all possible witnesses that Plaintiffs have identified, regardless of any showing by Plaintiffs that the witnesses have relevant emails. This plan is estimated to impose hard costs of over $60,000 dollars and additional employee time. Banner respectfully submits that its plan goes beyond what CR 26 requires and that no more should be required. Accordingly, Banner requests a protective order to that effect.

Dated: January 22, 2016.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:      s/James M. Barrett
         James M. Barrett, WSBA No. 41137
         james.barrett@ogletreedeakins.com
         Elizabeth A. Falcone, OSB No. 111694
           *Admitted Pro Hac Vice*
         elizabeth.falcone@ogletreedeakins.com
           Of Attorneys for Defendant AmericanWest Bank

DEFENDANT'S RENEWED MOTION FOR
PROTECTIVE ORDER
(CASE NO. 15-2-01976-7 SEA) - 6

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503.552.2140 | Fax: 503.224.4518

## CERTIFICATE OF SERVICE

I certify that on January 22, 2016, I served the foregoing DEFENDANT'S RENEWED MOTION FOR PROTECTIVE ORDER REGARDING EMAIL PRESERVATION PLAN on:

> Scott C.G. Blankenship
> Robin J. Shishido
> Richard E. Goldsworthy
> The Blankenship Law Firm, P.S.
> 1000 Second Avenue, Suite 3250
> Seattle, WA 98104
> sblankenship@blankenshiplawfirm.com
> rshishido@blankenshiplawfirm.com
> rgoldsworthy@blankenshiplawfirm.com
> asmith@blankenshiplawfirm.com

*Attorneys for Plaintiffs*

☒ by **electronic** means through the Court's eFiling system, which will send automatic notification of filing to each person listed above.

☐ by **mailing** a true and correct copy to the last known address of each person listed. It was contained in a sealed envelope, with postage paid, addressed as stated above, and deposited with the U.S. Postal Service in Portland, Oregon.

☐ by causing a true and correct copy to be delivered **via overnight courier** to the last known address of each person listed. It was contained in a sealed envelope, with courier fees paid, and addressed as stated above.

☒ by **emailing** a true and correct copy to the last known email address of each person listed.

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

By: s/ James M. Barrett

James M. Barrett, WSBA No. 41137
james.barrett@ogletreedeakins.com
Of Attorneys for Defendant

23484502.1

CERTIFICATE OF SERVICE – 1
(CASE NO. 15-2-01976-7 SEA)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Tower
222 SW Columbia Street, Suite 1500 | Portland, OR 97201
Phone: 503.552.2140 | Fax: 503.224.4518

# EXHIBIT V



FILED
KING COUNTY, WASHINGTON

JUN 24 2015

SUPERIOR COURT CLERK

THE HONORABLE DOUGLASS A. NORTH
**Note on Motion Calendar: June 23, 2015**
Opposing Party

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

STEVEN ERICKSON, BETH THOMPSON, DANA COPELAND, WENDY ANDERSON, and TRACI BIOTTI,

Plaintiffs,

v.

AMERICANWEST BANK, a Washington Corporation,

Defendant.

No. 15-2-01976-7 SEA

[PROPOSED] ORDER DENYING DEFENDANT'S MOTION FOR PROTECTIVE ORDER

[PROPOSED] ORDER DENYING DEFENDANT'S MOTION FOR
PROTECTIVE ORDER
Page i

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

**THIS MATTER**, having come before the Court on Defendant's Motion for Protective Order. The Court has considered the following:

1.     Defendant's Motion for Protective Order;

2.     Declaration and Exhibits filed in support of Defendant's Motion;

3.     Plaintiffs' Opposition to Defendant's Motion for Protective Order;

4.     Declaration of Richard E. Goldsworthy in Support of Plaintiffs' Opposition to Defendant's Motion and the exhibits attached thereto;

5.     Declaration of Scott Blankenship in Support of Plaintiffs' Opposition to Defendant's Motion;

6.     Declaration of Dana Copeland;

7.     Declaration of Traci Biotti;

8.     Declaration of Beth Thompson;

9.     Defendant's Reply; *of Charles Moomaw*

10.    Declaration~~s~~ and Exhibits filed in support of Defendant's Reply, ~~if any, and;~~

11. ~~_____~~  *D.A.N.*

12. ~~_____~~

The Court has considered the briefs of the parties and has reviewed the pleadings and records on file.

## THE COURT HEREBY ORDERS:

1.     Defendant's Motion for a Protective Order is DENIED.

2.     Defendant must produce to Plaintiffs their entire Outlook accounts in native .pst format within 10 days of the entry of this Order.

3.     Defendant must produce any files or documents culled during any search of Troy Sims' and David Sorsabal's computers in native format within 10 days of the entry of this Order.

[PROPOSED] ORDER DENYING DEFENDANT'S MOTION FOR
PROTECTIVE ORDER
Page 1

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

4.    Defendant must conduct a diligent search for the electronic communications requested by Plaintiffs and produce any discoverable information it locates.

DATED this _23rd_ day of _June_, 2015.

_Douglass a. North_

THE HONORABLE DOUGLASS A. NORTH

Presented by:

THE BLANKENSHIP LAW FIRM, P.S.

By: _s/ Richard E. Goldsworthy_
Scott C. G. Blankenship, WSBA No. 21431
Robin J. Shishido, WSBA No. 45926
Richard E. Goldsworthy, WSBA No. 40684
The Blankenship Law Firm, P.S.
1000 Second Avenue, Suite 3250
Seattle, WA 98104
Telephone: (206) 343-2700
Facsimile: (206) 343-2704
Email: sblankenship@blankenshiplawfirm.com
        rshishido@blankenshiplawfirm.com
        rgoldsworthy@blankenshiplawfirm.com
Attorneys for Plaintiffs

[PROPOSED] ORDER DENYING DEFENDANT'S MOTION FOR
PROTECTIVE ORDER
Page 2

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

# EXHIBIT W

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

STEVEN ERICKSON, BETH THOMPSON, DANA COPELAND, WENDY ANDERSON, and TRACI BIOTTI,

Plaintiffs,

v.

AMERICANWEST BANK, a Washington Corporation,

Defendant.

No. 15-2-01976-7 SEA

ORDER DENYING DEFENDANT'S RENEWED MOTION FOR PROTECTIVE ORDER REGARDING EMAIL PRESERVATION PLAN

**THIS MATTER**, having come before the Court on Defendant's Renewed Motion for Protective Order Regarding Email Preservation Plan. The Court has considered the following:

1. Defendant's Renewed Motion for Protective Order Regarding Email Preservation Plan;

2. Declarations and Exhibits filed in support of Defendant's Motion;

3. Plaintiffs' Opposition to Defendant's Renewed Motion for Protective Order Regarding Email Preservation Plan;

4. Declaration of Robin J. Shishido in Support of Plaintiffs' Opposition to Defendant's Motion for Protective Order Regarding Email Preservation Plan and the exhibits attached thereto;

6. Defendant's Reply and exhibits attached thereto.

ORDER DENYING DEFENDANT'S RENEWED MOTION FOR PROTECTIVE ORDER REGARDING EMAIL PRESERVATION PLAN
Page 1

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

7.      Plaintiffs' Surreply and exhibits attached thereto.

9.      _____

The Court has considered the briefs of the parties and has reviewed the pleadings and records on file.

**THE COURT HEREBY ORDERS:**

1.      Given that discovery is ongoing and additional witnesses and potentially relevant discovery may still be identified, Defendant's Renewed Motion for a Protective Order Regarding Email Preservation Plan is DENIED.

2.      _____

3.      _____

ORDERED this ___19___ day of ___Feb.___, 2016.

_____

THE HONORABLE BARBARA MACK

Presented by:
THE BLANKENSHIP LAW FIRM, P.S.


By: _s/ Scott C. G. Blankenship_
Scott C. G. Blankenship, WSBA No. 21431
Robin J. Shishido, WSBA No. 45926
Richard E. Goldsworthy, WSBA No. 40684
The Blankenship Law Firm, P.S.
1000 Second Avenue, Suite 3250
Seattle, WA 98104
Telephone: (206) 343-2700
Facsimile: (206) 343-2704
Email: sblankenship@blankenshiplawfirm.com
        rshishido@blankenshiplawfirm.com
        rgoldsworthy@blankenshiplawfirm.com
Attorneys for Plaintiffs

ORDER DENYING DEFENDANT'S RENEWED MOTION FOR
PROTECTIVE ORDER REGARDING EMAIL PRESERVATION
PLAN
Page 2

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

# EXHIBIT X

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| STEVEN ERICKSON, BETH THOMPSON, DANA COPELAND, WENDY ANDERSON, and TRACI BIOTTI, | No. 15-2-01976-7 SEA |
| Plaintiffs, | DECLARATION OF ALLISON GOODMAN |
| v. | |
| AMERICANWEST BANK, a Washington Corporation, | |
| Defendant. | |

Allison Goodman, being over the age of 18 years and competent to testify to the matters stated herein, states and declares as follows:

1.     I am the President of eDiscovery Inc., a consulting firm that provides electronic discovery and computer forensic services to law firms and corporate counsel nationwide. I am a Certified Computer Examiner and have testified numerous times in both state and federal court.  I have the requisite knowledge, experience and training to analyze and inform the court on issues related to the preservation and migration of email data.  A copy of my curriculum vitae is attached as Exhibit A.

2.     I have reviewed Defendants' Renewed Motion for Protective Order re Email Preservation, Declaration of James M. Barrett in Support of Defendant's Renewed

DECLARATION OF ALLISON GOODMAN
Page 1

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

Motion for Protective Order, Declaration of Duane Swizer and a series of emails between counsel for the parties dated January 22, 2016.

3. Mr. Swizer, the Senior Vice-President of IT Client Services for Banner Bank identified 150 AWB employee mailboxes in his October 23, 2015 declaration that are hosted by Google Apps, Mr. Swizer states that "the extraction, conversion and importation of the mailboxes of 150 AWB employees is expected to take as many as 90 days or more, using two dedicated Banner IT employees". Swizer Dec. ¶5.

4. **Preservation and Conversion are Different.** Mr. Swizer states in his October declaration, that in order to preserve the AWB email, "Banner will be required to extract, convert, and import those emails from their current location in AWB's Google Apps account to an in-house system called Symantec E-Vault".

5. But Mr. Swizer is wrong. It is not necessary to convert the mailboxes from Google Apps to Symantec E-Vault in order to **preserve** the data. For purposes of this litigation, it would not be necessary to load AWB email into Symantec E-Vault at all. The only reason it would be necessary to convert the AWB email and load it into Symantec E-Vault is if Banner Bank wanted to have access to the email for its ongoing business purposes.

6. At this point, all that is necessary is to have the AWB email **preserved.** There is no need to load the mailboxes into Symantec E-Vault and no need to index and search the additional AWB custodians' mailboxes unless their data becomes relevant.

7. **Many Easy Options to Preserve Google Apps Email.** In their motion, Defendants have lumped together the task of preserving the email along with making the email ready to search and produce. But plaintiffs are only asking that the email be preserved and simply preserving the email would be fairly easy. There are a variety of methods that can be used to preserve the AWB email currently within Google Apps and

DECLARATION OF ALLISON GOODMAN
Page 2

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

none of them would take anything close to 6 – 8 hours per mailbox as stated in paragraph 5 of Mr. Swizer's declaration.

8.  **Individual Downloads**. Google Apps has an easy option to download data from each user's mailbox. Attached as Exhibit B are the instructions provided by Google on how to download a user's data. There are only 4 steps and each of these steps takes only seconds. I use Google Apps as well and just timed how long it took to create a download of my email account which was 38 seconds. And I hadn't done it in a while so it took a few seconds to identify the correct links to click. Of course, I was already logged into the email account which would likely be the most time consuming part of the project. But even assuming that took 2 minutes, we are still considerably less than 6 – 8 hours per mailbox.

9.  Clearly Mr. Swizer's time estimate included "converting" the AWB mailboxes that were downloaded from Google Apps into a format that could be used by Symantec E-Vault. But again, this is not necessary nor is it being requested by plaintiffs. The default format for Google Apps email is known as MBOX which is a very generic type of email that can be easily read by a variety of programs. This is in stark contrast to Microsoft's Outlook program which uses a PST or OST file format which can only be read by Outlook or other specific programs designed to open these files.

10. It is likely that Mr. Swizer was including time in his estimate to convert the Google Apps MBOX format to an Outlook PST file format. Again, there would be no need to undertake this conversion process unless the data was ultimately deemed necessary, but putting that aside, it would also be fairly easy to download all of the AWB email into a PST file format directly through Outlook by simply putting the user name and password for the mailbox into Outlook and Outlook would automatically start downloading the email. As a matter of fact, it is likely that this process has already been done.

DECLARATION OF ALLISON GOODMAN
Page 3

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

11.     **Outlook Email Client.**  It is my understanding that AWB employees' used Outlook as their email client.  What that means is that Google Apps was functioning as the email server (sending and receiving the email) and Outlook was the program the employees used to read and compose their email.  In this type of situation, Outlook would have created either a PST or an OST file[1] directly on the hard drive of the computer used by the AWB employee.  Assuming AWB has not wiped the hard drives of the former employees, any employee that was using Outlook would have a copy of their email on their computer's hard drive.

12.     There has been no mention as to what has happened to the computers from the former employees, but simply putting the hard drives on a shelf could also preserve their email.  If Banner Bank did not want to preserve the entire hard drive for some reason, the OST and PST files on the hard drives could be copied onto a separate hard drive for preservation purposes.

13.     **Google Apps Migration Tool**.  In addition to downloading each mailbox individually using either Google Apps (with the MBOX format) or Outlook (as a PST or OST file), Google Apps also offers the option to migrate data for an entire organization using the Migration option within the Google Apps Control Panel.  This process anticipates that the domain would be changing after the migration process and creates a standard Gmail address for each user that contains a code to authorize the migration.  This process is designed for exactly the type of situation that defendants have described and yet there is no evidence this option has been explored.

14.     **Google Vault**.  Google Vault is similar to Symantec E-Vault and allows for a number of user's mailboxes to be downloaded at the same time.  Google Vault is available on all Google Apps Enterprise accounts which cost $10 per month per user.  If

---

[1] Whether it was a PST or an OST file would depend on the version of Outlook that was installed on the computer.

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

AWB is using Google Apps for Work (which does not have Google Vault and is $5 per month per user) a 30-day free trial to use Google Vault is available. See attached Exhibit C. This means Banner Bank on behalf of AWB could sign up for the 30 day free trial and use Google Vault to export the former employees' mailboxes.

15.     Any user mailbox can be preserved in its entirety directly through Google Vault which would eliminate the need to log into each mailbox separately. It is even possible to download more than one mailbox at the same time. This means that it would take even less than the roughly 2 ½ minutes I previously estimated for preserving each mailbox individually.

16.     **Mailboxes can be Saved on Any Hard Drive.** The MBOX format that is the default for downloading Google Apps email is simply a folder that contains all of the email and attachments. Outlook PST and OST files are single files that contain all of the email and attachments within the single file. Regardless of whether the email has been saved in MBOX, PST or OST file format, it does not need to be stored in any particular location in order to be preserved. The mailboxes could be stored on a standard file share server, in a cloud location or on a USB drive (with an appropriate backup of course). None of these options would be overly burdensome or expensive. The data does not need to be loaded into Symantec E-Vault for preservation purposes.

17.     **Symantec E-Vault is not an eDiscovery Program**. As I've said, there is no point in loading any of the additional email into Symantec E-Vault unless or until the custodians' data becomes relevant. But even after that point, I question whether Defendants would use Symantec E-Vault to review and produce the data. Defendants have stated that they have hired a third party vendor to help them with this process. Most vendors have access to programs that are considerably more robust in their searching options than Symantec E-Vault and that also offer review and tagging options. It seems highly likely that defendants and their counsel will want to review any email

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

before it is produced so they will need to use something other than Symantec E-Vault for that functionality.

18.     **Summary**.  Defendants have a number of options available to preserve AWB email, none of which are onerous.

> a.  Preserve the entire hard drives from the computers used by the employees which will already contain the email in a PST or OST file format[2].
>
> b.   Copy the PST or OST files from the employee's hard drives to another location.
>
> c.  Download each mailbox in an MBOX format using Google Apps.
>
> d.  Download each mailbox using Outlook into a PST or OST format.
>
> e.  Use Google Apps migration tool; or
>
> f.  Use Google Vault and download multiple mailboxes at the same time.

19.     Plaintiffs' request that defendants preserve their business data is standard and reasonable.  Plaintiffs are not asking defendants to create bit-stream images of every hard drive or to stop their backup tape rotation or anything along those lines.  If that were the case, those requests would be onerous and unreasonable.

20.     Defendants' motion for a protective order requests relief from costs that are far beyond preservation.  Defendants are assuming all of the data that is preserved also needs to be ready to search and produce and that is not the case.  Plaintiffs are simply requesting that data within defendants' custody and control not be destroyed, while defendants are seeking a data destruction free pass.

21.     I have been advising counsel and their clients on the standards and reasonableness of data preservation for over 12 years.  Some of my clients primarily

---

[2] For those employees that were using Outlook as their email client.

DECLARATION OF ALLISON GOODMAN
Page 6

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

represent plaintiffs but even more primarily represent defendants. Given what I know at this time, I would never recommend to defendants that they allow this data to be destroyed. What if another former AWB employee decides to file a lawsuit and its mailbox has been destroyed? It has been my experience that data within an employees' mailbox is often as beneficial to the employer as to the former employee and there have been numerous times I have been asked to recover deleted mailboxes for corporations for that very reason.

22. However, this is ultimately a business decision by the defendant and if it decides that it does not want to preserve its data, it does so at its own risk.

I certify or declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

SWORN TO this 1st day of February, 2016 at Bellevue, Washington.

_____
Allison Goodman

DECLARATION OF ALLISON GOODMAN
Page 7

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700



**Allison Goodman**
President

eDiscovery Inc.
12828 Northup Way, Ste 120
Bellevue, WA 98005-1932

425-373-3349

agoodman@ediscoveryinc.com

# Allison Goodman, CCE

Allison Goodman is the President of eDiscovery Inc., a consulting firm established in 2006 to provide electronic discovery and computer forensic services to law-firms and corporate counsel nationwide.

Prior to founding eDiscovery Inc. Ms. Goodman was an electronic discovery and computer forensics consultant at Computer Forensics Inc. and Navigant Consulting, Inc.

Ms. Goodman is a Certified Computer Examiner with more than 20 years experience in managing electronic discovery issues and over ten years as a computer forensic examiner. She has been trained or has experience with all major electronic discovery and computer forensic programs such as EnCase, Forensics Tool Kit, X-ways, IEF, Intella, Cellebrite, Summation and Concordance. Ms. Goodman has provided expert testimony in numerous cases involving electronic discovery and computer forensics.

## Selection of Relevant Experience

» *Computer Forensic Projects* –Imaged and examined thousands of hard drives to ascertain computer activity (copying files, inappropriate Internet activity by employees, use of certain programs, etc.).

» *Spoliation*– Identify activity that may have resulted in the destruction of electronic data and attempt to determine parameters under which such activity occurred.

» *eDiscovery Consultation* – Assist governmental agencies, corporations and law firms to properly identify and preserve potentially responsive data in a defensible and cost effective manner.

» *Expert Testimony* – Provides expert testimony to authenticate data, provide results of computer exam or verify ediscovery process in court, at deposition or through declaration.

## Lectures, Courses, and Presentations

» *Metadata and Beyond* - Washington State Bar Association – November 2015

» *Cyber Scary* – Junior League of Seattle – April 2015

» *Review of Forensic Tools* - Computer Technology Investigators Network – March 2015

» *It's all About the Phone* – Women in eDiscovery – January 2015

» *Cloud, Computers and Devices* – King County Bar Association – December 2014

» *Cell Phone Forensics* – Washington Defense Trial Lawyers – December 2014

» *Mac Forensics 101* – Computer Technology Investigators Network – March 2014

» *The Where, What and Why of ESI* - Washington State Bar Association – October 2013

» *Electronic Discovery and the Law* - Washington State Bar Association – June 2013

» *eDiscovery for Fun and Profit -  Talking IT, King County Bar Association* – December 2011

» *Managing Client Expectations in Computer Forensics and eDiscovery – CTIN* – October 2011

» *Strategies for Location and Collecting Electronic Data,* Institute for Paralegal Education – March 2011

» *Keeping up with eDiscovery,* National Institute of Business – November 2010

» *eDiscovery Certification Program,* University of Washington, Guest Speaker – April, 2010

» *Women in eDiscovery,* Collection Options – March, 2009

» *National Institute of Business Seminar,* Keeping up with eDiscovery – November 2008

» *Litigation Technology Conference*, Washington State Paralegals Association – February 2007

» *Computer Forensics Certification Program,* University of Washington, Guest Speaker – October 2006 and October 2005.

» *Electronic Discovery Training,* Washington State Attorney General's Office, Lacey, WA – Sept 2005.

» *Computer Forensics,* ARMA, Fort Worth Chapter, Fort Worth, TX - May 2005.

» *Current Issues in E-Discovery,* Washington State Paralegal Association (WSPA), - February 2005.

» *Superior Legal Document Drafting Techniques,* National Business Institute, Seattle, WA - Nov 2004.

» *Relevant Case Law for the Non-Lawyer,* LawNet, Web Seminar - October 2004.

» *Sarbanes Oxley Experience,* Association for Information and Image Management (AIIM) and Association of Records Managers and Administrators (ARMA), Seattle, WA - October 2004.

» *The Artful Use of E-Discovery and Litigation Specialists,* Litigation Information Management, Inc. and Computer Forensics Inc., Portland, OR - September 2004.

» *Advanced Civil Discovery for the Litigation Paralegal in Washington,* Institute for Paralegal Education, NBI, Seattle, WA - October 2000.

» *Civil Procedure – Managing Documents,* University of Washington School of Law, Arthur J. Lachman, Adjunct Professor, Seattle, WA - January 1999.

## Publications

» *Identification, Collection and Preservation of ESI,* Keeping up with eDiscovery, NBI – 2009

» *Native File Review – Low Cost Options*, WSPA 3rd Annual Litigation Technology Conference - 2007

» *Advanced Civil Discovery*, Institute for Paralegal Education, NBI - 2000.

*Discovery Techniques,* Institute for Paralegal Education, NBI – 1998.

## Education, Certifications and Board Positions

Computer Technology Investigators Network, Board Member 2013

University of Washington, Computer Forensics Certificate Program Board Member, October 2008-2011

University of Washington, Electronic Discovery Certificate Program Board Member, August 2008-2012

Certified Computer Examiner (CCE), International Society of Forensic Computer Examiners

A+ Certification Program, Bellevue Community College

Network+ Certification Program, Bellevue Community College

X-Ways Certification Training Program

SQL Database Programming

Access Data Boot Camp (Forensic Tool Kit)


## TESTIMONY


## Declarations
.
» *Selland v. Selland Auto Transport, et al., King County Superior No.15-2-11994-0 SEA, January 2016*

» *In Re Steel – King County Superior Court No. 15-2-23349-1SEA, November 2015*

» *Washington Capital v Bravern Businesses, King County Superior No. 14-2-29631-2 SEA, Nov 2016*

» *Diagnos-Techs v. Mai, et al.- King County Superior No. 15-2-07573-0 SEA, September 2015*

» *Anel v Franciscan Medical Group, et al., King County Superior No. 14-2-10378-6 KNT, August 2015*

» *In Re Reed – King County Superior No. 14-3-04451-1 SEA – July 2015*

» *Cobain v. City of McCleary, USDC West Dist of Tacoma 3:14-CV-05218-RBL, April 2015*

» *Brovick v. Wade, King County Superior Court 14-2-13189-5, January – April, 2015*

» *Geier v. mQube, et al., USDC, West. Dist of WA at Seattle No. 13-CV-354-TSZ, November 2014*

» *Patch v. First & Goal, Inc., King County Superior Court No. 14-2-09378-1SEA, August 2014*

» *Contemporary Services Corporation v. Landmark Event Staffing, et al., USDC, Central Dist of CA No. SACV09-00681 BRO, May 2014*

» *MYCO Instrumentation Inc. v. Randy Fuller, et al., Pierce County Superior Court, March 2014*

» *Garcia v. Blackburn, Thurston County Superior Court No. 10-3-01237-1, March, 2014*

» *Austin v. Farmers Insurance Company, King County Superior No. 13-2-14398-4 SEA, January 2014*

» *US v. Mark E. Phillips, USDC, West. Dist of Seattle No 2:10-CR-00269JCC, July 2014*

» *Chism v. Tri-State Construction, et al., King County Superior 12-2-32541-3 SEA, November 2013*

» *McEuen v. Riverview, et al., USDC, Tacoma 3:12-cv-5997 RJB, November 2013*

» *Dynamo Recruiting. v. Lawlor, et al., Pierce County Superior No. 12-2-10769-1, October, 2013*

» *Cross Key Capital v. LA Structures NW, King County Superior No. 12-2-38153-4 SEA, August 2013.*

» *In Re Karen Orr, San Juan Superior Court No. 13-3-05002-6, July 2013*

» *In Re Shaun S. Duncan, King County Superior Court No. 11-3-03341-8 SEA, Nov 2012*

» *Armour v. Wilson, USDC, Seattle C12-851RAJ, August, October 2012; May 2013*

» *Osborne v. REI, et al., King County Superior Court No. 10-2-20999-9 KNT, May 2012*

» *VICI Racing v. T-Mobile, USDC, Delaware CV 10-835 January 2012*

» *Golden Bridge v. MaxVision Biosciences, King Co. Superior No. 11-2-22052-4SEA Jan 2012*

» *Volcan Group, Inc. v. T-Mobile USA, Inc., USDC, Seattle, 210:cv-00711 RSM, Sept 2011*

» *Maust Transportation v. InMotion, et al. King County Superior Court No. 11-2-3821-0 SEA, Dec 2011*

» *Julie Wright v. Southlake Clinic, et al., King County Superior Court No. 09-245500-7 KNT, Oct 2011*

» *Balevski v. Danilov, King County Superior Court No. 11-3-04915-2 SEA, Aug 2011*

» *James Bugbee v. OVD USA, King Co. Superior Court No. 11-2-03083-1 SEA. May and June, 2011*

» *West Linn Paper v. Solomon, King Co. Superior Court No. 09-2-40931-5 SEA. June 2011*

» *Tony Sterley v. MidMountain Contractors, King Co. Superior Court No. 09-2-33500-1 SEA. May 2011*
» *In Re Richardson, King County Superior Court No. 11-3-02319-6 SEA, April 2011*
» *Snoqualmie Indian Tribe v. A. Venture, Snoqualmie Tribal Court, SNO-CR-0022-2010. April 2011*
» *Lindell v. City of Mercer Island, U.S.D.C., Western Dist of WA, Case No. 08-1827 JLR. March 2011*
» *Lodis v. Corbis Holdings, Inc. et al., King Co. Superior Court No. 08-2-20301-8 SEA. February 2011*
» *Microsoft v. M. Miszewski, King Co. Superior Court No. 11-2-04589-7 SEA. February 2011*
» *Raceway Park, v. Meridian Sunrise Village, Piece Co. Superior No. 10-2-06523-2. October 2010*
» *Citizens for Sustainable Development v. DOE, King Co. Superior No. 10-2-21751-7SEA. Oct 2010*
» *Kollar v. Bank of America et al., King Co. Superior Court No. 08-2-32353-6 SEA. December 2009*
» *Le & Associates PS v. Diaz-Luong., King Co. Superior Court No. 07-2-39131-2 SEA. August 2009*
» *Eric Howk v. Gary Vasseur et al., King Co. Superior Court No. 07-2-28760-4 SEA. September 2008*
» *Warren v. Lossing, et al., King Co. Superior Court No. 07-2-22182-4 SEA. July 2008*
» *Datadot Technology USA, v. Stuart Cutler, King Co. Superior Court No. 08-2-09332-8 SEA. July 2008*
» *Gary Kuhar v. Underwritersat Lloyds of London,King Co. Superior No. 08-2-02169-6 SEA. May 2008*
» *Fluke Corporation v. Jon Morrow, King Co. Superior Court No. 08-2-08754-9 SEA. March 2008*
» *Jelena Helen Rakic v. Anne Michelle Walker, King Co. Superior No. 07-2-08976-4SEA. October 2007*
» *Contemporary Services v. Haskell, King Co. Superior court No. 06-2-32584-2 SEA. October 2007*
» *Shirk v. Fifth Third Bancorp, et al., So. District Ohio, Western Division No. 05-cv-00049. July 2007*
» *Gallagher v. Michael H. Girton, et al., King Co. Superior Court No. 06-2-20927-3 SEA. February 2007*
» *M & F Fishing v. Sea-Pac Insurance Managers,San Diego Superior No. GIC 826769. December 2006*


## Depositions

» *Chism v. Tri-State Construction, et al., King County Superior Court 12-2-32541-3 SEA, January 2014*
» *Dynamo Recruiting Inc. v. Lawlor, Pierce Cnty Sup Ct. No. 12-2-10769-1, October 2013*
» *Armour v. Wilson, USDC Seattle C12-851RAJ, May 2013*
» *In Re Hanacek, Skagit County Cause No. 10-3-00605-9, July 2012*
» *VICI Racing v. T-Mobile, USDC, Delaware CV 10-835 March 2012*
» *Golden Bridge International, Inc. v. MaxVision Biosciences, Inc., King Co. Superior Court No. 11-2-22052-4 SEA. January 2012*
» *Le & Associates PS v. Diaz-Luong et al., King Co. Superior Court No. 07-2-39131-2 SEA. August 2009.*
» *Contemporary Services Corporation v. Grant Haskell, King Co. Superior court No. 06-2-32584-2 SEA. October 2007.*


## Trial/Arbitration

» *Dynamo Recruiting Inc. v. Lawlor, Pierce Cnty Sup Ct. No. 12-2-10769-1, April 2014*
» *Hanacek v. Hanacek, Skagit County Superior Court No. 10-3-00605-9, Oct 2012*
» *Balevski v. Danilov, King County Superior Court No. 11-3-04915-2, Sept 2012*
» *Osborne v. REI, et al., King County Superior Court No. 10-2-20999-9 KNT, May 2012*
» *Lindell v. City of Mercer Island, et al., U.S.D.C., Western Dist of WA, Case No. 08-1827 JLR, March 2011*
» *Le & Associates PS v. Diaz-Luong et al., King Co. Superior Court No. 07-2-39131-2 SEA. August 2009.*
» *Private Parties - Arbitration/JAMS - 2006*



## Accounts Help

ACCOUNTS

# Download your data

You can download the data associated with your Google Account so that you can use it in another service or keep a copy for your records.

You can request this info using the "Download your Data" tool. Here's how:

## Start your download

1. Visit the Download your data page.
2. Select the Google products you'd like to include in your download and select **Next**.
3. Choose the file type that you'd like your data in and how you want to get it (either by a download link or directly into your Google Drive).
4. Select **Create archive**.

Once the archive is created, you'll get an email to let you know it's ready. Depending on the amount of information in your account, this process could take a few minutes or several hours, but most people get their link the same day they request it.

**Note**: Your content from Google Play Music isn't included when you create an archive. To download your music, use the Google Play Music Manager .

If you're missing a product that you use, let us know . There is usually a way for us to get your data to you.

## Common questions



Which format should I choose for my data?                                    ⌄

Where should I store my data?                                                 ⌄

Why was my archive broken into multiple zip files?                           ⌄

Why do my archives expire?                                                   ⌄

Why do I have to enter my password again when I try to download my archive?  ⌄

Why didn't my archive work?　　　　　　　　　　　　　　　ⱽ

How do I preserve my Gmail labels if I am exporting my mail?　　　　ⱽ

I'm a Google Apps customer. How do I export my organization's data?　　∧

See Migrate data away from Google Apps ⧉ for options on how to migrate your organization's email, calendars, documents, and sites.

Share this:　

Ashley is an Accounts expert and the author of this help page. Leave her feedback below about how to improve it.

**Was this article helpful?**

YES　　　　NO

## Managing and using Google products

Make Google my homepage

Gmail

Google Dashboard

Search History

Merging accounts

Use the Google bar

**Download your data**

Google Storage

©2016 Google - Privacy Policy - Terms of Service    English



# Migrate data away from Google Apps

If you've decided to use another solution for your organization's email, calendars, documents and sites, don't forget to migrate your data to your new solution before you delete your Google Apps account. Here are the available options for migrating your data:

Download your data                                                                               ⌄

In-app data transfer                                                                             ⌃

Here's a list a data transfer options available for Google Apps:

- **Email:** Gmail accounts offer an option to download all mail to your computer via POP or IMAP access with a local desktop client, such as Microsoft® Outlook or Mozilla Thunderbird®.

- **Contacts:** Each email account allows users to export the contacts list in a CSV or vCard format.

- **Calendar:** Google Calendar offers the ability to download an iCal file to your desktop (limited to calendars that are publicly shared), or you can download all calendar in your My Calendars list. For more details, see Export your calendar.

- **Drive:** Google Drive lets you save your documents, spreadsheets and presentations to your hard drive in various formats. For more details, see Download a file.

- **More Google applications:** You can find additional information about moving data from other Google applications in the Google Accounts Help Center.

The Google Apps Marketplace hosts partners with Google Apps expertise who can assist with migrations away from Google Apps.

Share this:   [G+]  [Twitter]  [Facebook]

**Was this article helpful?**

| YES | NO |

## Help

Compare calendar migration options

Migrate mailing lists to Google Groups

Migrate from Microsoft Exchange

Migrate data between Google Apps accounts

Options for migrating mail from Google accounts or IMAP servers

**Migrate data away from Google Apps**

Email Migration API

Migrate from a webmail host



**Join the official community for Apps administrators**

In Google for Work Connect, discuss the latest Apps updates, learn and share tips and tricks to make your work easier, be one of the first to know what is happening and engage with Googlers.

©2016 Google - Privacy Policy - Terms of Service    **English** 

# EXHIBIT Y



Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045

**Ryan Hess**
(206) 757-8141 tel
(206) 757-7141 fax

ryanhess@dwt.com

July 20, 2018

*Via Email*

Charlotte Sanders
The Blankenship Law Firm, P.S.
1000 Second Avenue, Suite 3250
Seattle, WA 98104
csanders@blankenshiplawfirm.com

**Re:**   *Bolding, et al. v. Banner Bank*

I'm writing in response to your July 16, 2018, letter and to follow up regarding our most recent discovery conference on July 13, 2018.

**A.      Timekeeping Data**

We will produce the time entry audit data for the deponents by July 27, 2018, and the time entry audit data for the remainder of the opt-ins by August 31, 2018.

Regarding timekeeping approval data, your letter misstates that Empower and UltiPro required managers to approve timecards. Instead, as we've discussed, the timecards needed to be approved by someone, which could be either a manager or a payroll/HR employee. You letter also states that we discussed that the UltiPro reports show "null" in the approval column. We instead discussed that the Ceridian reports show "null" in the approval column.

In any event, we have located reports in both Empower and UltiPro that will show timekeeping approval information. We will produce those reports for the deponents by July 27, 2018, and for the remainder of the opt-ins by August 31, 2018.

We also are continuing to determine whether Banner Bank can locate any Ceridian time entry audit or approval data.

**B.      Manager Outlook Calendars**

Your letter incorrectly states that you provided examples of shared Outlook appointments between MLOs and manager, including between Michael Manfredi and manager Matt Towery. During the call, you had declined to provide examples even though I stated those examples would be very helpful in assessing plaintiffs' requests.

Based on the additional information provided in your letter, we are willing to search for and collect Outlook calendars for the opt-ins' managers, and produce entries from those

| Anchorage | New York | Seattle |
| Bellevue | Portland | Shanghai |
| Los Angeles | San Francisco | Washington, D.C. |

4826-9452-2989v.1 0058243-000340

www.dwt.com

calendars to the extent the calendar appointments show the MLO opt-in as an invitee, inviter, or attendee.   Please let us know if this proposal is acceptable to plaintiffs.

### C.      BannerTime Training Materials

On July 18, 2018, we produced the BannerTime/Empower training materials.

### D.      Outlook Information and Timekeeping Information for MLO Declarants

Banner is willing to produce Outlook calendars and timekeeping data for Banner's declarants who testified about their work as MLOs.  We will produce the timekeeping information by August 3, 2018, and the Outlook calendars by August 17, 2018.

I do not understand your demand to produce the information by July 25th.  Particularly given the voluminous other ESI that plaintiffs have requested—including all emails to or from 33 different opt-ins and timekeeping metadata—the production schedule above is reasonable.  If there are case deadlines implicated by this production schedule, please let us know what they are and we can discuss them.  You also mention that plaintiffs served the discovery requests 30 days ago, but Banner served timely objections and responses to these discovery requests and we did not meet and confer about those discovery request until last Friday,and that conference allowed us to reach a compromise on plaintiffs' requests.  It is not reasonable to expect immediate production of voluminous ESI immediately after the parties reach a compromise on the scope of production.

### E.      Overtime Pay Data

Banner will produce the overtime pay data summarized in Kristina Boettcher-Milleville's declaration in support of Banner Bank's Opposition to Plaintiffs' Motion for Class Certification.  As requested, Banner will produce this data without redaction of individual MLO names.  We will produce this data by July 30, 2018.

Here again, I do not understand plaintiffs' demand to produce the information by July 25th, and given all of the other pending ESI and other discovery requests in the case, the July 30, 2018, production deadline is reasonable.

### F.      Plaintiffs' and Opt-ins' Outlook Calendars and Emails

I disagree with your representations in this section of your letter.  For example, I did not agree that Banner failed to preserve emails for all former employees except those who left their Banner employment after opting in.  In addition, your statement that we have not produced any opt-in emails or Outlook calendars is incorrect.  We have produced emails from the Erickson litigation, and earlier this week, we produced Ricky Clark's Outlook calendar.  As we previously

have stated, Banner is committed to producing any emails and Outlook calendars to the extent they are available, including by searching backup tapes.

We discussed that plaintiffs sought additional information regarding Banner's ESI preservation efforts, and I stated that internal preservation efforts are privileged. We will review the case you sent with you letter and report back by July 27th regarding whether Banner will stand on its objection.

We are working diligently to produce the plaintiffs' and opt-ins' Outlook calendars and emails. However, the process is taking longer than expected. We now plan to produce available Outlook calendars and emails for the deponents along with our planned production of the other opt-ins' available materials on August 10, 2018.

Very truly yours,

Davis Wright Tremaine LLP

*s/ Ryan Hess*

Ryan Hess

Enclosures

cc:     Ken Payson
        Sheehan Sullivan
        Laura-Lee Williams

# EXHIBIT Z - Filed Under Seal

# EXHIBIT AA

| | |
|---|---|
| **From:** | Childs, Stephanie <StephanieChilds@dwt.com> |
| **Sent:** | Wednesday, July 18, 2018 4:01 PM |
| **To:** | Erica Brunette; Nathan Durham; Rick Goldsworthy; Charlotte Sanders; Scott Blankenship |
| **Cc:** | Payson, Kenneth; Hess, Ryan; Williams, Laura-Lee; Sullivan, Sheehan |
| **Subject:** | Bolding v. Banner Bank:  BB005689-5740 |
| **Attachments:** | BB005689-5740.zip |

Good Afternoon Counsel,

Attached please find BannerTime Reference Guides, bates stamped as BB005689-5740.

Regards,
Stephanie

**Stephanie Childs** | Davis Wright Tremaine LLP
Paralegal
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8446 | Fax: (206) 757-7700
Email: stephaniechilds@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

# EXHIBIT BB

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| STEVEN ERICKSON, BETH THOMPSON, DANA COPELAND, WENDY ANDERSON, and TRACI BIOTTI,<br><br>        Plaintiffs,<br><br>    v.<br><br>AMERICANWEST BANK, a Washington Corporation,<br><br>        Defendant. | No. 15-2-01976 SEA<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER<br><br>**ORAL ARGUMENT REQUESTED** |

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

# I.  RELIEF REQUESTED

Plaintiffs Steven Erickson, Dana Copeland, Beth Thompson, Wendy Anderson and Traci Biotti (Plaintiffs) respectfully request that this Court deny Defendant's Motion for a Protective Order and grant Plaintiffs access to critical emails, messages, and other electronic documents in Defendant's possession. Plaintiffs have narrowly requested that Defendant AmericanWest Bank ("AWB") produce Plaintiffs' own work communications and Outlook calendars, essential discovery that Plaintiffs must be allowed to review. Defendant, has already collected data relating to sexually offensive communications and images from one of the primary harasser in this case, but has not produced it. It cannot hide behind search terms that would prevent Plaintiffs from discovering key information, including sexually offensive emails and other messages containing sexual innuendo that cannot be located through a limited use of search terms. As such, Plaintiffs request an order denying Defendant's motion and requiring it to produce all Plaintiffs' work email and Outlook accounts, to perform a diligent search for requested information, and to produce any discoverable information it locates or has already identified.

# II.  STATEMENT OF FACTS

## A.  Plaintiffs Received Sexually Offensive Innuendo Including Sexually-Charged Emails, Messages, Photographs and Other Communications

Defendant AWB subjected Plaintiffs to severe and pervasive sexual harassment, gender discrimination and retaliation during their employment. In addition to other forms of sexual harassment, throughout their employment Plaintiffs often received sexually offensive and harassing emails, pictures, text messages and instant messages (IMs) from their supervisors, Senior Vice President (SVP) Troy Sims and Secondary Markets Manager (SMM) David Sorsabal, mostly in the form of innuendo. *Goldsworthy Declaration, Exh. A*. When Plaintiffs complained about the sexual harassment and discrimination, they were retaliated against and were ultimately unlawfully terminated.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR PROTECTIVE ORDER Page 1

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

Sexually harassing innuendo sent by SVP Sims and SMM Sorsabal included, for example: when Plaintiff Thompson asked SMM Sorsabal for loan pricing exception over email, Mr. Sorsabal would write back something she cannot recall verbatim like, "You owe me big. I'll take what I can get," which in context related to sex. *Thompson Declaration.*

SVP Sims also disguised many sexually-charged comments to and about Plaintiffs in innuendo (as well as retaliatory threats). At an interview, SVP Sims commented about a candidate's body and while leering at her buttocks said words like, "I want to get to know that." *Exh. A.* Similarly, while attending a work presentation, Sims sent Plaintiff Copeland an email on his company laptop about a woman saying (not verbatim), "I would do that, wouldn't you?" *Copeland Declaration.* Innuendo, sexual and retaliatory, was sent to Plaintiffs via email and Plaintiffs have asked to examine those emails. These subtle but offensive electronic messages were persistent throughout Plaintiffs' employment. This e-discovery must be reviewed, which requires production of Plaintiffs' emails and Outlook calendars to refresh their recollections and to get time, places and context for harassing, discriminatory, and retaliatory events. Such comments are virtually impossible to locate with search terms.

**B.    Defendant Has Already Located Hundreds of Sexual Messages and Pictures But Seeks to Limit Plaintiffs' Access to Electronic Information**

On June 9, 2015, three days before Defendant filed this motion, Plaintiffs learned that Defendant had fired SMM Sorsabal after discovering hundreds of sexually offensive messages and images sent from his company computer. *Copeland Decl.* On approximately March 13, 2015, Defendant began searching his and SVP Sims's work computers in response to this lawsuit. *Id.* During his exit interview, SVP Sims informed Sorsabal that Defendant fired him due to Defendant finding "hundreds" of sexually inappropriate messages and pictures pulled from his computer. *Id.* Sims said that Defendant had a file of these electronic documents. *Id.* SVP Sims said that many of the messages were not explicitly sexual but were mostly sexual innuendo. *Id.*

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

Defendant filed this motion to hide this highly relevant electronic evidence. Soon after beginning its search of Sorsabal's and Sims's computers and discovering "hundreds" of sexually harassing emails and pictures, Defendant began a campaign to limit Plaintiffs' access to this critical evidence:

- On or about **March 13, 2015**, Defendant searched SMM Sorsabal's and SVP Sims' company computers because of this lawsuit; the search yielded hundreds of emails and pictures with inappropriate sexual content from Sorsabal's computer. *Copeland Decl.*

- On **March 20, 2015**, Defendant emailed Plaintiffs its Proposed Discovery Plan attempting to limit basic e-discovery by insisting that Plaintiffs substantially adopt an opt-in federal discovery protocol.

- On **April 15, 2015**, after delays and an extension, Defendant finally answered Plaintiffs' discovery.[1] For each of Plaintiffs' requests that required production of emails, Defendant withheld emails they had already secured (like Sorsabal's) and lodged the following boilerplate objection:

  ***As to reasonably accessible ESI****, Defendant agrees to confer in good faith with Plaintiff's counsel to define custodians and search terms from which to search for non-privileged, responsive documents, consistent with the stated limitations placed on its response to this request and the Proposed Discovery Plan. Goldsworthy Decl., Exh. B.*

- On **May 6, 2015**, Defendant moved to approve a discovery plan that would limit electronic discovery through search terms.

- On **June 3, 2015** Plaintiffs' counsel sent an email asking Defendant to confirm whether it had done any searches of email and, if so, whether those searches yielded any discoverable information that was being withheld. *Goldsworthy Decl., Exh C.*

---

[1] Through discovery, Plaintiffs requested documents relating to sexually harassing and offensive communications by Defendant's employees, including SVP Sims and Manager Sorsabal (including but not limited to emails, IMs, text messages and other electronic communications). *Exh. B.* In response to this request and essentially all others that could require production of email, Defendant divided its answers into non-ESI, which it partially produced, and ESI, which it refused to produce without conferring on search terms. *Id.* Thus, Defendant delayed production of almost all responsive email.

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

- On **June 9, 2015**, Defendant terminated Manager Sorsabal after finding emails, images and other electronic information from his computer and it had gathered in a file. *Copeland Decl.*

- On **June 11, 2015**, defense counsel represented that Defendant had "produced what our diligent search and reasonable inquiry yielded, after discussion with relevant custodians."

- On **June 12, 2015**, three days after firing Sorsabal, knowing that he could now talk to anyone, Defendant filed a motion for a protective order seeking to restrict electronic discovery to search terms, despite telling Sorsabal there was actually a file containing hundreds of sexually offensive electronic messages and photographs.

At no point did Defendant produce or even inform Plaintiff that it had located these highly relevant documents on Sorsabal's computer. Indeed, as of June 19, 2015 *Defendant has still not produced any of the sexual messages or pictures it discovered on Sorsabal's computer* despite claiming as recently as June 11, 2015 that it had "produced what our diligent search and reasonable inquiry yielded, after discussion with relevant custodians." *Goldsworthy Decl. Exh. D.*

**C.     Defendant Prematurely Files This Motion After Refusing Plaintiffs' Reasonable Proposal to Produce Plaintiffs' Email Pursuant to the Parties' Protective Order**

Prior to learning that Defendant had located hundreds of sexually offensive electronic documents on SMM Sorsabal's computer, Plaintiffs had attempted to work cooperatively with Defendant on issues related to the discovery of Plaintiffs' accounts and Outlook calendars, suggesting that Defendant at least initially produce emails sent between the Plaintiffs and the two primary harassers in this case, SMM Sorsabal and SVP Sims. *Exh. B.* Defendant refused to produce them, incredbily claiming that the volume of these emails (a little less than 6,000 emails and attachments per Plaintiff) was too burdensome to review and produce and demanded Plaintiffs agree to search terms. *Id.* Defendant claimed that it needed an attorney to review each email and attachment and came up with its own estimate on the cost and burden of such an exercise. Defendant also claimed that it needed to review and redact information

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

under the Gramm-Leach-Bliley Act despite the fact that the parties have a Stipulated Protective Order entered in this case that protects confidential information from disclosure. *Goldsworthy Decl., Exh. F.* Plaintiffs provided Defendant with authority that the protective order in this case was more than sufficient to protect any supposed confidential information.

Plaintiffs' counsel disputed that the review would be difficult, costly or burdensome. Nevertheless, in order to alleviate any burden to Defendant, Plaintiffs' counsel also offered to assume the burden and agreed all could be made confidential under the parties' Stipulated Protective Order. Plaintiff even offered to Bates stamp and produce them back to Defendant. *Goldsworthy Decl., Exh. E.* Defendant simply refused Plaintiffs' proposal and failed to provide legal authority contradicting it.

Despite gathering hundreds of sexually offensive electronic communications and images, Defense counsel stated on June 11, 2015 that Defendant had produced all responsive emails that it had discovered. *Goldsworthy Decl., Exh. D* (confirming that Defendant was "not sitting on, for example, a folder full of Word documents or other electronic files relevant to one of the Plaintiffs' allegations of harassment that Plaintiffs do not have"). When Plaintiff requested three business days to respond and confer, Defendant refused and filed this motion.

### III.    ISSUES PRESENTED

A.    Whether this Court should deny Defendant's Motion for a Protective Order and compel production when Defendant's proposal unreasonably denies Plaintiffs access to critical evidence in this case.

### IV.    EVIDENCE RELIED UPON

Plaintiffs rely upon the Declarations of Plaintiffs Dana Copeland, Traci Biotti, Beth Thompson, Scott C.G. Blankenship, and Rick Goldsworthy, with attached exhibits.

### V.    AUTHORITY

It is well settled that discovery rules are to be given a broad and liberal construction. *McGugart v. Brumback,* 77 Wn.2d 441 (1969). Rule 26 provides that:

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. CR 26(b)(1).

This broad right to discovery is based on the general principle that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth. *See e.g. Taylor v. Cessna Aircraft Co.,* 39 Wash.App. 828, 835 (1985)("the purpose of the discovery rules is to make a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent."). The party opposing discovery is "required to carry a heavy burden of showing" why discovery should be denied. *Blankenship v. Hearst Corp.,* 519 F.2d 418, 429 (9th Cir.1975).

A.    **Defendant's Proposed Protective Order is "Blindman's Bluff" and Will Prevent Plaintiffs from Obtaining Critical Evidence of harassment and Retaliation.**

This is a sexual harassment case that includes sexually harassing emails, messages, and images that Plaintiffs were subjected to at work. All five Plaintiffs have a fundamental right to review any admissions and communications they sent or received on Defendant's maintained computers, servers, or accounts without limitation. They have a substantial need to review Outlook calendars for identifying key dates about incidents which provide valuable context to proving their case. Defendant currently enjoys full access to this information while it simultaneously attempts to limit which of these communications it will produce and has noted each of Plaintiffs' depositions. To allow Defendant to do this offends the integrity and fairness of discovery, well established principles in Washington.

Many emails indeed contain sexual innuendo that is virtually impossible to locate using search terms. Sims's and Sorsabal's sexually suggestive comments often did not contain overt language referring to "sex," obscenity, or genitalia, yet they were in context sexual and obscene. Sexually offensive innuendo is by its very nature cloaked in ordinary or allusive language. Designing search terms to find messages containing phrases like "I want to get to

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

know that," "I would do that, wouldn't you?" or "What's in it for me? I'll take what I can get," would not be located unless Plaintiffs knew the exact phrase, *verbatim*. Thus the innuendos that Defendant commonly used to sexually harass Plaintiffs and other female employees is critical discovery that likely will not be found using search terms.

Additionally, the sexual harassers sent Plaintiffs and other employees sexual pictures—large data items that will quickly reach the five gigabyte limit proposed by Defendant. Defendant can easily locate these photos (as it did with Sorsabal's computer) without search terms while search terms would not find such images.

Defendant's demand that Plaintiffs agree to use search terms and limit the volume of data most certainly would exclude highly relevant evidence of sexual harassment through innuendo and large-data photographs. Plaintiffs have substantially limited their requests at this stage of discovery by focusing on their own communications and work accounts and those of the two main harassers in this case. Search terms are unnecessary and unreasonably limit Plaintiffs' right to review information by missing critical documents. The needs of this case dictate that Plaintiffs have access to their email accounts so that they may be searched subject the protective order already in place.

**B.** **The Discovery Rules Mandate that Relevant Electronic Information, Including Plaintiffs' Work Emails and Outlook Calendars, Must be Produced in Their Entirety; Search Terms will Deny Plaintiffs Full and Fair Discovery**

Plaintiffs' email accounts and Outlook calendars are easily accessible. They contain highly relevant information, including information related to their performance and communications with the two main harassers and decision-makers in this case. Indeed, Defendant has already collected Outlook accounts of the five Plaintiffs and the two primary sexual harassers. All of it could be simply copied and delivered electronically. Indeed, Defendant has already culled and gathered "hundreds" of sexual messages and images on SMM Sorsabal's computer. *Copeland Decl.* Complete production is the only way to ensure

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR PROTECTIVE ORDER Page 7

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

that Plaintiffs have the same access to their own statements, admissions and communications as Defendant.

Defendant's claim that the burden and expense prevents full production is false. It is absurd to claim a review of a limited number of emails can cost between $60,000 to $190,000. Moreover, there is no $35,000 limit beyond which parties no longer have to search for information as Defendant falsely claims, citing to a U.S. District of Puerto Rico case. Defendant has trumped up these costs in order claim a reasonable and diligent search is prohibitively expensive. It is not. This case is not complex, and has limited players: five Plaintiffs, and two primary alleged harassers. Defendant has unfettered access to all Plaintiffs' admissions and communications and has already gathered it. It is not burdensome. Moreover, Defendant's proposed limitation on the amount of discovery Plaintiffs should be allowed to obtain is not reasonable. The discovery in this case involves 5 Plaintiffs who received sexually offensive images and other communications, all of which is relevant but may be excluded if Defendants are only required to produce 5 gigabytes of data. Moreover, Plaintiffs are willing to take on any burden of searching their own communications (although it is slight). This is production plaintiffs routinely obtain in employment cases without needing court involvement. Washington law requires that Plaintiffs have full and fair access to all of the evidence discovered and highly relevant to the issues in this case – here Plaintiffs' complete Outlook accounts.

Every email sent by the harassers to Plaintiffs has the possibility of containing evidence of sexual harassment, especially given the fact that many of the harassing communications were cloaked in sexual innuendo. Indeed, many of the harassing comments from SVP Sims and SSM Sorsabal were made in the course of business communications—for example, Mr. Sorsabal's comment in response to a loan pricing inquiry, "What's in it for me? I'll take what I can get." SMM Sorsabal and SVP Sims made such comments on a regular basis and it will be impossible to discover their full extent using search terms.

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

Moreover, the Plaintiffs need to be able to review their Outlook accounts, which contain calendars. Much of the sexual harassment and subsequent retaliation took place at work events or during specific meetings. Plaintiffs need to be able to review their calendars in order to provide, dates, time and important context to these events. Plaintiffs have already seen these documents during their employment. It is fundamentally unfair to allow only Defendant unlimited access to communications and admissions.

None of this information contains any private or privileged information that would prevent it from being produced in this case since it has already been viewed by the Plaintiffs. The Court's protective order protects any private information from public view.

1. <u>The Graham-Leach-Bliley Act specifically allows parties to obtain full discovery and does not create an undue burden for production.</u>

The Gramm-Leach-Bliley Act (GLBA) allows full discovery of bank records in civil cases when a protective order is in place. Indeed, Congress drafted and included an express exception for discovery in civil cases for the nondisclosure provision for purposes of "judicial process" (15 U.S.C. § 6802(e)(8)). This express exception is to be interpreted in its "broadest" and "plainest" sense. *Ex parte Nat'l W. Life Ins. Co.*, 899 So. 2d 218, 226 (Ala. 2004). As such, Defendant's claim the GLBA would impose a burden on Defendant to review every single page of email for nonpublic customer information prior to production is simply false.

Courts have applied this exception consistently and have not let banks use it as a shield to avoid production in civil cases. *Marks v. Global Mortgage Group, Inc.*, 218 F.R.D. 492 (2003). In *Marks*, after carefully examining the legislative history of the "judicial process" exception, the court concluded that Congress "expressly excepted from the Act's general nondisclosure framework that information requested through the judicial process of discovery" in a civil case. *Id.* The *Marks* court recognized "[T]he mere fact that a statute generally prohibits the disclosure of certain information does not give parties to a civil dispute the right to circumvent the discovery process." *Marks*, 218 F.R.D. at 496.

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

Thus, courts have routinely compelled production of nonpublic information in response to discovery requests subject to an appropriate protective order. *Id.*; *Martino v. Barnett*, 215 W.Va. 123 (2004) (same); *Ex parte Nat. W. Life Ins. Co.* (same); *Alpha Funding Group v. Cont'l Funding, LLC*, 17 Misc. 3d 959, 964 (N.Y. Sup. Ct. 2007) (citing cases that "that the GLBA should not bar a proper discovery request so long as the disclosure is made subject to an appropriate protective order"). Such an order exists in this case.

Here, some of the sexual comments were actually *about* bank customers and Defendant cannot properly bar production under the GLBA. Indeed, when Plaintiffs' counsel pointed out the express exception that allows discovery of covered information in a civil case, Defendant responded that it would respond with contrary authority and never did. *Exh. G.* Here it cites the GLBA without referencing the exception. Defendant can simply produce any documents subject to the SPO and not violate the GLBA. The Plaintiffs have already seen them and all are bound by the SPO. There is simply no basis to continue to delay production or insist on search terms. Defendant does not even need to review and redact for privilege prior to producing this highly relevant information. Plaintiffs have no opposition to returning any inadvertent production of privileged documents and will agree not to use them.

## C.     Defendant Cannot Hide Behind Search Terms, Creating a Game of "Go Fish" to Avoid Their Duty to Search for, Gather, and Produce Discoverable Information.

The burden for uncovering documents responsive to a plaintiff's discovery requests lies with the defendant, and it is well-established that a company such as AWB is required to conduct a diligent search of its own records in response to discovery requests. *Magana v. Hyundai Motor America*, 167 Wash.2d 570, 585 (2009) ("A corporation must search all of its departments . . . when a party requests information about other claims during discovery."). A defendant's duty to diligently search for documents remains in place after the advent of the paperless office, where most "documents" are stored on servers and most "communications" take place via email or other electronic messaging.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR PROTECTIVE ORDER Page 10

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

In Washington, the burden of locating and producing discovery lies with the producing party. In *Hyundai*, for example, the Washington Supreme Court found that the defendant "had the obligation not only to diligently and in good faith respond to discovery efforts, but to maintain a document retrieval system that would enable the corporation to respond to plaintiff's requests." *Id.* Plaintiffs have located as single Washington case (nor has Defendant cited one) that even suggests that the use of search terms is a reasonable substitute for a diligent search for information requested by parties in discovery. In fact, Washington authority is to the contrary. *See Hyundai*.

Defendant devotes its discussion to three inapplicable unpublished federal cases; all involve parties who agreed to search terms as the means of discovering the electronic evidence at issue and merely disputed the scope of data, devices and custodians to be searched, or the appropriate search terms. *Thompson v. C&H Sugar Co. Inc.*, 2014 WL 595911, *5 (N.D. Cal. 2014) (court decided whether the parties should narrow the terms and custodians); *Fleming v. Cobra Electronics Corp*, 2012 WL 10243649 (D. Idaho 2012) (staging and organizing discovery of ESI in patent case); *Viteri-Butler v. University of California*, 2014 WL 60106, *2, *4 (N.D. Cal. 2014) (parties identified but reached impasse on the "custodians to be searched and search terms to be used" and disagreed about devices to be searched; court ordered defendant to search beyond email server for documents that "may be stored on a number of different devices or media, including employee laptops, and defendant's shared drives"). In Washington there is simply no presumption that search terms should be used. Further, the scope of Plaintiffs' current requests for emails simply asks Defendant's to search for readily-accessible information. It is not remotely burdensome.

Defendant has falsely claimed it has no duty to perform a diligent search for responsive electronic documents as required by *Hyundai* without the use of search terms. This is simply not the law in Washington. The truth is that Defendant has already culled documents, done as a secret search of Sims' and Sorsabal's computers, but has not been

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR PROTECTIVE ORDER Page 11

**The Blankenship Law Firm, p.s.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

candid to the Plaintiffs. Defendant may not shirk its own obligation to conduct a diligent search, by shifting that burden onto Plaintiffs and then placing arbitrary parameters on the amount of data, use of search terms and custodians.

The use of search terms and limiting access to information is not appropriate where, as here, Plaintiffs are primarily seeking their own work communications during a limited time period. All five Plaintiffs witnessed the same kinds of harassing and discriminatory conduct from primarily two actors.

Their communications through Defendant's maintained email and Outlook accounts are easily accessible and will contain highly relevant information, including information relating to sexual harassment and retaliation and Plaintiffs' performance at AWB, much of which is nuanced and innuendo and cannot be located through search terms. Limiting production through search terms will inevitably exclude relevant information whereas complete production of these communications is the only way for Plaintiffs to be assured that they discover admissions, and communications containing nuanced sexual innuendo used by the harassers in this case. This is inconsistent with the broad and liberal discovery that Washington requires.

## VI. CONCLUSION

Defendant attempts to prevent Plaintiffs from reviewing their own admissions and communications by insisting on the use of search terms. Defendant has already culled and gathered electronic records in this case that has not produced, and this motion is nothing more than an attempt to avoid production of this critical information. While Plaintiffs will not address Defendant's proposal for a discovery plan, which is subject to a separate motion, Defendant's motion for protective order must be denied. Defendant must produce to Plaintiffs their entire Outlook accounts in native format and perform a diligent search for other electronic documents and produce them. Plaintiffs request oral argument if the Court is inclined to grant Defendant's motion given the importance of the issues at stake.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR PROTECTIVE ORDER Page 12

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington  98104
(206) 343-2700

DATED this 19th day of June, 2015.

THE BLANKENSHIP LAW FIRM, P.S.


By: _s/ Richard E. Goldsworthy_____
 Scott C. G. Blankenship, WSBA No. 21431
 Robin J. Shishido, WSBA No. 45926
 Richard E. Goldsworthy, WSBA No. 40684
 The Blankenship Law Firm, P.S.
 1000 Second Avenue, Suite 3250
 Seattle, WA 98104
 Telephone: (206) 343-2700
 Facsimile: (206) 343-2704
 Email: sblankenship@blankenshiplawfirm.com
     rshishido@blankenshiplawfirm.com
     rgoldsworthy@blankenshiplawfirm.com
Attorneys for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR PROTECTIVE ORDER Page 13

**THE BLANKENSHIP LAW FIRM, P.S.**
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700

# DECLARATION OF SERVICE

I hereby certify under penalty of perjury under the laws of the State of Washington that on the date listed below I caused to be served a copy of the attached document to the following person(s) in the manner indicated below at the following address(es):

James M. Barrett
Elizabeth A. Falcone
Daniel L. Boyer
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
The KOIN Center
222 SW Columbia Street, Suite 1500
Portland, OR 97201
Telephone: (503) 552-2140
Fax: (503) 224-4518
Email: james.barrett@ogletreedeakins.com
elizabeth.falcone@ogletreedeakins.com
daniel.boyer@ogletreedeakins.com
sharon.glisson@ogletreedeakins.com
rosealynn.seitz@ogletreedeakins.com
sarah.churchill@ogletreedeakins.com

☒ by Electronic Mail
☐ by Facsimile Transmission
☐ by First Class Mail
☐ by Hand Delivery
☐ by Overnight Delivery
X by Notification via E-filing System

*Attorneys for Defendant*

DATED this 19th day of June, 2015, at Seattle, Washington.

*s/ Paul DeCarlo*
PAUL DECARLO
Paralegal

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR PROTECTIVE ORDER Page 14

THE BLANKENSHIP LAW FIRM, P.S.
1000 Second Avenue, Suite 3250
Seattle, Washington 98104
(206) 343-2700